

# THE BASIC CURRICULUM

## Massachusetts Criminal Justice Training Council

# The Use of Force

# The Use of Force

▲ Due to the complexity and brevity of circumstances surrounding confrontations, especially armed confrontations, it is often extremely difficult to define and identify excessive force. However, the use or appearance of use of force *to punish* a suspect is excessive, outrages the public, undermines trust and is wrong. Punishment falls only within the domain of the courts.

▲ A police officer who is highly skilled and confident in his or her ability to select and effectively apply the proper level of force to achieve lawful ends is less likely to panic, overreact, and misuse force than an officer who is trained to a minimum standard. Therefore, the academy places a high value on training that teaches command presence, including appearance and voice, defensive tactics techniques, and use of tools such as empty hands, aerosol sprays, handcuffs, batons, and firearms.

▲ The authority to use force, including deadly force, is given to police with the consent of the people. Included in that consent is the requirement of restraint. Because of this authority, and at times mandate, to use force, police officers are subject to the highest level of public oversight and scrutiny. However, a police officer who is self-disciplined, accountable, and recognizes the need for public scrutiny can expect to be faithfully supported by the public he or she serves. Trust and support are two essential elements of the police-community partnership.

▲ At the same time and with the same fervor that the academy stresses the highest levels of officer skills and safety, the academy teaches the highest levels of restraint in the use of force. Police who act by force and violence often leave no alternatives but to reply in kind.

▲ The use-of-force continuum provides officers with options. The result of the academy training should be equal skill at all levels along the continuum from voice to firearm. The use of deadly force is always the last resort.

# LEARNING OUTCOMES

At the close of this module, the student officer should be able to:

▲ Understand the constitutional basis for police use of force.

▲ Define key use-of-force terms.

▲ Describe the use-of-force model.

▲ Relate escalation and de-escalation to the use-of-force model.

▲ Employ the use-of-force model to choose the proper level of force in a given situation.

▲ Recognize circumstances that justify nondeadly force.

▲ Identify situations that warrant deadly force.

▲ Discuss MCJTC use-of-force policy.

▲ Cite the case law relevant to police use of force.

▲ Describe how the improper use of force impacts community-policing efforts.

▲ Identify the nonlegal factors the officer should consider before using force.

▲ Define the integrity issues related to the use of force.

# CONTENT SUMMARY

This module has the following sections:

I.      Understanding the Constitutional Basis for Police Use of Force

II.     Defining Key Use-of-Force Terms

III.    Choosing the Appropriate Level of Force

IV.     Outlining the Use-of-Force Model

V.      Common Elements of Use-of-Force Policies

VI.     Identifying the Legal Standards for Police Use of Force

VII.    Exploring Special Use-of-Force Considerations

# I. UNDERSTANDING THE CONSTITUTIONAL BASIS FOR POLICE USE OF FORCE

A. Two national documents, the Declaration of Independence and the U.S. Constitution, justify the existence, authority, and duty of the police.

B. The Declaration of Independence states the philosophy of legitimate government:

    1. All people are created equal.

    2. All people have inalienable rights, including:

        a) Life

        b) Liberty

        c) Pursuit of happiness

    3. Governments are established by the governed, for the governed, to secure the inalienable rights for all citizens.

        a) Legitimate government derives its power from the governed.

        b) Legitimate government respects the governed.

C. Communities establish governments to uphold the philosophy the Declaration of Independence shares with the U.S. Constitution.

    1. The U.S. Constitution, which is the "law of the land," was written to:

        a) Establish justice

        b) Ensure domestic tranquility

        c) Provide for the common defense

        d) Promote the general welfare

    2. The first ten amendments to the U.S. Constitution, known as the Bill of Rights, guarantee all citizens the inalienable rights outlined in the Declaration of Independence *(see Subsection B2 preceding)*.

THE BASIC CURRICULUM

a)   Under the Fourth Amendment to the U.S. Constitution, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated . . ."

   (1)   The Fourth Amendment provides that:

      (a)   An officer may proceed with a search or seizure only with probable cause (the suspect must pose an immediate threat of serious bodily harm *[see Subsection IIK following]* to the officer or others) *(see the Constitutional Law module).*

      (b)   When the suspect does not pose an immediate threat of serious bodily harm to the officer or others (no probable cause), the harm that *may* result from failing to apprehend that suspect does not justify the officer using deadly force.

b)   The Eighth Amendment to the Constitution was adopted to:

   (1)   Protect citizens from "cruel and unusual punishment"; and

   (2)   Prevent authorities from assessing excessive bail and excessive fines.

c)   The Fourteenth Amendment, while not part of the Bill of Rights, states that constitutional rights apply to all citizens, regardless of state law or procedure.

   (1)   Like the Fifth and Sixth Amendments, the Fourteenth Amendment guarantees all citizens due process of law.

      (a)   *Due process* is the course of legal proceedings according to the rules and forms established to protect individual rights.

         i)   Due process includes elements like a(n):

            •   Impartial jury;

            •   Accusation in proper form;

            •   Notice and opportunity to defend;

- • Trial according to established procedure; and

- • Discharge from restraints or obligations unless convicted.

    (b)    The Fifth Amendment states the due-process clause, "No person shall be . . . deprived of life, liberty, or property, without due process of law," explicitly, but the due-process guarantee underlies all the first ten amendments (the Bill of Rights).

    (c)    Due process requires authorities to recognize individual rights when criminal defendants facing state or federal prosecution are processed.

(2)    The Fourteenth Amendment is of special importance to due process because it binds due process on states, which means states must respect the due-process rights of citizens who come under their jurisdictions.

(3)    The Fourteenth Amendment applied to the use-of-force issue addresses the relationship between the:

    (a)    Need for and the amount of force;

    (b)    Extent of the resulting injury; and

    (c)    Manner in which the force was applied (e.g., maliciously, sadistically, or judiciously).

D.    In the United States, the police and the community have entered into a social contract to preserve and protect the legitimate-government philosophy the Declaration of Independence and the U.S. Constitution share *(see the Integrity module)*.

1.    In the police-community social contract, the community has entrusted police officers to serve as government agents who ensure all citizens enjoy their constitutional rights.

2.    In exchange for bearing the community's trust, officers have been given the right to use deadly force *(see Subsection IID following)* to provide for citizens' safety and security.

