1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2
C.A. 3:14-CV-30210-MG

3
JUSTIN DOUGLAS                                          )
                                                       )
4
                    vs.                                )
                                                       )
5
CITY OF SPRINGFIELD, DET. GREGG BIGDA,     )
DET. STEVEN KENT, DET. ROBERT PATRUNO,     )
6
DET. THOMAS KAKLEY, DET. MARK TEMPLEMAN,   )
DET. EDWARD KALISH, DET. CHRISTOPHER       )
7
BATES and MASS. STATE POLICE TROOPER       )
LIAM R. JONES,                             )

8

9
                    DEPOSITION of GREGG BIGDA, called at

10
the request of the Plaintiff, pursuant to Rule

11
30 of the Federal Rules of Civil Procedure,

12
before Linda Dunlop, Certified Shorthand

13
Reporter No. 134193 and Notary Public within and

14
for the Commonwealth of Massachusetts, at the

15
offices of Hector E. Pineiro, 807 Main Street,

16
Worcester, Massachusetts, on Monday, November

17
30, 2015, commencing at 2:28 p.m.

18

19

20

21
                    _____

22
                    **BAY STATE REPORTING AGENCY**
                    **8 VINELAND STREET**
23
                    **WORCESTER, MASSACHUSETTS 01604**
                    **(508) 753-4121**

24

1    **A P P E A R A N C E S:**

2    FOR THE PLAINTIFF:
     LAW OFFICE OF HECTOR E. PINEIRO, P.C.

3    807 Main Street
     Worcester, MA 01610

4        BY:   HECTOR E. PINEIRO, ESQ.

5

     FOR THE DEFENDANT LIAM R. JONES:

6    RAFANELLI & KITTREDGE, P.C.
     1 Keefe Road

7    Acton, MA   01720-5517
         BY:   MARGARET A. RUBINO, ESQ.

8

     FOR THE DEFENDANT CITY OF SPRINGFIELD:

9    CITY OF SPRINGFIELD
     36 COURT STREET, SUITE 210

10   SPRINGFIELD, MA 01103
         BY:   JOHN T. LIEBEL, ESQ.

11

     FOR THE DEFENDANT ROBERT PATRUNO, STEPHEN KENT:

12   REARDON, JOYCE & AKERSON, P.C.
     4 Lancaster Terrace

13   Worcester, MA 01609
         BY:   AUSTIN JOYCE, ESQ.

14

     FOR THE DEFENDANTS CHRISTOPHER BATES, MARK

15   TEMPLEMAN, THOMAS KAKLEY, EDWARD KALISH, GREGG
     BIGDA:

16   LAW OFFICE OF KEVIN B. COYLE
     1299 Page Boulevard

17   Springfield, MA 01104
         BY:   KEVIN B. COYLE, ESQ.

18

     ALSO PRESENT:   Stephen Kent

19                   Edward Kalish
                     Robert Patruno

20

21

22

23

24

1       eight feet.

2    Q.    And is it a solid wall?

3    A.    Yes.

4    Q.    Meaning you can't see to the other side even if

5          there's a wall?

6    A.    Correct.  It goes all the way to the ceiling.

7    Q.    Got it.  And so when you heard the word gun, you

8          were right next to the toilet?

9    A.    Yes.

10   Q.    And then what happened next?

11   A.    Other officers continued what they were doing

12         and I stayed in this vicinity with Mr. Douglas.

13   Q.    And you just drew an "X" there?

14   A.    Yes.

15   Q.    So Mr. Douglas was standing at this point in

16         time?

17   A.    Correct.

18   Q.    Was he compliant at this point in time?

19   A.    Yes.

20   Q.    And could you hear anything else, any

21         discussions that occurred regarding the gun?

22   A.    There was a lot of discussion going on.  I

23         stayed where I was.

