**ORIGINAL**

**Justin Douglas**
**December 03, 2015**

```
1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
2
                            C.A.No.: 3:14-CV-30210-MGM
3

4

5    JUSTIN DOUGLAS
          PLAINTIFF
6
     vs.
7

8    CITY OF SPRINGFIELD, MASSACHUSETTS, ET AL.
          DEFENDANTS
9

10

11

12   -------------------------------------------------
               DEPOSITION OF:  JUSTIN DOUGLAS
13   -------------------------------------------------

14

15

16
             Taken before Nicole A. Stewart, Court
17   Reporter, Notary Public, pursuant to Rule 30 of
     the Massachusetts Rules of Civil Procedure, at the
18   Northeast Correctional Center, located at 1
     Barretts Mill Rd., Concord, MA 01742 on
19   December 3, 2015.

20

21

22

23

24                    Nicole A. Stewart
                      Court Reporter
```

**Justin Douglas**
**December 03, 2015**

2

```
 1        APPEARANCES:

 2

 3     FOR THE PLAINTIFF:

 4     LAW OFFICE OF HECTOR E. PINEIRO
       807 Main Street
 5     Worcester, MA, 01610
       508-770-0600
 6          BY:  HECTOR E. PINEIRO, ESQ.

 7     FOR THE DEFENDANT:

 8     SPRINGFIELD LAW DEPARTMENT
       3 Court Street
 9     Springfield, MA 01103
       413-787-6085
10          BY:  JOHN T. LIEBEL, ESQ.

11     FOR THE DEFENDANT:

12     KEVIN B. COYLE LAW OFFICE
       1299 Page Boulevard
13     Springfield, Massachusetts 01104
       413-787-1524
14          BY:  KEVIN B. COYLE, ESQ.

15     FOR THE DEFENDANT:

16     REARDON, JOYCE, & AKERSON, P.C.
       4 Lancaster Terrace
17     Worcester, MA 01609
       508-754-7285
18          BY:  AUSTIN M. JOYCE, ESQ.

19     FOR THE DEFENDANT:

20     RAFANELLI & KITTREDGE, P.C.
       1 Keefe Road
21     Acton, MA 01720
       978-369-6001
22          BY:  JOSEPH P. KITTREDGE, ESQ.

23

24
```

Justin Douglas
December 03, 2015

63

```
 1    referring to when you say from reading
 2    Interrogatories?
 3       A.        Patruno.
 4       Q.        Okay.  What, if anything, did the three
 5    officers and you do at that time?
 6       A.        They told me to stand up, pull my pants
 7    up, and they put me in cuffs.
 8       Q.        Did anybody strike you at that time?
 9       A.        Not at that time.
10       Q.        Do you know who it was that told you to
11    stand up?
12       A.        I believe it was Bigda.
13       Q.        And do you know who it was who placed
14    handcuffs on you?
15       A.        I believe it was Bigda.
16       Q.        And were you able to see what any other
17    officers were doing at that time?
18       A.        There was like two officers standing
19    around me and I was being cuffed and my back was
20    kind of turned, was turned because I had to put the
21    cuffs on and then they just walked me out the room.
22    They walked me out.
23       Q.        So, where did they walk you out to?
24       A.        Right just before the door.
```

1    Q.      Okay.  And what other officers were in

2    your vicinity at that time when you were by the

3    door?

4    A.      I seen Samantha on the floor with

5    officers on her.

6    Q.      I'm sorry.  My question was, who was

7    close to you when they walked you to the door?

8    A.      There was like three, two or three

9    officers right there.

10   Q.      Do you know who they were?

11   A.      No, sir.  Now, I can speculate but at

12   that time, I didn't know.

13   Q.      I'm not asking you to speculate.  Do

14   you have a memory that you're able to identify

15   specifically who those officers were?

16   A.      I didn't know at the time who those

17   officers were.

18   Q.      So what happened after they walked you

19   to the door?

20   A.      I asked him to pick Samantha up because

21   she had nothing to do with it.

22   Q.      How would you describe your demeanor

23   and your conduct in doing that?

24   A.      Well, I knew what they were there for

1    and they were there for me and, you know, I felt

2    the conduct of what they did or what they were

3    doing wasn't right.  I was, Yo, pick her up.  She

4    has nothing to do with it.  And my demeanor was

5    just like, you know, I'm looking in his face and

6    telling him, asking him, Yo, pick her up.  She has

7    nothing to do with it.

8         Q.      What was your tone of voice when you

9    made that comment?

10                    MR. PINEIRO:  Objection.

11                    THE WITNESS:  I was already in

12        cuffs, sir.  So, I can only ask.

13        Q.      (By Mr. Coyle)  I'm asking you, did you

14    ask that in a loud voice?

15                    MR. PINEIRO:  Objection.

16                    THE WITNESS:  Well, he -- I was

17        possibly maybe I was a little, I raised my

18        voice a little bit, you know, to get his

19        attention, you know, but he told me to shut

20        the fuck up.

