```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
                    C.A. 3:14-CV-30210-MG
```

JUSTIN DOUGLAS                                          )
                                                        )
             vs.                                        )
                                                        )
CITY OF SPRINGFIELD, DET. GREGG BIGDA,                  )
DET. STEVEN KENT, DET. ROBERT PATRUNO,                  )
DET. THOMAS KAKLEY, DET. MARK TEMPLEMAN,                )
DET. EDWARD KALISH, DET. CHRISTOPHER                    )
BATES and MASS. STATE POLICE TROOPER                    )
LIAM R. JONES,                                          )

      DEPOSITION of STEVEN KENT, called at the request of the Plaintiff, pursuant to Rule 30 of the Federal Rules of Civil Procedure, before Linda Dunlop, Certified Shorthand Reporter No. 134193 and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Hector E. Pineiro, 807 Main Street, Worcester, Massachusetts, on Monday, November 30, 2015, commencing at 10:52 a.m.

---

**BAY STATE REPORTING AGENCY**
**8 VINELAND STREET**
**WORCESTER, MASSACHUSETTS 01604**
**(508) 753-4121**

```
 1        A P P E A R A N C E S:

 2     FOR THE PLAINTIFF:
       LAW OFFICE OF HECTOR E. PINEIRO, P.C.
 3     807 Main Street
       Worcester, MA 01610
 4        BY:  HECTOR E. PINEIRO, ESQ.

 5

       FOR THE DEFENDANT LIAM R. JONES:
 6     RAFANELLI & KITTREDGE, P.C.
       1 Keefe Road
 7     Acton, MA  01720-5517
          BY:  MARGARET A. RUBINO, ESQ.
 8
       FOR THE DEFENDANT CITY OF SPRINGFIELD:
 9     CITY OF SPRINGFIELD
       36 COURT STREET, SUITE 210
10     SPRINGFIELD, MA 01103
          BY:  JOHN T. LIEBEL, ESQ.
11
       FOR THE DEFENDANT ROBERT PATRUNO, STEPHEN KENT:
12     REARDON, JOYCE & AKERSON, P.C.
       4 Lancaster Terrace
13     Worcester, MA 01609
          BY:  AUSTIN JOYCE, ESQ.
14
       FOR THE DEFENDANTS CHRISTOPHER BATES, MARK
15     TEMPLEMAN, THOMAS KAKLEY, EDWARD KALISH, GREGG
       BIGDA:
16     LAW OFFICE OF KEVIN B. COYLE
       1299 Page Boulevard
17     Springfield, MA 01104
          BY:  KEVIN B. COYLE, ESQ.
18
       ALSO PRESENT:   Robert Patruno
19                     Edward Kalish
                       Gregg Bigda
20

21

22

23

24
```

| | | |
|---|---|---|
| 1 | Q. | Do you know if an injured prisoner report was |
| 2 | | prepared in connection with Mr. Ververis? |
| 3 | A. | I believe there was, yes. |
| 4 | Q. | And did you prepare the injured prisoner report? |
| 5 | A. | No. |
| 6 | Q. | Who prepared the injured prisoner report? |
| 7 | A. | I don't recall. |
| 8 | Q. | If someone gets hurt during a drug raid and |
| 9 | | you're the highest officer, do you have an |
| 10 | | obligation to fill out an injured prisoner |
| 11 | | report? |
| 12 | A. | Yes.  But that report will go through the squad |
| 13 | | commander's office so, yes, the officer is |
| 14 | | obligated. |
| 15 | Q. | And then you, as the supervisor, have to cosign |
| 16 | | that report? |
| 17 | A. | No. |
| 18 | Q. | So then it goes to a lieutenant? |
| 19 | A. | It would go to the squad commander which would |
| 20 | | be either a lieutenant or captain and through |
| 21 | | the booking sergeant, the injury report's given |
| 22 | | to the booking sergeant who takes it to the |
| 23 | | commanding officer. |
| 24 | Q. | Then what happens to the report? |

```
 1   A.   It goes upstairs to the commissioner's office.
 2   Q.   And to your knowledge, does the commissioner
 3        review those reports?
 4   A.   I believe they do.
 5   Q.   Do you know that or are you simply --
 6   A.   I don't know.
 7   Q.   Fair enough.  Do you know if the Bureau of
 8        Professional Standards gets injured prisoner
 9        reports?
10   A.   I don't know.
11   Q.   Fair enough.  Were any of the officers that were
12        involved in the arrest of Ververis reprimanded
13        or disciplined?
14   A.   There were -- I don't think they were
15        disciplined but there was retraining which is
16        different.
17   Q.   So was there any reprimand?
18   A.   I don't believe so, no.
19   Q.   And what type of retraining was ordered?  Why
20        was retraining ordered?
21   A.   The commissioner ordered Officers Roberson and
22        Mitchell to be retrained on how to carry
23        noncompliant person -- how to carry a
24        noncompliant person.
```

| | | |
|---|---|---|
| 1 | Q. | Why did he order that? |
| 2 | A. | Because the video of Mr. Ververis's arrest, he |
| 3 | | was being noncompliant and making himself limp |
| 4 | | and apparently the commissioner took issue on |
| 5 | | the way that they carried him, obviously. |
| 6 | Q. | Did you see the video? |
| 7 | A. | I did. |
| 8 | Q. | And what does that video show? |
| 9 | A. | It shows two officers picking up Mr. Ververis, |
| 10 | | pulling him from the middle of Worthington |
| 11 | | Street into the park and laying him down. |
| 12 | Q. | And when they did that was Mr. Ververis moving |
| 13 | | in the videotape? |
| 14 | A. | No. |
| 15 | Q. | Was he limp? |
| 16 | A. | He was being noncompliant, limp, yes. |
| 17 | Q. | Was he unconscious when he was being dragged by |
| 18 | | those officers? |
| 19 | A. | No. |
| 20 | Q. | He was just playing dead, playing possum is what |
| 21 | | you're saying? |
| 22 | A. | Yes. |
| 23 | Q. | And then did they get to place him on the |
| 24 | | ground? |