**THE BASIC CURRICULUM**

    3.    Community members part with some individual liberty under this social contract and agree to obey the police as long as the police respect their inalienable rights under the Declaration of Independence.

E.    Police officers pledge to serve lawfully as government agents.

    1.    In accepting the duty to serve their government and their country, police officers assume the serious responsibility of exercising the use-of-force privilege honorably (Charles & Connor, 1996).

    2.    Officers must be committed to the philosophy of legitimate government to use force reasonably and thereby fulfill their obligations to all members of their communities.

    3.    Officers are *never* authorized to break the law to provide for citizens' safety and security.

## II.  DEFINING KEY USE-OF-FORCE TERMS

A.    *Force* is an influence that causes motion or action; compulsion; strength directed toward an end.

B.    The *use of force* is conduct that invades another's interests or personality; unless privileged is assault *(see Subsection L following)*, battery *(see Subsection M following),* or false imprisonment.

C.    *Nondeadly force* is that degree of force which is neither likely nor intended to cause serious physical harm or death; includes the use of physical strength and skill, approved nonlethal chemical substances (e.g., oleoresin capsicum [OC] spray; *see the Oleoresin Capsicum [OC] Spray segment of the Defensive Tactics module*), and the authorized baton *(see the Baton Techniques segment of the Defensive Tactics module)*.

D.    *Deadly force* is force used to cause, or to create substantial risk of causing, death or serious bodily harm; any firearm discharge toward a person.

E.    *Less-than-deadly force* is force used to cause, or to create substantial risk of causing, bodily harm that may result in death.

F.    *Lethal force* is force used to cause, or to create substantial risk of causing, death.

G.   *Excessive force* is force that does not fit the totality of circumstances *(see Subsection O following)*; force beyond that needed to resolve the situation.

H.   *Reasonable force* is force that is not excessive; appropriate for gaining compliance.

I.   *Constructive force* is any force that produces fear sufficient to suspend the power of resistance and prevent the exercise of will.

J.   *Bodily harm* is any physical impairment, pain, or illness.

K.   *Serious bodily harm* is injury that creates substantial risk of death, causes serious and permanent disfigurement, or results in the long-term loss or impairment of the functioning of any body part or organ.

L.   *Assault* is the act of intentionally showing force or threatening to show force to cause a reasonable person to fear for his or her safety; requires no contact between parties.

M.   *Battery* is any form of intentional, nonconsensual bodily contact a reasonable person would consider harmful or offensive; carrying out the threat to inflict bodily harm; the follow-up to assault *(see Subsection L preceding)*.

N.   *Self-defense* is the act of defending one's self, family, and/or property against a threat; circumstances must be such that the danger is unprovoked, a reasonable person would fear for his or her life, and the person has no escape avenue.

O.   The *totality of circumstances* is the sum of all elements in a situation; used to determine the presence or absence of excessive force *(see Subsection G preceding)*.

P.   *Probable cause* is the state when facts and circumstances warrant a person of reasonable caution to believe an offense was, will be, or is being committed; established when a suspect poses an immediate threat of serious bodily harm *(see Subsection K preceding)* to the officer or others.

Q.   The *"reasonable man" doctrine* is the principle that outlines the degree of caution every officer must observe to perform law-enforcement duties ethically and legally; that set of circumstances that would cause a reasonable person to reach the same conclusion as the actor.

# III.   CHOOSING THE APPROPRIATE LEVEL OF FORCE

A.   The officer must use force to protect him- or herself and the other members of the community.

B.   The officer uses force in varying degrees to:

   1.   Ensure subjects comply with the law

   2.   Overcome resistant subjects

C.   In all subject encounters, the officer should respond professionally and with sound judgment.

D.   The reasonable officer uses his or her perceptions of subjects' actions and other circumstances (the totality of circumstances; *see Subsection IIO preceding*) to respond with reasonable amounts or levels of force.

   1.   In addition to subject actions, the totality of circumstances includes the:

      a)   Nature of the subject's offense

      b)   Actions of third parties

      c)   Officer's physical odds

      d)   Feasibility or availability of force alternatives

E.   The officer may use whatever force is necessary and reasonable in the circumstances to protect him- or herself or others from imminent bodily harm.

F.   The officer should exhaust all minimum levels of force before resorting to more severe options, except when force is needed to prevent the officer's serious bodily harm *(see Subsection IIK preceding)* or death.

G.   The officer may never use more force than is needed to achieve a lawful purpose.

H.   The officer's justified use of force ends when the subject's resistance ends.

I.   The officer is justified using nondeadly force to:

1. Preserve the peace

2. Prevent crimes, suicide, or self-inflicted injury

3. Overcome subjects resisting arrest

4. Conduct searches and seizures

5. Prevent people in custody from escaping

6. Act in self-defense

7. Defend community members against unlawful violence to person or property

J. The officer is justified using deadly force (e.g., discharging firearms; *see Subsection IID preceding*) to prevent him- or herself or others from suffering serious bodily harm *(see Subsection IIK preceding)* or death.

# IV.   OUTLINING THE USE-OF-FORCE MODEL

A. The use-of-force model (Charles & Connor, 1996) is a flowchart of police force options that helps the officer to identify and clarify two important components of police use of force: accurate risk assessment and appropriate force response.

  1. Accurate risk assessment

    a) Risk assessment helps to establish the reasonable officer's perceptions of subject actions.

    b) The use-of-force model organizes the reasonable officer's perceptions of the subject's actions on five levels *(see Subsection B following)*.

    c) The reasonable officer's perceptions dictate his or her appropriate force responses *(see Subsection 2 following)*.

  2. Appropriate force response

    a) As it does with the reasonable officer's perceptions, the use-of-force model organizes the reasonable officer's responses to the subject's perceived actions on five levels *(see Subsection B following)*.

**THE BASIC CURRICULUM**

    b)    The use-of-force model links each level of the reasonable officer's perceptions to a level of reasonable officer responses.

B.    Organization of the use-of-force model

    1.    Level 1 of the use-of-force model

        a)    Reasonable officer's perception of the subject

            (1)    Compliant

        b)    Reasonable officer's response to the subject

            (1)    Cooperative controls

                (a)    Verbal communication

                    i)    Verbal communication skills are some of the most important skills the officer can master *(see the One-on-One Communication module).*

                    ii)    Crisis intervention and conflict resolution techniques complement verbal communication *(see the Crisis Intervention and Conflict Resolution module).*

                    iii)    Strong communication skills are essential to community policing.