24   Q.    What discussion did you hear?

```
 1    A.    I had no idea what they were saying.  I just

 2          could hear voices.

 3    Q.    Could you hear a female voice?

 4    A.    I don't recall hearing a female voice or not.

 5    Q.    Did you know there was a female on the other

 6          side?

 7    A.    I knew there were someone over there at that

 8          time.  I didn't know it was a female.

 9    Q.    So you didn't hear a female voice at this point

10          in time?

11    A.    Not to my recollection.

12    Q.    When you're standing right next to -- were you

13          holding him --

14    A.    I had a hold of his -- what would be his left

15          arm by the bicep.

16    Q.    Your hands were on his bicep?

17    A.    My right hand was on his left bicep.

18    Q.    And he had his hands cuffed?

19    A.    Yes.

20    Q.    To his back?

21    A.    Yes.

22    Q.    Wrist to wrist?

23    A.    Yes.

24    Q.    And it seemed to you he understood that he was
```

```
 1          under arrest?
 2     A.   Yes.
 3     Q.   Fair enough.  And then what happened next when
 4          you were at that "X"?
 5     A.   We were kind of milling in the general vicinity
 6          and upon his line of sight reaching where he
 7          could see his girlfriend slash wife, whatever
 8          she is, laying on the floor proned out he became
 9          belligerent and irate.
10     Q.   So where was the girl that she was laying on the
11          ground prone?
12     A.   She was over in this vicinity somewhere.
13     Q.   Could you just put the initials there SR?
14     A.   (Witness complying.)
15     Q.   So he was where this "X" is but he couldn't see
16          where she was; right?
17     A.   Originally we couldn't and, again, he's sitting
18          next to the toilet that he just finished using.
19          We moved our way down to the end of the wall
20          basically more towards the door in the general
21          vicinity of the main living area.
22     Q.   And he started leaning?
23     A.   Not at this point.  He was still compliant until
24          he saw Ms. Rawls proned out.  When we reached --
```

```
 1         when we reached the level where he could see her

 2         beyond the half wall, he became enraged.

 3   Q.    What did he say?

 4   A.    Screaming, She's got nothing to fucking do with

 5         this, get her off the fucking ground.  He called

 6         us a piece of shit.

 7   Q.    Is that in your report?

 8   A.    No.  It's not part of the crime.

 9   Q.    But it's part of what happened?

10   A.    Again, I believe in the report it's stated he

11         got belligerent.  I didn't feel the need of

12         getting in the details of his comments.

13   Q.    Is that because you didn't think it's important?

14   A.    I don't think it's important at this point in

15         time.

16   Q.    And who was next to Ms. Rawls?

17   A.    I have no idea.

18   Q.    Now, at this point when he was able to -- did he

19         walk forward or did you bring him over?

20   A.    We were --

21                    MR. JOYCE:  Objection.

22   Q.    Tell me how the two of you moved to the corner

23         of that wall?

24   A.    Walking again.  I had his left bicep with my
```

```
 1        right hand and we made our way to this way away

 2        from the toilet.

 3   Q.   But you don't know who was holding Ms. Rawls?

 4   A.   No idea.  She was laying on the ground.

 5   Q.   If there was an officer next to her, you don't

 6        know who that officer was?

 7   A.   No.

 8   Q.   Do you know where Trooper Jones was at this

 9        point in time?

10   A.   No.

11   Q.   Do you know where Mr. Kakley was at this point

12        in time?

13   A.   No.

14   Q.   Do you know where Mr. Templeman was?

15   A.   No.

16   Q.   Where Mr. Kalish was?

17   A.   No.

18   Q.   At any point in time while you were standing in

19        the door were you able to see Mr. Kalish come

20        in?

21   A.   I don't recall seeing Mr. Kalish at all.

22   Q.   Do you remember seeing Sergeant Kent at any

23        point in time?

24   A.   Again, he had arrived with me and at some point
```

1      during the course of this arrest I had further

2      interaction but whether I saw him in the room or

3      not, I don't recall.

4   Q.  How about Mr. Patruno, did you see him in the

5      room?