21        Q.      (By Mr. Coyle)  Do you remember the

22    words that you used?

23        A.      I said, Yo, pick her up.  You're here

24    for me.  You know what I'm saying?  She didn't do

1   nothing.  Do you know what I'm saying?

2       Q.      At any point in time did you hear an

3   officer yell, Gun, or words to that effect?

4       A.      No.

5       Q.      Did you do anything else other than

6   say, Pick her up?

7       A.      No.

8       Q.      Did you try to move towards the

9   location where Samantha was?

10      A.      I looked -- I took a step forward and

11  looked in his face like, Sir, pick her up, she had

12  -- and then I was like swung, like pushed and then

13  pulled and that's when I was punched in the face.

14      Q.      Who were you looking at when you said,

15  Pick her up?

16      A.      All I can -- at the time, I didn't know

17  who it was but it looked like he was in full

18  tactical gear.  He had glasses and he had a little

19  bit of -- his face looked funny a little bit.  I'm

20  going to say I'm not sure who it was.  I'm not sure

21  who it was, Mr. Coyle.  I'm really not.

22      Q.      You said he was in full tactical gear.

23  Can you describe the gear?

24      A.      I think he had on like black pants,

1  black shirt, goggles, gun out.

2       Q.      Okay.  And you don't know who that

3  person is at this point in time?

4       A.      I think it was Kent.

5       Q.      I'm sorry?

6       A.      I believe it was Kent.

7       Q.      Kent?

8       A.      Yeah.

9       Q.      Was there anybody else dressed like

10 that in the room?

11      A.      I don't think so.  I remember the way

12 he was dressed because I was in the direct line of

13 him kicking me in my face and I moved and he said,

14 Yeah, you better effing move out of my way.  That's

15 the only reason why I remember what he looked like.

16      Q.      Well, let's back up just a second.

17 When you said that something happened and you were

18 spun, can you tell us any more specifically how

19 that happened and who you were dealing with at that

20 point in time?

21      A.      Attorney Coyle, I know Officer Bigda

22 and there were other officers -- as soon as he hit

23 me, Mr. Coyle, the other officers just started

24 beating on me.  And then all I could do was turn my

1    face, and all the way to the ground, they beat me

2    all the way to the ground.  I didn't know I was hit

3    with a firearm until my wife screamed but I felt

4    the blunt object in my head.  And right before my

5    face got turned to where they can smash my face, I

6    believe it was Liam Jones because I seen him ask

7    Liam Jones to search the room.  He put his hand

8    down to like cover my face and gestured to like not

9    to stop.  And then I heard and I'm kind of out of

10   it.  And I heard my wife say, Why you hit me?  And

11   then I was focussing on her and her face was all

12   screwed up, like sour, bracing for a hit.  And then

13   they just started -- I seen him ask.  I looked at

14   Jones, and the officer asked him, Can we?  And he

15   was like, he gestured yes to search.  And then he

16   said, Cocaine?  There's cocaine too?  And I said,

17   Cocaine?  And then I seen him gesture not to plant

18   cocaine.

19            And then I was laying on the floor

20   looking at my wife because I know she had the blood

21   disease.  She has Wilebrand's disease and when

22   she's hit or she's cut, she bleeds profusely.  And

23   by him slapping her, she could have bled out

24   profusely from her nose or wherever, you know.

1        Q.        Let's back up.  You said you were taken

2    to the ground and you were struck and kicked by a

3    number of officers.  How many officers struck and

4    kicked you?

5        A.        Officer Coyle, I was blind sided by

6    Bigda.  To the best of my --

7        Q.        My question was how many officers

8    struck you and kicked you?

9        A.        All of them.

10       Q.        Okay.  Every one of those officers?

11       A.        All I can tell, I had to turn my face,

12   Attorney Coyle, you know, that I was being

13   assaulted with my arms behind my back by multiple

14   officers.

15       Q.        Where were you struck by these

16   officers?

17       A.        In my head and all over my body when I

18   was on the floor.  And they were trying to rip my

19   face from hiding.  And that's when Liam Jones

20   interfered, and I don't know why he didn't tell the

21   truth.

22       Q.        Did anybody strike you with any

23   objects?

24       A.        I felt a blunt object in the back of my

Justin Douglas
December 03, 2015
                                                                70

1  head.  I could tell it was metal.  I didn't know if

2  it was a flashlight or whatever until my wife

3  explained to me that these officers --

4       Q.       Well, I'm asking what you saw and what

5  you can tell us from your own knowledge.

6       A.       All I know is that there was a blunt

7  object hitting me in my head.

8       Q.       Did you say that somebody kicked you?

9       A.       I was being assaulted, sir.  I don't --

10  there were punches and kicks.  I can't really

11  determine, say for sure, because I was hiding my

12  face, Attorney Coyle.