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Did they throw him on the ground? |
| 3 | A. | No. |
| 4 | Q. | So what does the video show that they did, |
| 5 | | though? |
| 6 | A. | The video shows them dragging him over and |
| 7 | | putting him in the snow. |
| 8 | Q. | Because you were the officer that prepared the |
| 9 | | report in Ververis, were there things that you |
| 10 | | left out of the report that you felt later on |
| 11 | | that should have been included? |
| 12 | A. | Yes. |
| 13 | Q. | And what was it that you felt should have been |
| 14 | | included that was not included? |
| 15 | A. | Officer Collins had taken a cell phone from the |
| 16 | | bystander who had recorded -- we believe who had |
| 17 | | recorded Mr. Ververis pulling out my gun and |
| 18 | | neglecting to write that into the report. |
| 19 | Q. | And so Officer Collins confiscated a cell phone? |
| 20 | A. | Yes. |
| 21 | Q. | And who took the cell phone back to the station? |
| 22 | A. | He did. |
| 23 | Q. | And it was kept as evidence? |
| 24 | A. | It was tagged into evidence per Springfield |

```
 1        Police Department policies.
 2   Q.   Was a search warrant obtained to look through
 3        the phone?
 4   A.   No.
 5   Q.   Did somebody look through the phone?
 6   A.   No.
 7   Q.   You know there was an allegation that somebody
 8        erased a video of that that had been taken?
 9   A.   Yes.
10   Q.   Did you investigate that?
11   A.   The allegation?
12   Q.   Yes.
13   A.   No.
14   Q.   Do you know that the Bureau of Professional
15        Standards reviewed that allegation?
16   A.   They did.
17   Q.   Did anyone look into the actual video to see if
18        something had been erased that day?
19   A.   They were unable because someone else had given
20        the phone back without anybody's knowledge.
21   Q.   To the individual?
22   A.   To the person who owned it.
23   Q.   To a female?
24   A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Was Mr. Bigda using force or not using force? |
| 2 | A. | Again, I believe that the situation resolved |
| 3 | | itself so other than -- I believe he had his |
| 4 | | hands on him.  I don't believe there was any |
| 5 | | force behind that being used at that time. |
| 6 | Q. | And you said that you saw Mr. Patruno holding |
| 7 | | the legs? |
| 8 | A. | Yes. |
| 9 | Q. | And when you came around did you say it took you |
| 10 | | seconds from the time that you heard the yelling |
| 11 | | to the moment that you saw Mr. Bigda? |
| 12 | A. | Yes.  Several seconds. |
| 13 | Q. | And during those several seconds things had |
| 14 | | subsided, things had quieted down? |
| 15 | A. | Correct. |
| 16 | Q. | And was Mr. Douglas moving at that time? |
| 17 | A. | I don't recall. |
| 18 | Q. | And were his legs moving at the time or did they |
| 19 | | stop moving? |
| 20 | | MR. JOYCE:  Objection. |
| 21 | A. | I'm not sure. |
| 22 | Q. | Did Mr. Douglas appear to you to be conscious or |
| 23 | | did he appear to you to have passed out? |
| 24 | | MR. JOYCE:  Objection. |

| | | |
|---|---|---|
| 1 | A. | He appeared to me to be conscious. |
| 2 | Q. | And did he appear to you to be injured or not? |
| 3 | | MR. JOYCE:  Objection. |
| 4 | A. | I didn't see any signs of injury, no. |
| 5 | Q. | You didn't see any blood in the room? |
| 6 | A. | No. |
| 7 | Q. | Do you know if any blood had to be cleaned in the room? |
| 9 | A. | I don't believe so, no. |
| 10 | Q. | Do you know if the hotel management cleaned any blood inside of the room? |
| 12 | A. | I don't know. |
| 13 | Q. | Did you ever make any inquiry on that? |
| 14 | A. | No. |
| 15 | Q. | Fair enough.  What happened next? |
| 16 | A. | Eventually there was an additional firearm found.  We recovered the evidence that we needed to recover and Mr. Douglas and the girl were transported to the state police barracks. |
| 20 | Q. | Can you tell me what interactions that you had with Samantha Rawls? |
| 22 | A. | I don't believe I interacted with her directly.  She was upset, belligerent.  I mean, I don't believe that I dealt with her directly. |

```
1   Q.   She was upset and belligerent?
2   A.   Yes.
3   Q.   What did she say?
4   A.   I don't recall but she was making a lot of noise
5        yelling.
6   Q.   Do you know the words that she uttered?
7   A.   I don't recall.
8   Q.   Do you know who she was yelling at?
9   A.   I don't recall if there was any one specific
10       person or just the police in general.
11  Q.   And when you saw Ms. Rawls, who had physical
12       custody of Ms. Rawls?
13  A.   I'm not sure.
14  Q.   And do you know if Ms. Rawls was slapped?
15  A.   I don't believe Ms. Rawls was slapped, no.
16  Q.   Are you having doubts about that?
17  A.   Yes, I do.
18  Q.   You have some doubts whether she was or not?
19  A.   No.  I have no doubt that she was not slapped.
20  Q.   As a commanding officer would there be any
21       reasons, knowing what you know about this
22       arrest, to have slapped her in the face?
23  A.   About in this specific arrest?
24  Q.   Yes.
```