                (b)    Officer presence

    2.    Level 2 of the use-of-force model

        a)    Reasonable officer's perception of the subject

            (1)    Resistant (passively)

        b)    Reasonable officer's response to the subject

            (1)    Contact controls

                (a)    Touch techniques

      i)     The officer must be confident to attempt and execute these low-level, empty-hand control techniques.

- Confidence comes from proper training.

   (b)    Escort position

      i)     The officer uses the escort position to guide, support, or direct a subject into proper position *(see the Handcuffing and Searching Techniques segment of the Defensive Tactics module)*.

3.    Level 3 of the use-of-force model

   a)    Reasonable officer's perception of the subject

      (1)    Resistant (actively)

         (a)    The officer can place a subject on this level without touching him or her.

         (b)    The subject may use physical or mechanical means to actively resist the officer.

   b)    Reasonable officer's response to the subject

      (1)    Compliance techniques

         (a)    Oleoresin capsicum (OC) spray *(see the Oleoresin Capsicum [OC] segment of the Defensive Tactics module)*

            i)     Many departments allow their officers to use OC spray *(see the Oleoresin Capsicum [OC] segment of the Defensive Tactics module)* before executing hands-on techniques.

         (b)    Controlling and restraining techniques *(see the Controlling and Restraining Techniques segment of the Defensive Tactics module)*

      i)     The officer may need to use controlling and restraining techniques *(see the Controlling and Restraining Techniques segment of the Defensive Tactics module)* after using OC spray *(see the Oleoresin Capsicum [OC] segment of the Defensive Tactics module)* on a subject.

      ii)    The officer should use controlling and restraining techniques *(see the Controlling and Restraining Techniques segment of the Defensive Tactics module)* should OC spray *(see the Oleoresin Capsicum [OC] segment of the Defensive Tactics module)* fail to control a subject.

4.     Level 4 of the use-of-force model

   a)    Reasonable officer's perception of the subject

      (1)    Assaultive (threatens bodily harm; *see Subsection IIJ preceding*)

   b)    Reasonable officer's response to the subject

      (1)    Defensive tactics

         (a)    Impact techniques (intermediate and personal weapons)

            i)     The officer may use defensive tactics like empty-hand strikes, baton strikes, or other assaultive countermeasures *(see the Defensive Tactics module)* when facing an unarmed or assaultive subject.

5.     Level 5 of the use-of-force model

   a)    Reasonable officer's perception of the subject

      (1)    Assaultive (threatens to inflict serious bodily harm *[see Subsection IIJ preceding]* or to use deadly force *(see Subsection IID preceding)*

  b)  Reasonable officer's response to the subject

    (1)  Deadly force *(see Subsection IID preceding)*

      (a)  The officer should be trained and ready to use deadly force when confronted by an armed subject.

C.  The use-of-force model is a useful police tool because it:

  1.  Facilitates officer recall

  2.  Organizes the ever-expanding pool of police use-of-force techniques

  3.  Orders force options logically

  4.  Provides the officer reasonable guidelines for determining which level of force is appropriate in given circumstances (relates perceived threat to appropriate and reasonable response)

D.  The use-of-force model is designed to encourage the officer to respond with the least amount of force needed to stop the subject's resistance or to gain the subject's compliance, which means the officer may move up the model to choose a force option (escalation) or down the model to choose a force option (de-escalation).

  1.  While the officer's encounters with subjects often escalate, compelling the officer to move up the model to higher and more severe force options, the officer's encounters with subjects may stabilize (remain on the same level of the model) or de-escalate.

  2.  The officer may raise, lower, or maintain his or her response as his or her perceptions of the subject change.

E.  The use-of-force model should be paired with departmental use-of-force policy because the model is designed to help explain policy and serve in an integrated use-of-force program.

# V. COMMON ELEMENTS OF USE-OF-FORCE POLICIES

A.  The following are common elements of police departments' use-of force policies (student officers should refer to their departments' policies):

**THE BASIC CURRICULUM**

1.   The officer may use deadly force *(see Subsection IID preceding)* only to protect him- or herself or other community members from imminent death or serious bodily harm *(see Subsection IIK preceding)* and when doing so will not unreasonably endanger innocent community members.

2.   The officer may use deadly force *(see Subsection IID preceding)* in self-defense or defense of others if the four following conditions exist:

   a)   The subject has the ability (e.g., a firearm or a knife) to cause death or serious bodily harm *(see Subsection IIK preceding)*.

   b)   The subject has the opportunity to use his or her ability (e.g., a firearm or a knife) to cause death or serious bodily injury.

   c)   The subject's threat of causing death or serious bodily injury is imminent (a life is in jeopardy).

   d)   The officer has no reasonable alternative for addressing the subject.

3.   The officer may use deadly force *(see Subsection IID preceding)* to apprehend fleeing felons when:

   a)   The felons used or threatened to use deadly force *(see Subsection IID preceding)* to commit their felonies; and

   b)   Delaying the felons' apprehension would cause the imminent deaths or serious bodily injuries of the officer or other community members.

4.   The officer may shoot to stop subjects, not to kill or to wound them.

   a)   The officer who shoots (uses deadly force; *see Subsection IID preceding*) to stop subjects who are using or threatening to use (imminent) deadly force *(see Subsection IID preceding)* is justified.

      (1)   The officer stops subjects by preventing them from using or threatening to use deadly force *(see Subsection IID preceding)*.

      (2)   The officer should determine whether he or she has stopped a subject by considering all circumstances of the incidents.

(a)   For example, an officer acting in self-defense fires two shots at a male subject from 10 feet.

    i)   The officer hits the subject.

    ii)   The subject falls to the ground.

    iii)   The subject's firearm slides 15 feet from his body.

        •   The officer has stopped the subject because the subject can no longer use his firearm and therefore cannot use or threaten to use deadly force *(see Subsection IID preceding)*.

    iv)   The officer stops shooting at the subject and aids him medically.

    v)   The officer's shooting is justified.

(b)   In another example, an officer acting in self-defense fires two shots at a female subject from 25 feet.

    i)   The officer hits the subject.

    ii)   The subject falls to one knee, still holding her firearm.