6   A.  Yes.

7   Q.  Where did you see Mr. Patruno?

8   A.  After I started fighting with Mr. Douglas I

9      realized someone was on my feet and his feet and

10     I realized after it was Mr. Patruno.

11  Q.  So you started fighting with Mr. Douglas?

12  A.  Yes.

13  Q.  When did you start fighting with Mr. Douglas?

14  A.  During his tirade about his girlfriend slash

15     wife being proned out, he became more and more

16     enraged and then he started pulling against me.

17     I was attempting to pull him back.  He was

18     obviously much larger than I am.  I began to

19     pull him away to prevent him from accessing

20     officers and his girlfriend.  At that point he

21     dropped his shoulder and tried to pull his way

22     by me.  At that point I --

23  Q.  He dropped his shoulder?

24  A.  He dropped his shoulder down into me and began

1        to --

2    Q.  He hit you with his shoulder?

3    A.  Oh, yes, and tried to pull his way by me.  At

4        that point I swept his feet but because of our

5        positioning, it wasn't really a good sweep.

6        Both of us landed down on the floor basically

7        face to face and he was going wild.

8    Q.  How did you sweep his feet?

9    A.  With my feet.

10   Q.  Okay.  So that he would fall over?

11   A.  Yes.  My attempt was to drop him to the ground.

12   Q.  Were you successful?

13   A.  Well, depends on how you consider it.  Generally

14       when you sweep someone's feet you don't end up

15       on the ground too so I was successful in getting

16       him off his feet but I also, because of the

17       situation, ended up on the ground also.

18   Q.  And how did you land on the ground and where was

19       your position in relation to him?

20                    MR. JOYCE:  Objection.

21   A.  He was kind of on his right side but facing up.

22       I landed on his -- more or less left side.  He

23       was kicking his feet wildly and squirming

24       around.  At that point I smashed him on the side

1          of the head twice with a closed fist and

2          attempted to stop his attack on us and at that

3          point he completely complied and said, All

4          right, all right.  I'm done.

5     Q.   So when you struck him where was Mr. Douglas in

6          relation to the wall?  Where was his head?

7     A.   His head was down towards this side of the wall.

8     Q.   So his head had not passed the wall?  In other

9          words, his head was before the end of this wall?

10    A.   Yes.

11    Q.   That's what I meant to say.  And his legs, were

12         they extended towards the toilet?

13    A.   No.  Towards the main part of the room.

14    Q.   And you were on his left side?

15    A.   I was on -- yeah.  All depends which way he's

16         facing, but more or less on his left side over

17         here.

18    Q.   And his legs were extending outside of this

19         wall?

20    A.   I have no idea.

21    Q.   And he was still handcuffed at that point in

22         time?

23    A.   Yes.

24    Q.   And you said that you struck him twice in the

1          head?

2      A.   Correct.

3      Q.   What side of the head did you strike him?

4      A.   Left.

5      Q.   On the left side, where about on the left side

6           of his head did you strike him?

7      A.   Ear area.  Ear and side of the head.

8      Q.   Ear and side of the head?

9      A.   Yes.

10     Q.   And so one was in the ear area and one above the

11          ear area?

12     A.   Well, again, he's thrashing about, being

13          combative with officers and he's kicking and so

14          forth.  I just landed two blows on the side of

15          his head in an attempt to stop him.

16     Q.   Well, your best memory is that whenever you

17          struck him it was on the ear side and above the

18          ear?

19              MR. COYLE:  Objection.

20              MR. PINEIRO:  I'm sorry.  What is the

21          objection?

22              MR. COYLE:  That's not what he said.

23     A.   Both blows landed on the ear slash side of the

24          head area.  I'm not sure exactly where they

1           landed.

2    Q.    Did you hit him in the jaw?

3    A.    No.

4    Q.    So you didn't touch him in the jaw?

5    A.    Well, technically the jaw extends all the way up

6          to the top of your ear, so technically I guess I

7          would.

8    Q.    Do you have a memory of hitting him in the jaw?

9    A.    Again, depending on -- that's a foolish

10         question, which part of the jaw?  Can you be

11         more specific and I'll answer.

12   Q.    So I'm just trying to figure out where you

13         punched him.

14               MR. LIEBEL:  Come on.  It has to be

15         question, answer, question, answer.