13       Q.       Can you tell us who kicked you?

14       A.       I don't know.

15       Q.       Okay.  How long did this go on, Mr.

16  Douglas?

17       A.       I was a little disorientated from the

18  initial, from my jaw being almost broken seriously

19  and from me standing up to hiding my face to being

20  on the ground to them trying to turn my face so

21  they can get access to my face to the, Liam Jones

22  putting his hand over my face and just gesturing

23  for them to stop.

24       Q.       Can you identify who tried to turn your

Justin Douglas
December 03, 2015

1     made this observation other than the three that

2     were with you?

3        A.      All I can recollect is there was a lot

4     of activity and I felt it was funny because after

5     they beat me up, they just left me there to lay

6     there.   There wasn't nobody holding me or anything.

7     I was just laying there.   And I remember seeing one

8     officer run out the room with a blanket with the

9     other receiver and he ran out the room.   And I was

10    trying to be as quiet as I can because I didn't

11    know what these officers were going to do to me.

12    So, I felt like I was in the fear for my life, you

13    know, and I was like in a hole and I couldn't -- I

14    didn't want to know what was going on because I

15    wanted to get out of that room because I felt like

16    my life was in danger.

17       Q.      All right.   Back to my question.   My

18    question was, did you see any other officers in the

19    room other than the two that were with your wife

20    and the three that were with you at the point in

21    time that you first observed your wife?

22       A.      There was a lot of officers, Attorney

23    Kittredge, in the room.

24       Q.      Did you observe any others other than

Justin Douglas
December 03, 2015

121

```
1    the five that you have already described?
2         A.        I observed two or three officers coming
3    in and out.
4         Q.        But, sir, I'm focused on a precise
5    moment.  That precise moment when you saw your wife
6    with the officers with her, when you first saw her,
7    did you see any other officers in the room at that
8    precise time?
9         A.        I have no recollection.  I can't -- I
10   don't know.
11        Q.        Did your wife say anything to you at
12   the point in time that the two of you were in the
13   room after the police entered?
14        A.        After the police entered, did she say
15   anything to me?
16        Q.        Yes.  You need to say verbally for the
17   court reporter, please.
18        A.        I remember her saying, you know, she
19   was cussing after they were hitting on me and then
20   she said, You hit him with a gun.  Why did you hit
21   him with a gun?  That's all I remember her saying.
22   She didn't say anything specifically to me.  She
23   was arguing with the police, you know.  That's all
24   I really remember.
```

Justin Douglas
December 03, 2015
                                                                        122

1      Q.      So let's see if I can get it
2  subsequently.  At what point in time did you hear
3  the first thing your wife said after the police
4  entered the room?
5      A.      After the assault?
6      Q.      What did you hear her say?
7      A.      You hit him with a gun.
8      Q.      So, up until that time point in time,
9  she hadn't said anything that you recall?
10     A.      Yes, sir.
11     Q.      Had you said anything after being
12 handcuffed and until your wife said that, made that
13 comment?
14     A.      I was asking the officers to pick her
15 up.  She had nothing to with it.
16     Q.      Did you use the word Complain?
17     A.      I said, you know, she has nothing to
18 do.  Pick her up.  You're here for me.  I can't
19 recollect entirely what precisely I said but I know
20 that the officers were there for me and she had
21 nothing to do with it.
22     Q.      So, after you make that comment about,
23 My wife, she has nothing to do with it, what
24 happens?

Justin Douglas
December 03, 2015

133

```
 1                    MR. KITTREDGE:  We're going to be
 2          here a long time.
 3                    MR. PINERIO:  That's fine.
 4                    THE WITNESS:  I hid my face all
 5          the way to the ground, Attorney Kittredge,
 6          and I was on the ground.  The result ended
 7          with me on the ground.  I just explained
 8          that I was left on the ground and I was
 9          right on the ground and I was kind of both
10          ways.
11     Q.       (By Mr. Kittredge)  You have explained
12 that a number of times.  Thank you.  But I want to
13 know is the answer to my question, and that
14 question is, you said that you were struck in the
15 face and then the other officers punched you in the
16 face, correct?
17     A.       They were striking me in the face, yes,
18 in the head.
19     Q.       And the point in time that you were
20 struck after that first blow, were you standing?
21     A.       I was on -- after the first blow, I
22 turned away and the other officers were hitting me
23 and the result of that ended me up on the ground.
24     Q.       Where were the other officers located
```

1   that struck you after that first blow?

2       A.      Assuming -- well, they -- all the blows

3   came from the left-hand side of me.

4       Q.      How many times were you struck in the

5   left side?

6       A.      I couldn't count how many times.

7       Q.      Was it more than ten times?

8               MR. PINERIO:  Objection.

9               THE WITNESS:  I know it was a few

10      good times, yes.

11      Q.      (By Mr. Kittredge)  So, was it more

12  than ten?