        •   The officer has not stopped the subject because she retains use of her firearm and can therefore still use or threaten to use deadly force *(see Subsection IID preceding)*.

    iii)   The officer continues shooting at the subject until she can no longer use or threaten to use deadly force *(see Subsection IID preceding)*.

    iv)   The officer's shooting is justified.

   b)    The officer who shoots (uses deadly force; *see Subsection IID preceding*) to kill subjects who are using or threatening to use (imminent) deadly force *(see Subsection IID preceding)* is *not* justified.

      (1)    Again consider the officer who, acting in self-defense, fires two shots at a male subject from 10 feet.

         (a)    The officer hits the subject.

         (b)    The subject falls to the ground.

         (c)    The subject's firearm slides 15 feet from his body.

            i)    The officer has stopped the subject because the subject can no longer use his firearm and therefore cannot use or threaten to use deadly force *(see Subsection IID preceding)*.

         (d)    The officer continues shooting at the subject.

         (e)    Because the officer is shooting to kill the subject, the officer's shooting is not justified.

5.    The officer cannot control subjects' fates (life or death) after firearm discharge.

   a)    When the officer shoots at a subject, there are three outcomes:

      (1)    The officer misses the subject.

         (a)    While missing the subject is not desired, it is possible.

      (2)    The officer wounds the subject, but the subject survives.

         (a)    Many factors combine to determine whether the subject survives, including the:

            i)    Shot placement

               •    Subjects with leg wounds are more likely to survive than subjects with chest wounds.

    ii)    Subject's age

    iii)    Subject's health

    iv)    Subject's will to live

    v)    Availability of medical care

(3)    The officer kills the subject.

6.    When shooting, the officer should aim for the subject's center of mass.

a)    In firearms training *(see the Firearms module)*, a subject's *mass* is the officer's available target area (visible area).

(1)    *Mass* in this context is not the same as *body mass.*

(2)    A subject may decrease his or her mass, and thereby decrease the officer's target area, by shielding parts or all of the body (e.g., with a wall or a door).

b)    The *center of mass* is the center of the officer's available target area (center of the subject's mass).

(1)    If the subject's full body is available to the officer as a target, the center of mass is the chest area directly above the sternum or breastbone, which is in the center of the chest connecting the ribs.

    (a)    Contrary to popular belief, the center of mass is not always the chest area above the sternum because the subject's full body is not always available to the officer as a target.

(2)    If the subject's full body is not available to the officer as a target, the center of mass changes with the target area.

    (a)    For example, if the subject stands behind a waist-high wall, the subject's center of mass is above the chest (head or neck) because the officer can target only the subject's upper body.

7.    The officer is not required to count his or her shots.

8.     The officer may not discharge his or her firearm to threaten or subdue subjects who are destroying property or injuring themselves unless the subjects threaten the officer or other community members with imminent serious bodily harm *(see Subsection IIK preceding)* or death.

9.     The officer may not discharge his or her firearm at moving vehicles unless the officer or other community members are in imminent danger of serious bodily harm *(see Subsection IIK preceding)* or death.

10.    The officer may not discharge his or her firearm from a moving vehicle.

11.    When circumstances allow, the officer should issue verbal warnings before using deadly force (e.g., "Police! Don't move!").

12.    When the officer anticipates encountering hostile, armed subjects, the officer should make every effort to take cover *(see the Patrol Response Procedures)* before engaging in the situation.

13.    The officer may not fire warning shots or fire to signal for help.

14.    The officer should avoid displaying his or her firearm unnecessarily, and he or she may draw his or her firearm only to accomplish a proper police purpose, which includes:

   a)     Making an arrest *(see the Arrests and Processing Detainees module)*

   b)     Investigating circumstances that are reasonably believed may cause the officer or others serious bodily harm *(see Subsection IIK preceding)* or death

# VI.   IDENTIFYING THE LEGAL STANDARDS FOR POLICE USE OF FORCE

A.     General principles of relevant case law

   1.     Case law has been instrumental in:

      a)     Shaping use-of-force policies *(see Section V preceding)*; and

      b)     Developing agencies' use-of-force models.

2.  Over the years the courts have continued to:

    a)  Refine the definition of *force (see Subsection IIA preceding)*; and

    b)  Develop more specific guidelines for the appropriate use of force to guard against abuse and misinterpretation.

B.  Relevant case law

1.  *Commonwealth v. Klein*, 372 Mass. 823, 363 N.E. 2d 1313 (1977)

    a)  Brief background of the case

        (1)  One night, the defendant, Klein, witnessed two men breaking into the drugstore across the street from his home.

        (2)  Klein called the police, then went outside with a pistol to confront the two men.

        (3)  Klein later told officers that he had intercepted the men as they left the drugstore and had ordered them to stop or be shot.

        (4)  Klein said one suspect threw cigarettes at him and Klein fired, hitting the suspect.

        (5)  The suspects reentered the drugstore but reemerged seconds later and retreated along the building.

        (6)  Klein fired several shots at the suspects as they retreated.

    b)  Basis of the case

        (1)  In *Commonwealth v. Klein,* the Supreme Judicial Court reviewed the right of a private citizen to use deadly force to arrest a felon.

    c)  Goal of the case

        (1)  The goal of *Commonwealth v. Klein* was to determine if the private citizen was justified using deadly force to effect a citizen's arrest.

**THE BASIC CURRICULUM**

d)   Outcome of the case

(1)   The Court defined *deadly force* as force intended or likely to cause death or great bodily harm *(see Subsection IIK preceding)* and established that Klein used deadly force in confronting the two suspects.

(2)   The Court approved the finding of the jury that had indicted Klein for assault *(see Subsection IIL preceding)* and battery *(see Subsection IIM preceding)* with a dangerous weapon and found him not entitled to a self-defense claim.

(a)   The Court determined the trial judge had correctly informed the jury that the self-defense claim is valid only ". . . when the person using the weapon had a reasonable apprehension (fear) of great bodily harm and a reasonable belief that no other means would suffice to prevent such a harm."

(b)   However, because it had expanded the use-of-deadly-force rules recently, the Court reversed Klein's conviction on that count.

(3)   In response to Klein's argument that deadly force was needed to prevent the two suspects from escaping, the Court first acknowledged it had never clearly limited an arresting citizen's right to use deadly force.