16               MR. PINEIRO:  We will.

17               MR. LIEBEL:  Well, we will.  This is

18         a deposition.

19               MR. PINEIRO:  It is.  It's my

20         deposition.

21               MR. LIEBEL:  And the deponent has to

22         answer your questions too.  You got to wait

23         until he finishes.  Nice and slow.  Otherwise,

24         we're going to get a room tonight in the

```
 1          Worcester area.

 2   Q.     So how far would you say Mr. Douglas ever came

 3          from Ms. Rawls?  Was there a distance that

 4          separated them?

 5   A.     Yes.

 6   Q.     And what is the closest distance that they came

 7          from one another?

 8   A.     At this time I'd be guessing because I couldn't

 9          really tell because of what happened between him

10          and I.  I would say ten feet.

11   Q.     How hard did you hit him?

12   A.     Hard.

13   Q.     Did it knock him unconscious?

14   A.     No.

15   Q.     It didn't?

16   A.     No.

17   Q.     It just straightened him out after you hit him

18          twice?

19   A.     Yes.

20   Q.     And did you hit him with a weapon?

21   A.     No.

22   Q.     You didn't?

23   A.     No.

24   Q.     And at this point your gun was in your holster?
```

```
 1   A.   Correct.

 2   Q.   And what type of gun did you have in your

 3        holster?

 4   A.   M&P Smith & Wesson.

 5   Q.   And how much does an M&P weapon weigh?

 6   A.   No idea.

 7   Q.   Would it weigh, like, 10, 12 pounds?

 8   A.   No idea.

 9   Q.   Would there have been any reason for you to

10        strike Mr. Douglas in the head with a gun, with

11        a weapon?

12   A.   In the head, no.

13   Q.   Would there have been any reason to strike him

14        on any other body parts on that particular

15        occasion?

16   A.   Oh, absolutely.  With his combative attack on

17        officers, it was absolutely justified using an

18        impact weapon.

19   Q.   So if you had a weapon with you, you could have

20        struck him with a weapon.  Is what you're

21        saying?

22   A.   Yes.

23   Q.   But not on the head?

24   A.   Correct.
```

1    Q.    Did he bleed?

2    A.    I don't recall.  Not to my knowledge.  Again,

3          after fighting with somebody generally I was

4          relieved of custody of Mr. Douglas.

5    Q.    And who relieved you of the custody of Mr.

6          Douglas?

7    A.    I have no idea.

8    Q.    Did someone assist you in restraining him?

9    A.    Restraining him on the floor?

10   Q.    Yes.

11   A.    Possibly.  Again, I don't recall.

12   Q.    Do you know who assisted you in restraining him

13         on the ground?

14   A.    I know Bobby Patruno was on his feet.  There

15         could have been other officers.  I would be

16         surprised if there wasn't any other officers

17         involved.

18   Q.    Was Mr. Douglas charged with assault and battery

19         on a police officer?

20   A.    I believe just resisting arrest.

21   Q.    Resisting arrest?

22   A.    Yes.  I don't believe we threw in assault and

23         battery.

24   Q.    And what happened next?  How long did it take

```
 1            before you got relieved?

 2    A.      On the ground?

 3    Q.      Yes.

 4    A.      Seconds.

 5    Q.      And then what did you do next?

 6    A.      I entered the room a little bit, made sure

 7            everything was secure and then I exited the

 8            apartment.

 9    Q.      And what happened to Mr. Douglas?

10    A.      Other officers removed him from the room.

11    Q.      Who were the officers?

12    A.      I have no idea.

13    Q.      Is that reflected on your report?

14    A.      I'm not sure.

15    Q.      And did anyone strike Ms. Rawls?

16    A.      No.

17    Q.      Was Ms. Rawls yelling and screaming?

18    A.      Yes.

19    Q.      What was she saying?

20    A.      Everything.  She's not a very nice person.

21    Q.      How do you know that?

22    A.      Because I don't know a woman in the world that

23            uses the vocabulary that she was using.

24    Q.      Would there have been any reason for anybody to
```