13              MR, PINERIO:  Objection.

14      Q.      (By Mr. Kittredge)  Give me a range.

15      A.      Well, from the time it took from the

16  first initial strike to the rest of the strikes to

17  me just turning away to getting struck all the way

18  on the floor and then them still continuing to hit

19  me and then until the time that Mr. Jones stopped

20  them from assaulting me.

21      Q.      Right.  What's the range of how many

22  times you were stuck on the left side of your face?

23      A.      Twenty or thirty times, sir.

24      Q.      And during each of those -- well,

1    strike that.

2              How many times were you struck before

3    you reached the ground?

4        A.     I was struck, at least from my

5    recollection, maybe about ten times.

6        Q.     And how long did it take from the first

7    blow until you reached the ground, how much time

8    elapsed?

9        A.     Seconds.  You know, it wasn't -- it

10   seems like they were getting in each other's way so

11   they couldn't really assault me the way they wanted

12   to because it was a lot, it was a lot of officers.

13       Q.     So, they were getting in each other's

14   way to get to you?

15       A.     To assault me.

16       Q.     Sure.  So, can you identify anybody

17   other than Officer Bigda as actually striking any

18   of the twenty to thirty blows?

19       A.     Can I identify them?

20       Q.     Yes.

21       A.     I can only identify them from being in

22   the room.

23       Q.     Okay.  So, you can't identify any

24   officer other than Officer Bigda who actually

Justin Douglas
December 03, 2015

136

```
1    struck you?
2        A.       All I can identify, Attorney Kittredge,
3    is the officers that were in the room and Bigda.
4        Q.       So, did you see Officer Jones strike
5    you, Trooper Jones?
6        A.       Trooper Jones, from my understanding,
7    is the one that helped me even though he didn't
8    tell the truth.  And I thought he was going
9    disassociate himself with these other officers, but
10   he didn't.
11       Q.       But the question was, did you see
12   Trooper Jones strike you?
13       A.       Not to my recollection.
14       Q.       All right.  And how about the other
15   officer that -- well, strike that.
16                You identified Officer, Trooper Jones
17   as being one of the two that was with your wife
18   while she was on the ground, correct?
19       A.       I believe Trooper Jones was one of the
20   two officers, yes.
21       Q.       You indicated in earlier testimony that
22   you think he was holding her legs?
23       A.       Holding her legs or something like
24   that.
```

1   coming?  Was it the police officer or did you ask

2   to have an ambulance come?

3        A.        I think that they were aware that I had

4   injuries, and once my wife told me I was bleeding,

5   I said, I want to see an ambulance, or I asked or

6   somehow an ambulance came up.  I don't know if I

7   insinuated or not, but when they asked me, I

8   remember being asked, and I said, Yes, I would like

9   to see an ambulance.  I can't specifically recall

10  if I asked or if they asked me.  I can't

11  specifically recall.

12       Q.        Well, once again, no disrespect, but

13  you have been booked before, correct?

14       A.        Correct, sir.

15       Q.        And one of the booking questions is,

16  Are you suffering any injuries, correct?

17                 MR PINEIRO:  Object to form.

18                 THE WITNESS:  Correct, sir.

19       Q.        (By Mr. Kittredge)  And you were asked

20  while at the State Police Barracks whether you're

21  in any pain or you suffered any injuries, correct?

22       A.        Correct.

23       Q.        And at that point in time, what was

24  your response?

Justin Douglas
December 03, 2015

148

1       A.      I believe that my response would be

2  yes.  My response was yes.

3       Q.      All right.  And to that, did the police

4  officer ask you whether you wanted an ambulance or

5  not?

6       A.      Yeah, he did ask me.

7       Q.      So, you think that's the way it went

8  down?

9       A.      I believe so, yes, sir.

10      Q.      And an ambulance was provided to you,

11  correct?

12      A.      Correct, sir.

13      Q.      What happened when the ambulance

14  arrived?

15      A.      They brought me back into the garage

16  and I was sitting down and he came out and he just

17  cleaned up my -- the blood and I told him about my

18  jaw and my lips were swollen.  And he said, Oh,

19  you're okay.  You just got roughed up a little bit,

20  you know.  And I can't remember if he asked me if I

21  wanted to go to the hospital, but my feelings and

22  what I was thinking was I didn't feel safe with

23  leaving my wife alone with the police officers

24  after we were both assaulted.

1     Q.      Now, so you just don't have a memory as

2   to whether you were asked whether you wanted to go

3   to the hospital or not?

4     A.      He kind of like played my injuries

5   down, I guess.

6     Q.      That wasn't my question.

7     A.      The ambulance guy was like, Well,

8   you're just roughed up.  You should be all right,

9   da, da, da, da, da.

10    Q.      That wasn't the question though, sir.

11    A.      So, I don't have a recollection if I

12  was asked to go to the hospital.

13    Q.      And you believe that you would have

14  been able to assist your wife if you stayed at the

15  barracks?

16    A.      No.  I just wanted to make sure she was

17  going to be okay.