(a)   In response, the Court adopted s. 3.07 of the Model Penal Code (Use of Force in Law Enforcement) of Massachusetts, which states deadly force is justifiable to prevent a subject's escape if:

i)   The arrest is for a felony; and

ii)   The citizen reasonably believes the force creates no substantial risk to innocent people; and

iii)   The citizen reasonably believes:

• The crime for which the arrest is made included the use or threatened use of deadly force; or

- There is a substantial risk the arrestee will cause death or serious bodily harm if his or her arrest is delayed.

(b)   The Court ruled that under the Model Penal Code Klein was not justified in shooting to prevent the suspects' escape because they were fleeing.

2.   *Julian v. Randazzo,* 403 N.E. 2d 931 (1980)

a)   Brief background of the case

(1)   A short time after two Medford, Massachusetts, police officers received a radio report of a holdup, they began pursuing three suspects in a high-speed car chase.

(2)   During the chase, the suspects fired several times at the officers' vehicle.

(3)   The suspects' vehicle eventually spun out and stopped, at which time the suspects fled the car on foot.

(4)   While chasing the suspects on foot, Officer Randazzo fired twice, hitting an innocent bystander, Julian, in the elbow.

(5)   The officers then mistakenly held Julian at gunpoint until a neighbor convinced them Julian was not a suspect.

(6)   Julian sued Randazzo for assault and battery and false imprisonment.

b)   Basis of the case

(1)   In *Julian v. Randazzo,* the Supreme Judicial Court reviewed an officer's right to use deadly force to effect an arrest.

c)   Goal of the case

(1)   The goal of *Julian v. Randazzo* was to determine if an officer was justified using deadly force *(see Subsection IID preceding)* to effect an arrest.

    d)      Outcome of the case

        (1)     The Court adopted for officers the standard *Commonwealth v. Klein (see Subsection 1 preceding)* set forth for civilians when it adopted s. 120.7 of the Model Penal Code.

            (a)     Section 120.7, which mirrors s. 3.07 of the Model Penal Code, states an officer may use deadly force *(see Subsection IID preceding)* to effect an arrest only if:

                i)     The arrest is for a felony *(see the Criminal Law module)*; and

                ii)     The officer reasonably believes the force creates no substantial risk to innocent people; and

                iii)     The officer reasonably believes:

                    •     The crime for which the arrest is made included the use or threatened use of deadly force *(see Subsection IID preceding)*; or

                    •     There is a substantial risk the arrestee will cause death or serious bodily harm *(see Subsection IIK preceding)* if his or her arrest is delayed.

        (2)     The Court ruled that, under the Model Penal Code, Randazzo's use of deadly force was justified.

  3.     *Tennessee v. Garner*, 471 U.S. 1 (1985)

    a)      Brief background of the case

        (1)     The Memphis, Tennessee, police shot and killed an unarmed 15-year-old who was escaping the scene of a nighttime burglary.

(2)    The shooting officer stated he was reasonably sure the suspect was unarmed and implied he shot to prevent the suspect from escaping.

(3)    At the time of the incident, Tennessee statute allowed officers to shoot to prevent suspects from fleeing when:

    (a)    The officers had probable cause *(see the Constitutional Law module)* to believe the suspects committed felonies *(see the Criminal Law module)*; and

    (b)    No alternatives for apprehending the suspects existed.

(4)    The suspect's father filed a lawsuit against the shooting officer alleging the shooting violated the Fourth Amendment to the Constitution *(see Subsection IC2a] preceding)* because it constituted an unreasonable seizure *(see the Constitutional Law module)*.

b)    Goal of the case

(1)    The goal of *Tennessee v. Garner* was to determine whether the officer's amount of force was needed given the suspect's violation.

c)    Outcome of the case

(1)    The U.S. Supreme Court confirmed that using deadly force *(see Subsection IID preceding)* to effect an arrest constitutes a seizure under the Fourth Amendment *(see Subsection IC2a] preceding)* and therefore must be reasonable to be constitutional *(see the Constitutional Law module)*.

(2)    The Court ruled the Tennessee fleeing-felon statute was unconstitutionally broad because it allowed officers to use deadly force *(see Subsection IID preceding)* against unarmed and nondangerous fleeing felons.

(3)    The *Garner* case established the constitutional standard for police use of deadly force *(see Subsection IID preceding)*, the four components of which are:

**THE BASIC CURRICULUM**

    (a)    The officer must have probable cause *(see the Constitutional Law module)* to believe the suspect committed a felony *(see the Criminal Law module)*.

    (b)    The officer must warn the suspect, if possible.

    (c)    The officer must have probable cause *(see the Constitutional Law module)* to believe the suspect threatens the officer or others with serious bodily harm *(see Subsection IIK preceding)*.

        i)    The officer may use deadly force *(see Subsection IID preceding)* only upon precluding all other force options for preventing the suspect's escape.

        ii)    If feasible, the officer must verbally warn he or she is about to shoot.

    (d)    Deadly force *(see Subsection IID preceding)* must be needed to prevent the suspect's escape.

4.    *Graham v. Connor,* 490 U.S. 386, U.S. Supreme Judicial Court (1989)

    a)    Brief background of the case

        (1)    Graham, the plaintiff, asked a friend, Berry, to drive him to a local convenience store so he could buy orange juice to counteract the early symptoms of his diabetic insulin reaction.

        (2)    Graham entered but quickly left the store because he felt it was too crowded to make his purchase.

        (3)    The defendant, Officer Connor, saw Graham's hasty exit and became suspicious.

        (4)    After Graham re-entered Berry's vehicle and Berry pulled away, Officer Connor followed the pair and pulled them over a short time later for a motor-vehicle violation.

        (5)    Officer Connor conducted an investigatory stop.

        (6)    Officer Connor ignored Berry's and Graham's attempts to

        inform him of Graham's diabetic condition and called for backup assistance.

(7)      While Officer Connor was calling for backup, Graham left Berry's vehicle, ran around the vehicle twice, and passed out briefly, falling to the ground.

(8)      The backup officers arrived, handcuffed Graham's hands tightly behind his back, and placed him face down on the hood of the police vehicle.

(9)      Like Officer Connor, the backup officers ignored Berry's attempts to disclose Graham's condition, and they prevented another of Graham's friends from giving Graham orange juice for his condition.

(10)     Four officers removed Graham from the hood of the police vehicle and threw him head first into the police vehicle.