18    Q.      And you felt safer in the State Police

19  Barracks, is that right?

20    A.      Yes.  Attorney Kittredge, when I said I

21  stepped forward, I just wanted to make sure they

22  didn't hurt her.  I wasn't going to do anything.  I

23  just wanted to make sure she wasn't hurt.

24    Q.      Now, did you see -- other than Liam

Justin Douglas
December 03, 2015

1      A.      I didn't participate in the theft of

2  those weapons, no.

3      Q.      You knew they were stolen when you

4  received them obviously?

5      A.      Yes.

6      Q.      Okay.  Am I clear that in the detailed

7  explanation you have provided us of this event,

8  that the first blow you received was a closed fist

9  to your face by Officer Bigda or someone?

10     A.      It was by Officer Bigda, that initial

11 first blow.

12     Q.      It was a closed fist though, correct?

13     A.      Yes, sir.

14     Q.      And you described it rather in detail

15 to Attorney Kittredge about being turned around and

16 the force of it, but it was a fist, correct?

17     A.      Correct.

18     Q.      Okay.  Did you ever see any black

19 police officer or any individual, Afro-American

20 individual in the motel room on the date of the

21 incident?

22     A.      As I think back, I can't recollect,

23 sir.

24     Q.      So, I'm trying to -- and I apologize.

1    You know, I appreciate that we have been here since

2    a little before one o'clock during this deposition

3    but my memory was in your testimony when there was

4    some discussion about whether there was a Hispanic

5    officer, that your testimony was that the best you

6    remember is that all of the officers there in that

7    room, that they were all at least light skinned, is

8    that correct?  Is that your testimony?

9        A.      Yeah, at least light skinned.

10       Q.      So, you didn't see any black officers,

11   is that a fair statement?

12       A.      Well, to my recollection, I didn't see

13   any black officers.

14       Q.      And that's all I'm looking for is your

15   recollection.

16       A.      Yeah.

17       Q.      Did you ever see a female officer?

18       A.      No, sir.

19       Q.      Okay.  And when you were first

20   approached by the officers as you were in the

21   toilet area, how many officers were approaching

22   you?

23       A.      Three.

24       Q.      And do you recall who placed handcuffs

Justin Douglas
December 03, 2015                                                                    190

1    on you?

2        A.        Bigda.

3        Q.        Okay.  You didn't take any photographs

4    or ask anyone to take any photographs of the

5    immediate vicinity of the motel, did you?

6        A.        I asked my attorney to see if there

7    were video cameras, the tapes from the -- and she

8    said she took pictures but they said the videotape

9    didn't work or was a host or was like, you know, it

10   was like a spook or something that didn't work.

11   They just did it to spook people.

12                 MR. LIEBEL:  Okay.  That's all I

13       have.

14                 THE WITNESS:  Thank you.

15

16   EXAMINATION BY MR. COYLE:

17       Q.        Just I asked you a series of questions

18   about specific officers and I omitted one.  Can you

19   attribute any specific action in association with

20   your arrest in Room 35 on April 26th, 2012, to

21   Officer Lopes?

22       A.        Can I specify any specific --

23       Q.        Anything that he did, can you tell us

24   anything that he specifically did?

```
 1       A.       I couldn't tell you.
 2                    MR. COYLE:  That's all I have.
 3                    MR. JOYCE:  I don't have anything
 4         else.
 5                    MR. KITTREDGE:  I don't have
 6         anything.
 7                    MR. PINEIRO:  I just have a couple
 8         of follow-up questions.
 9
10   EXAMINATION BY MR. PINEIRO:
11       Q.       You mentioned that Tommy Smith, who is
12   your step-brother, correct, came to pick you up at
13   the motel, at the Springfield Inn?
14       A.       Yes, sir.
15       Q.       And that from there, you drove on Route
16   5?
17       A.       Yes, sir.
18       Q.       Am I right?  And that from Route 5, you
19   rode a short distance to the Stop & Shop?
20       A.       Yes, sir.
21       Q.       And that there was an ATM in that mall?
22       A.       Yes.  In the shopping mart, yes, sir.
23       Q.       Was this ATM inside of the Stop & Shop
24   or was it outside in the parking area?
```

Justin Douglas
December 03, 2015

200

1    When I was going out, I seen her.  I remember
2    seeing her sitting there.
3         Q.      And you remember seeing her?  You
4    pointed out to a small bureau with a white lamp on
5    it?
6         A.      Yes, sir.
7         Q.      So, you saw her first on the ground and
8    there were some officers surrounding her?
9         A.      Yeah.  She had some officers on her at
10   first on the ground.
11        Q.      All right.  And then you saw when she
12   was sat on that small bureau?
13        A.      Yes, sir.
14        Q.      Right next to the lamp?
15        A.      Right next to the lamp.
16        Q.      Okay.  Did you ever -- let's look at
17   Exhibit Number 7, the fourth picture in Exhibit 7.
18   Did you ever observe Ms. Rowls on this area of the
19   bed, laying on the floor?
20                MR. KITTREDGE:  Objection.
21        Q.      (By Mr. Pineiro)  Right next to the
22   round table?
23                MR. KITTREDGE:  Objection.
24                THE WITNESS:  No, sir.