(11)     Graham was released immediately when Officer Connor determined no illegal activity had occurred at the convenience store, but Graham had suffered a broken foot, a cut wrist, a bruised forehead, and an injured shoulder.

b)    Basis of the case

(1)      In *Graham v. Connor*, the U.S. Supreme Judicial Court reviewed the standards of an officer's conduct when using physical force to effect an arrest or a seizure under the Fourth Amendment to the Constitution *(see Subsection IC2a] preceding)*.

c)    Goal of the case

(1)      The goal of *Graham v. Connor* was to determine if the officer's actions were reasonable given the facts and circumstances of the incident (totality of circumstances; *see Subsection IIO preceding)*.

(2)      Specifically the Court considered:

(a)    Did the officer use good and reasonable police practices?

          (b)     Did the officer act as other "reasonable" and "prudent" officers would act if faced with the same situation (the "reasonable man" doctrine; *see Subsection IIQ preceding*)?

   d)    Key considerations of the case

      (1)    The severity of the crime

      (2)    Whether the suspect posed an immediate threat to the safety of officers or others

      (3)    Whether the suspect actively resisted arrest or tried to evade arrest by fleeing

      (4)    Whether the circumstances surrounding the use of force were tense, uncertain, and/or changing rapidly

   e)    Outcome of the case

      (1)    The Court determined that the use of force should be judged from the perspective of a reasonable officer on the scene rather than with 20/20 hindsight.

5.    *Popow v. City of Margate,* 476 F. Supp. 1237, U.S. District Court (District of New Jersey) (1987)

   a)    Brief background of the case

      (1)    One evening, a City of Margate police officer shot and killed Popow, an innocent bystander, while pursuing another man believed to be a fleeing kidnapper.

      (2)    The victim's wife filed a lawsuit against the city and the shooting officer.

   b)    Outcome of the case

      (1)    The Court determined that in civil-rights actions under s. 1983, claimants like Mrs. Popow must establish that:

          (a)    The defendant deprived another of a constitutional right *(see the Constitutional Law module)*; and

(b)   A person acting under state law deprived that right.

(2)   The Court also decided that to prove liability under 42 U.S.C. s. 1983 when the alleged constitutional deprivation is based only on the due-process clause of the Fourteenth Amendment *(see Subsection IC2a] preceding)*, claimants must show the degree of culpability (guilt) exceeded simple negligence and constituted gross negligence or recklessness.

(3)   To prove municipal liability, claimants must prove:

(a)   An official policy or custom violates constitutional rights *(see the Constitutional Law module)*; or

(b)   Officials' conduct implicitly authorized, approved, or acquiesced to (complied with) the constitutional violation.

6.   *Dean v. City of Worcester,* 924 F. 2d 364, Court of Appeals (First Circuit 1991)

a)   Brief background of the case

(1)   Acting on a tip from a reliable informant, a Massachusetts state trooper obtained an arrest warrant for a suspect who:

(a)   Had escaped a state correctional facility;

(b)   Was believed to be armed;

(c)   Had threatened to shoot any officer trying to arrest him; and

(d)   Was serving sentences for armed assault, armed robbery, and rape when he escaped.

(2)   The next day, the trooper and Worcester police officers apprehended the plaintiff, Dean, seated in a public area because:

(a)   Dean strongly resembled the suspect; and

(b)   The officers did not wish to endanger the woman

and child with whom the suspect was reportedly staying.

(3)     During Dean's apprehension, officers pushed Dean to the ground, threatened to "blow his head off" if he moved, kneed his back, kicked his feet, and handcuffed him tightly.

(4)     During the encounter, Dean insisted he was not the suspect, but officers proceeded with the arrest.

(5)     After the arrest, officers noted Dean was taller than the suspect, but they placed him in the cruiser and executed a search warrant for the apartment in which the suspect was allegedly staying.

(6)     Officers arrested the true suspect in executing the search warrant, and they released Dean upon explaining their error.

(7)     Dean, detained for roughly 30 minutes, suffered minor physical injuries like nose and scalp abrasions and welts on his back.

(8)     Two years later Dean filed suit in U.S. District Court under Title 42 U.S.C. s. 1983 alleging the officers used excessive force to effect his arrest.

(9)     When the U.S. District Court dismissed the claim, Dean appealed to the First Circuit Court of Appeals.

b)     Basis of the case

(1)     In *Dean v. City of Worcester,* the First Circuit Court of Appeals reviewed the standards of officers' conduct when using excessive force to effect an arrest or a seizure under the Fourth Amendment to the Constitution *(see Subsection IC2a] preceding).*

c)     Goal of the case

(1)     The goal of *Dean v. City of Worcester* was to determine if the officers used excessive force given the facts and circumstances of the incident (totality of circumstances; *see Subsection IIO preceding).*

(2)   Specifically the Court considered:

(a)   Did the officers lack probable cause *(see the Constitutional Law module)* to arrest the plaintiff because he was taller than the suspect?

(b)   Did the officers use excessive force to effect the plaintiff's arrest?

(c)   Did the officers act as other "reasonable" and "prudent" officers would act if faced with the same situation (the "reasonable man" doctrine; *see Subsection IIQ preceding)*?

d)   Outcome of the case

(1)   Regarding the probable-cause issue, the Court reasoned that the officers' failure to notice the height difference was not unreasonable, particularly given that:

(a)   Dean was seated when the officers first saw him.

(b)   Dean strongly resembled the suspect in ways other than height.

(c)   Dean was arrested reasonably near the apartment in which the suspect was alleged to have been staying.

(d)   The suspect had escaped a correctional institution and was believed to be armed and dangerous.

(2)   As for the excessive-force issue, the Court cited *Graham v. Connor (see Subsection 4 preceding)* in reasoning the officers had clearly established probable cause to arrest the true suspect and therefore were justified using whatever force was "objectively reasonable."

(a)   Because the officers believed they were arresting the true suspect, the Court ruled they were reasonable to:

i)   Rely on their knowledge of the suspect's threats against any arresting officer and his criminal record; and

     ii)  Assume the suspect (thought to be Dean)
        would resist arrest with deadly force *(see
        Subsection IID preceding)*.

    (b)  The Court further ruled that Dean's minor injuries
       did not support his claim that the officers used
       excessive force to effect the arrest.