Justin Douglas
December 03, 2015

201

1      Q.      (By Mr. Pineiro)  You mentioned that

2   there was a booking photograph at the State Police,

3   right?

4      A.      Yes, sir.

5      Q.      And you mentioned that the photograph

6   shows that there was blood?

7      A.      Yes, sir.

8      Q.      Okay.  And I want to show you Exhibit

9   Number 3 that was marked during Mr. Jones'

10  deposition.  Can you tell the lawyers here where,

11  if any, you had blood?

12     A.      Blood coming down my left shoulder

13  dripping down to my chest.

14     Q.      Okay.  So, this line, this black line

15  that appears in the exhibit, the third exhibit in

16  Mr. Jones' deposition, this is blood that was

17  pouring from your head?

18     A.      Yes, sir.

19             MR. KITTREDGE:  Wait.  I just got

20      to put my glasses on.

21     Q.      (By Mr. Pineiro)  Sure.  Can you point

22  for Mr. Kittredge?

23             MR. KITTREDGE:  What do you

24      describe that to be?

1              THE WITNESS:  That's blood

2        dripping from my head.

3        Q.      (By Mr. Pineiro)  And so you have blood

4   dripping from your head when they took your booking

5   photograph at the State Police on Liberty Street?

6              MR. COYLE:  Objection.

7        Q.      (By Mr. Pineiro)  Is that right?

8        A.      Yes, sir.

9        Q.      You said that Trooper Jones, that you

10  saw at the State Police Barracks Trooper Kakley and

11  Trooper Jones?

12             MR. KITTREDGE:  Objection.

13             THE WITNESS:  I remember

14       distinctly them two, yes, sir.

15       Q.      (By Mr. Pineiro)  And that Trooper

16  Jones wanted to convert you into an informant?

17       A.      Yes, sir.

18       Q.      Okay.  And when he had the conversation

19  with you that he wanted to turn you into an

20  informant, was that before this booking photograph

21  was taken or after -- when is it that he spoke with

22  you about being a snitch in relation to when this

23  booking photograph was taken?

24             MR. KITTREDGE:  Objection.

Justin Douglas
December 03, 2015

1          MR. JOYCE:  Objection.

2          THE WITNESS:  I believe it was

3    before and after.

4          MR. KITTREDGE:  So, are we marking

5    that for this deposition?

6          MR. PINEIRO:  We can, yes.

7          MR. LIEBEL:  Is that the entire

8    exhibit, sir?

9          MR. COYLE:  Or just the first page

10    of the photograph?

11          MR. PINEIRO:  Yeah, this is the

12    entire Exhibit 3.  It certainly is.

13          MR. COYLE:  Well, the only thing

14    you have used it for here is for the

15    photograph.  So, let's just have this page

16    be the --

17          MR. KITTREDGE:  Well, I know that

18    he identified it as Exhibit 3 in Mr. Jones'

19    deposition.  It's up to him.

20          MR. PINEIRO:  Why don't we just

21    mark it as the next exhibit, please?

22              (Exhibit 8, marked)

23    Q.     (By Mr. Pineiro)  Did you sit in a

24    Motion to Suppress that occurred in the Springfield

Justin Douglas
December 03, 2015

204

```
1   Superior Court?
2       A.      Did I sit in a Motion to Suppress?
3       Q.      Right.  Were you called to court?
4       A.      Yes.
5       Q.      Did your counsel hab you to court in
6   superior court, when a Motion to Suppress took
7   place?
8       A.      Yes, sir.
9       Q.      And to your knowledge, were there
10  officers that testified at the Motion to Suppress?
11      A.      I believe so, yes, sir.
12      Q.      And do you remember who the officers
13  testified at the Motion to Suppress?
14      A.      I believe it was Bigda and Liam Jones.
15      Q.      Okay.  To your knowledge, did anybody
16  else testify at that hearing?
17      A.      Maybe Kent.  I believe Kent.
18      Q.      Let me ask you another question.  You
19  said that you applied for a criminal complaint --
20      A.      Yes, sir.
21      Q.      -- against the officers that arrested
22  you?
23      A.      Yes, sir.
24      Q.      And you said that you brought the
```

```
 1    complaint initially against Mr. Bigda and, I
 2    believe you said against officer others?
 3         A.      Yes.   It was others, yes, sir.
 4         Q.      And you spoke with a Mr. Nagel?
 5         A.      I was in front of Magistrate Nagel.
 6         Q.      Right.   And you made an effort to get
 7    the records from Magistrate Nagel?
 8         A.      Yes, I did.
 9         Q.      And when did you learn that Officer
10    Nagel --
11              MR. LIEBEL:   Not officer.
12         Q.      (By Mr. Pineiro)  I'm sorry.   When is
13    it that you found that there was no, that no
14    probable cause had been found in connection with
15    your application for a criminal complaint?
16         A.      Well, I never received any
17    determination on his ruling.   He told me he was
18    going take it under advisement.   And I had to have
19    a CPO from Hampden County call the courthouse and
20    ask what was the determination in regards to my
21    show cause hearing.
22         Q.      Okay.   Do you remember who testified at
23    the show cause hearing?
24         A.      I believe it was -- yeah.   It was
```