   (3)  Overall, the Court found that the arresting officers used
      sound and reasonable police practices and should therefore
      not be charged with violating Dean's civil or constitutional
      rights *(see the Bias Crimes and the Constitutional Law
      modules)*.

7.  *City of Canton, Ohio, v. Harris et al.,* 489 U.S. 378, U.S. Supreme Judicial
   Court (1989)

  a)  Brief background of the case

   (1)  The plaintiff, Harris, was arrested and transported to the
      Canton, Ohio, police station.

   (2)  When officers began to remove Harris from the transport
      vehicle at the station, they noticed her sitting on the
      vehicle's floor.

   (3)  The officers asked Harris if she needed medical assistance.

   (4)  Harris's response was incoherent.

   (5)  During processing in the station, Harris twice slumped to
      the floor.

   (6)  Although officers helped Harris to sit after both incidents,
      they eventually left her seated on the floor of the station
      and never summoned medical attention for her.

   (7)  When Harris was released after about 1 hour of detention,
      her family summoned an ambulance to take her to a local
      hospital, where she was diagnosed with several emotional
      illnesses.

   (8)  Harris was released after 1 week of hospital care but
      continued to received outpatient care for another year.

(9)   Harris filed a lawsuit against the city of Canton and many city officials alleging the parties had violated her state and constitutional rights.

    (a)   Harris alleged the city was liable under 42 U.S.C. s. 1983 for violating her right under the due-process clause of the Fourteenth Amendment to receive necessary medical attention while in police custody *(see Subsection IC2c] preceding)*.

b)   Basis of the case

    (1)   In *City of Canton, Ohio, v. Harris et al.,* the U.S. Supreme Judicial Court reviewed the standards for holding municipalities liable for failing to train their employees.

c)   Goal of the case

    (1)   The goal of *City of Canton, Ohio, v. Harris et al.* was to determine whether the city of Canton's policy was directly linked to Harris's alleged constitutional deprivation.

d)   Outcome of the case

    (1)   The Court determined that, in certain circumstances, municipalities may be held liable under 42 U.S.C. s. 1983 for constitutional violations resulting from failing to train their employees, specifically:

        (a)   There are limited circumstances in which "failure to train" can be the basis for liability.

        (b)   Inadequate police training may be the basis for s. 1983 liability only when the inadequacy constitutes deliberate indifference to the constitutional rights of police constituents.

            i)   The police training must be evaluated to determine if it adequately addresses the tasks employees must perform.

                •   If the training is judged inadequate, the question is whether the training can be said to represent "city policy."

          ii)      The training inadequacy must be closely related to the ultimate injury as well as the cause of the indifference to constitutional rights.

8.    *Commonwealth v. Adams et al.,* 416 Mass. 558, Supreme Judicial Court (1993)

    a)    Brief background of the case

        (1)    Upon ingesting cocaine in his parked car one evening, the plaintiff, Smith, became concerned about arrest and drove away.

        (2)    Two officers noticed Smith pull away and followed him for a short distance.

        (3)    When Smith ran a red light, the officers began pursuing him.

        (4)    Smith actively tried to lose the officers, forcing one police vehicle off the road and nearly doing the same to another that had joined the chase.

        (5)    Smith's actions attracted the attention of two more cruisers, and two more joined the chase when Smith ran a toll plaza.

        (6)    With eight police cruisers in pursuit, Smith's car stalled.

        (7)    One officer intentionally drove his cruiser into Smith's driver's side door, then backed away.

        (8)    Eight armed officers of equal rank surrounded Smith's unlocked car.

        (9)    Smith was sitting quietly and alone in his car when one officer ordered him to exit the car.

        (10)    In response, Smith lay in the front seat.

        (11)    The ordering officer smashed Smith's driver's side window with his flashlight, and his partner did the same to the passenger's side window using his nightstick.

(12)  A third officer reached through the broken driver's side window and dragged Smith from the car.

(13)  Three officers threw Smith to the ground and, although Smith did not resist, try to flee, or resist arrest, several officers jumped on him, handcuffed him, and left him lying facedown on the pavement for 5 to 10 minutes.

(14)  An officer would place a foot on the back of Smith's head each time Smith tried to raise it from the pavement.

(15)  No officer at the scene tried to protect Smith.

(16)  Smith suffered contusions, cuts, and bruises.

(17)  Two officers took Smith to the police station where, despite his visible injuries, no one filed a report.

b)  Basis of the case

(1)  In *Commonwealth v. Adams et al.,* the Supreme Judicial Court reviewed the standards for preventing police officers from collectively violating citizens' civil rights *(see the Bias Crimes module)* by using excessive force to effect arrests.

c)  Goal of the case

(1)  The goal of *Commonwealth v. Adams et al.* was to determine whether the officers' actions were justified given the totality of circumstances *(see Subsection IIO preceding).*

d)  Outcome of the case

(1)  The Court determined that the officers allowed their emotions and personal animosities to cloud their actions, thereby causing them to use excessive force against Smith or to allow others to use excessive force against him.

(2)  The Court upheld the injunction granted the attorney general (AG) against the officers, which required the officers to refrain from collectively violating citizens' civil rights *(see the Bias Crimes module)* by using excessive

(12)   A third officer reached through the broken driver's side window and dragged Smith from the car.

(13)   Three officers threw Smith to the ground and, although Smith did not resist, try to flee, or resist arrest, several officers jumped on him, handcuffed him, and left him lying facedown on the pavement for 5 to 10 minutes.

(14)   An officer would place a foot on the back of Smith's head each time Smith tried to raise it from the pavement.

(15)   No officer at the scene tried to protect Smith.

(16)   Smith suffered contusions, cuts, and bruises.

(17)   Two officers took Smith to the police station where, despite his visible injuries, no one filed a report.

b)   Basis of the case

(1)   In *Commonwealth v. Adams et al,,* the Supreme Judicial Court reviewed the standards for preventing police officers from collectively violating citizens' civil rights *(see the Bias Crimes module)* by using excessive force to effect arrests.

c)   Goal of the case

(1)   The goal of *Commonwealth v. Adams et al.* was to determine whether the officers' actions were justified given the totality of circumstances *(see Subsection IIO preceding).*

d)   Outcome of the case

(1)   The Court determined that the officers allowed their emotions and personal animosities to cloud their actions, thereby causing them to use excessive force against Smith or to allow others to use excessive force against him.