**Justin Douglas**
**December 03, 2015**                                                                206

```
 1   everybody but Liam Jones.  Bigda, it was Bigda,

 2   Kent, Kakley.  I remember specifically Kakley

 3   because he looked like he didn't want to lie.

 4   Templeman, Patruno, Kaylish.  There was no Liam

 5   Jones.  Everyone except Liam Jones.  I don't know

 6   why.

 7                   MR. PINEIRO:  Thank you.

 8

 9   EXAMINATION BY MR. LIEBEL:

10       Q.      Do you know when those photos were

11   taken?

12       A.      The photos you just gave me?

13       Q.      I didn't give them to you.  Your

14   counsel gave them to you.

15       A.      I mean, that he just gave?  I don't --

16   I have never seen them.

17       Q.      You have never seen them before?

18       A.      No.

19       Q.      How many times were you in that room

20   before?

21       A.      This one?

22       Q.      Yes.

23       A.      I was there that night and I have

24   actually rented the room once or twice before
```

1   because they have good water pressure.

2       Q.      Room 35?

3       A.      Not that specific room but that

4   specific motel.

5       Q.      So, am I correct in assuming that the

6   only time you have been in the room was on April

7   26th and the evening of April 25th?

8       A.      Yes, sir.

9               MR. LIEBEL:  Okay.  That's all I

10      have.

11              MR. KITTREDGE:  I have a few.

12

13  EXAMINATION BY MR. KITTREDGE:

14      Q.      Mr. Douglas, you said you attended the

15  Motion to Suppress hearing.  Did you take any notes

16  during that hearing?

17      A.      No, sir.

18      Q.      You attended a show cause hearing with

19  regard to your application for criminal complaints.

20  Did you take any notes during that hearing?

21      A.      I asked for some documentation of the

22  hearing but they said it would be mailed to me.  I

23  thought it was weird that I didn't have any papers

24  or anything when I left the hearing.

Justin Douglas
December 03, 2015

208

```
 1        Q.        I don't think you understand my
 2   question.
 3        A.        No, I didn't take any notes.
 4        Q.        You didn't take notes at the hearing?
 5        A.        Well, yes, I believe I did take notes.
 6   I might have been provided a pencil and a paper to
 7   write down some thoughts that I had and questions
 8   that I had to ask.
 9        Q.        What did you do with the notes?
10        A.        Well, I disregarded them after a while
11   or I just -- when I asked, my next question or my
12   next thought was, I don't have anything tangible to
13   leave here with, you know, besides what I scribbled
14   to ask them questions, that they eluded my
15   questions, my questioning.  And it was just like,
16   so, I guess I didn't put that much thought to hold
17   onto my notes.
18        Q.        Did you keep your notes?
19        A.        I tried to keep as much as I could, but
20   no, I don't believe I kept my notes.
21        Q.        Have you looked for those notes?
22        A.        I have looked for the determination of
23   my criminal compliant application.  I have looked
24   for the CD that they alleged, that I wrote to
```

1      Magistrate Gay, and asked him to furbish with me

2      the CD that he alleged that he mailed to me or

3      anything they acknowledged that there was a hearing

4      and there was transcripts but they destroyed it.

5              And if I was to receive it, I would

6      have been incarcerated the entire time, and for me

7      to receive legal mail, I have to -- they have ledge

8      it in a ledger and, then I have to go and sign for

9      it.  And, so, it's impossible for me to be in

10     prison or jail and receive anything without

11     notification regarding legal mail.

12         Q.      Well, if I understand you correctly, at

13     this show cause hearing, you had a paper and a

14     pencil and you made notes on the pad at the time,

15     correct?

16         A.      Yes, sir.

17         Q.      So, those were in your hand at the time

18     the hearing was over, right?

19         A.      By the time the hearing was over, yes,

20     sir.

21         Q.      What did you do with them when you left

22     the hearing?

23         A.      I had them in my hand and I might have

24     thrown them away because they weren't

1    necessarily -- they were more or less my questions

2    I had for the officers.  I was trying to piece

3    together the lies of him saying I'm kicking my feet

4    and swinging my shoulders at officers and the

5    inconsistencies with his statements.  How in the

6    world can I -- first off, me punched in the face

7    and I'm tripped like he alleges, how can I -- do

8    you have to brace yourself?  I have to brace --

9                    MR. PINEIRO:  He wants to know

10       what you did with the notes.

11                    THE WITNESS:  I thew them away.  I

12       threw them away.  I don't have them.