(2)   The Court upheld the injunction granted the attorney general (AG) against the officers, which required the officers to refrain from collectively violating citizens' civil rights *(see the Bias Crimes module)* by using excessive

**THE BASIC CURRICULUM**

force, on the grounds that such an egregious violation of a citizen's civil rights was a blatant violation of MGL c. 12, ss. 11H–J.

(3)    The Court imputed guilt (laid blame) on the officers who did not touch Smith but allowed him to be assaulted because they:

    (a)    Knew the force the other officers were applying;

    (b)    Approved and allowed the other officers to use such force; and

    (c)    Showed they shared the mental state of the officers who participated actively.

(4)    The Court established a judicial lack of tolerance for officers who use excessive force out of frustration or personal animosity.

(5)    The Court ruled that an officer who fails to report to proper authorities any knowledge of visible injury resulting from arrest will be held accountable.

(6)    The Court also ruled that an officer who fails to report to proper authorities any knowledge of any officer who uses excessive force in the line of duty will be held accountable.

9.    *Terry v. Ohio*, 392 U.S., at 22–27, 20 L.Ed. 2d 889, 88 S.Ct. (1968)

    a)    Brief background of the case

        (1)    An experienced officer conducted a "pat-down" search of two men he suspected of "casing" a store (preparing to commit a robbery).

        (2)    The officer approached the two men, suspecting they were armed.

        (3)    Because the officer feared for his life, he quickly spun the two men, placed them against a wall, and patted down their clothing.

      (4)      The officer found a firearm on one of the men, Terry, who was later convicted of carrying a concealed weapon.

      (5)      Terry appealed his conviction on the grounds the officer did not have probable cause *(see the Constitutional Law module)* to arrest him and therefore should not have been allowed to use evidence obtained in the search against him.

  b)    Basis of the case

      (1)      In *Terry v. Ohio,* the U.S. Supreme Court evaluated the circumstances surrounding the officer's right to conduct an investigatory stop and frisk *(see the Constitutional Law module).*

  c)    Goal of the case

      (1)      The goal of *Terry v. Ohio* was to clarify in which circumstances the officer has the right to conduct an investigatory stop and frisk *(see the Constitutional Law module).*

  d)    Outcome of the case

      (1)      The Court determined that to conduct stop and frisks officers must:

            (a)      Have reasonable, articulable suspicions that the people they intend to stop intend to commit, are committing, or have committed illegal acts

            (b)      Be able to articulate reasonable suspicion based on their observations of the circumstances

            (c)      Ensure the stops are reasonably long to confirm or negate their suspicions

C.    Unifying principles of relevant case law

  1.    The principles of *Commonwealth v. Klein* and *Julian v. Randazzo (see Subsections B1 and B2 preceding)* govern the use of deadly force *(see Subsection IID preceding)* in Massachusetts.

2. The federal case guiding the use of deadly force, *Tennessee v. Garner (see Subsection B3 preceding)*, categorizes the use-of-deadly-force principles of the *Klein* and *Randazzo* cases *(see Subsections B1 and B2 preceding)* into two types:

    a) Self-defense, which means the person with the firearm must have a reasonable:

        (1) Fear of great bodily harm *(see Subsection IIK preceding)*; and

        (2) Belief no other means would suffice to prevent such harm.

    b) Escape prevention, which means a person may use a weapon to inflict deadly force *(see Subsection IID preceding)* to prevent another's escape if:

        (1) The arrest is for a felony *(see the Criminal Law module)*; and

        (2) The officer reasonably believes:

            (a) The force creates no substantial risk to innocent people; and

            (b) The arrestable crime involves the use or threatened use of deadly force *(see Subsection IID preceding)*; and

            (c) There is substantial risk the arrestee will cause the officer or others serious bodily harm *(see Subsection IIK preceding)* or death should the arrest be delayed.

## VII. EXPLORING SPECIAL USE-OF-FORCE CONSIDERATIONS

A. The officer who uses any level of force should complete police reports fully and properly *(see the Report Writing module)*, answering questions that include:

    1. "Why did the officer need to use force against the subject?"

2.    "What specific actions did the subject take against the officer?"

3.    "What level and type of force did the officer use?"

4.    "Where and when did the officer use the force?"

5.    "What commands did the officer issue the subject?"

6.    "What was the subject's response to the officer's commands?"

7.    "What is the nature of the injury the officer inflicted on the subject, if any?"

8.    "What are the names and addresses of other injured parties and/or witnesses?"

9.    "What actions did the officer take after stopping the force?"

B.    When considering liability in the use of deadly force *(see Subsection IID preceding)*, the officer should interpret the guidelines provided by the state and federal courts *(see Section VI preceding)* as standards rather than restrictions.

    1.    Too often, liability issues intimidate officers into nonaction, which is as troublesome as overreaction.

    2.    The officer should rely on the use-of-force model *(see Section IV preceding)* in force confrontations because it is designed to give the officer the decision-making tools he or she needs to create legally and ethically sound solutions.

C.    The officer should remember that the use of force, whether proper or improper, affects the community profoundly.

    1.    The improper use of force negatively impacts a community's quality of life.

        a)    To guard against improper force encounters and let the community know what to expect from certain police actions, particularly aggressive ones, police departments should educate their communities about the force rules officers should follow.

            (1)    Informing the community builds trust and tends to create empathy for officers when those officers must use force to protect the community.

**THE BASIC CURRICULUM**

    2.      The use of deadly force *(see Subsection IID preceding)* can powerfully and negatively impact the community.

D.      With the proper tools, the officer can manage force properly and ensure he or she chooses force options legally and according to community standards.

# References

Charles, M.T., & Connor, G. (1996). *Integrated force management: Changing the police paradigm.* University of Illinois: Police Training Institute.

Large, H., Montuori, A., & Callahan, M. (1992, December). *Use of force lesson plan.* Massachusetts Criminal Justice Training Council.

Roush, J.D. (1996, September). How the use-of-force continuum benefits both the public and the police. *The Police Chief,* 45-47.

Schmalleger, F. (1997). *Criminal justice today: An introductory text for the twenty-first century,* 4th ed. Upper Saddle River, NJ: Prentice-Hall, Inc.

Taranto, S. (1994). *Use of force training.* Waltham, MA: Waltham Police Academy.