13                    MR. PINEIRO:  If you kept them.

14    Q.       (By Mr. Kittredge)  Where were you when

15    you threw them away?

16    A.       I was in possibly the county.  I was in

17    Hampden County.

18    Q.       So, you took them back to Ludlow with

19    you?

20    A.       Yes.

21    Q.       And you threw them away at the jail?

22    A.       Yes, sir.

23    Q.       How long after the hearing did you

24    throw them away?

1       A.       Well, since I didn't hear anything and

2   --

3                      MR. PINEIRO:  Give him a date.

4                      THE WITNESS:  I'm not -- I'm

5       trying to think back and I don't know the

6       timeframe.  Maybe a month or two depending.

7       I was waiting for the determination.  And

8       then logically, I would have put them away

9       to anticipate the incoming of more

10      information so I can put them, coagulate

11      them together, and they never showed up.  I

12      never received anything.  So, I threw them

13      away.

14                     MR. KITTREDGE:  I have to get up.

15      I need Exhibit 7.  Is that the photos?

16                     MR. LIEBEL:  Yes.

17                     MR. KITTREDGE:  Can I have that

18      for just a moment?

19      Q.       (By Mr. Kittredge)  I'm looking at the

20  second photo here in Exhibit Number 7 and is that

21  the same furniture -- or the furniture depicted in

22  that photograph, is it the same as what was in

23  there on April 26th, 2012?

24      A.       Yes, sir.

Justin Douglas
December 03, 2015

212

```
 1         Q.      It's the same furniture?

 2         A.      Yes, sir.

 3         Q.      Same lamp?

 4         A.      I couldn't tell you if it's the same

 5  lamp.  I know it's the same TV setup, the same

 6  chairs, and the same dresser but --

 7         Q.      And the sink is the same in Photo

 8  Number 3 --

 9         A.      Looks the same.

10         Q.      -- as it was on April?

11         A.      Yes, sir.

12         Q.      And the next photograph, the fourth

13  photograph, everything there is exactly the same as

14  it was on April 26th, 2012?

15         A.      It looks the same.  I'm not going to

16  say exactly but it looks the same.  Everything

17  looks the same.

18         Q.      The curtains are the same, are they, as

19  on April, 2012?

20         A.      It had curtains, yes, and it looks

21  exactly the same.

22         Q.      Is the bedcover in the photograph the

23  same as the one in of April, 2012?

24         A.      To my recollection, the bed cover does
```

**Justin Douglas**
**December 03, 2015**

1    look the same.

2        Q.       Is the rug color the same as it was in

3    April, 2012 in the next photo?

4        A.       Yes, sir.

5                 MR. KITTREDGE:  Thank you.

6                 MR. LIEBEL:  That's all I have.

7                 (Witness excused)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Justin Douglas
December 03, 2015

```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF MASSACHUSETTS

 3

 4        I, NICOLE A. STEWART, a Notary Public in and
     for the Commonwealth of Massachusetts, do certify
 5   that pursuant to notice, there came before me on
     December 3, 2015, at the Northeast Correctional
 6   Center, located at 1 Barretts Mill Rd., Concord,
     MA, the following named person, to wit:  JUSTIN
 7   DOUGLAS, who was by me duly sworn to testify to
     the truth and nothing but the truth as to his
 8   knowledge touching and concerning the matters in
     controversy in this cause; that he was thereupon
 9   examined upon his oath and said examination
     reduced to writing by me; and that the deposition
10   is a true record of the testimony given by the
     witness, to the best of my knowledge and ability.
11
          I further certify that I am not a relative
12   or employee of counsel or attorney for any of the
     parties, or a relative or employee of such
13   parties, nor am I financially interested in the
     outcome of the action.
14
          WITNESS MY HAND, this 26th day of December,
15   2015.

16

17

18   _____
          Nicole A. Stewart
19

20   My Commission expires:  April 16, 2021

21

22

23

24
```

**Accurate Court Reporting**
**(413)747-1806   Fax: (413)747-1818**

**Justin Douglas**
**December 03, 2015**

```
 1                    SIGNATURE/ERRATA SHEET

 2        I have read the foregoing, and it is a true

 3    transcript of the testimony given by me at the

 4    taking of the subject deposition with the

 5    following corrections/changes, if any:

 6

 7    _____        _____

 8         Date                     JUSTIN DOUGLAS

 9

10    PAGE     LINE     CHANGE                      REASON

11    -------------------------------------------------------

12    -------------------------------------------------------

13    -------------------------------------------------------

14    -------------------------------------------------------

15    -------------------------------------------------------

16    -------------------------------------------------------

17    -------------------------------------------------------

18    -------------------------------------------------------

19    -------------------------------------------------------

20    -------------------------------------------------------

21    -------------------------------------------------------

22    Case Name:  DOUGLAS V. CITY OF SPRINGFIELD, et al

23    Date Taken:  December 3, 2015

24    nas
```