

| Springfield Police Department<br>General Order | |
|---|---|
| **Subject: Electronic Control Weapons (ECW)** | |
| Order Number: G.O. 700.10 | Effective Date: 03/01/2015 |
| Issue Date: 03/01/2015 | Date of Next Review: 03/01/2017 |
| Distribution: All Sworn Officers | Page 1 of 5 |

## I.  Content

General Guidelines
Policy
Definitions
Procedures
Use of Force Model
Deployment of Device
Medical Care
Reporting

## II.  General Guidelines

Electronic control weapons, (ECW), often referred to by the common brand name TASER, are electro-muscular disruptors that override the central nervous system. Such weapons provide officers with another control option during situations which require the use of force.

Electronic control weapons will be made available to authorized officers who obtain the training specified by the Commonwealth of Massachusetts, consistent with the policies and recommendations of respected law enforcement agencies, such as the International Association of Chiefs of Police and the Municipal Police Training Committee (MPTC).

## III.  Policy

It is the policy of this department that electronic control weapons shall be made available as a less lethal use of force option to police officers who are authorized to carry this weapon; and electronic control weapons may be used by authorized and trained personnel in accordance with 501 CMR 8.00, and consistent with additional guidelines established herein.

## IV.  Definitions

A.  **Electronic control weapon or device:** Also referred to as an electronic weapon.  A portable device or weapon from which an electrical current, impulse, wave or beam may be directed where such current, impulse, wave or beam is designed to incapacitate temporarily.

B.  **AFIDS (Anti-Felon Identification Tags):** Confetti-like pieces of paper that are expelled from the cartridge when fired. Each AFID tag contains an alpha-numeric identifier unique to the cartridge used.

C. **Drive Stun Mode:** The electronic control weapon is used without the cartridge. The device is pressed against the subject, and an electrical shock is delivered. Utilized in this method, the electronic control weapon is a pain compliance option and will not cause neuromuscular incapacitation.

D. **Probe Deployment Mode:** Probes are discharged causing a temporary electro-muscular disruption.

E. **Neuromuscular Incapacitation:** Occurs when an electronic control weapon is able to cause involuntary stimulation of both the sensory nerves (nerves that carry information from the body to the brain) and the motor nerves (nerves that carry commands from the brain to the muscles to control movement).

## V.    Procedures

A. **Authorization**
The department policies regarding Use of Force G.O. 100.20, and Use of Force Reporting G.O. 500.75, apply to electronic weapons. For further information, refer to these policies.

Only officers who have been trained and authorized may carry this device. Except for training purposes, an officer shall not possess or carry an electronic control weapon until successfully completing an approved training program in the use of electronic weapons.

Special Regulation Regarding Electronic control weapons, training:
501 CMR 8.04 establishes a training requirement for the use of electronic weapons. In order to qualify for admission into an approved training program for the use of electronic weapons, an authorized officer must:
   a.  Be currently employed as a state or municipal law enforcement officer;
   b.  Have successfully completed a firearms training course conducted by the Municipal Police Training Committee or approved by the Colonel of the Massachusetts State Police; and
   c.  Be authorized by the officer's department to carry a firearm in the performance of the officer's duty.

All instructors must be certified by the Municipal Police Training Committee, (MPTC).

All officers authorized to carry an electronic control weapon will be trained using curriculum identical to the MPTC's and includes the following:
   a.  At least an 8-hour training course.
   b.  A review of the mechanics of the electronic control weapon.
   c.  A review of medical issues to be considered with the use of the electronic control weapon including but not limited to, effects of its use on individuals with pre-existing medical conditions and information / demonstration regarding removal of the wires and probes from an individual following the discharge of the electronic control weapon.
   d.  Weapon proficiency will be demonstrated with an accurate discharge of the electronic control weapon by each trainee.
   e.  Use of the electronic control weapon as a less lethal force option and its relation to other department authorized weapons, and review of the department's Use of Force policy and any other applicable policies.
   f.  Officers may periodically be required to re-certify with the use of the electronic control weapon.

B. Carrying
The device will be carried in an approved holster in a cross draw configuration on the side of the body opposite the service handgun. The device will be carried fully armed with the safety on. Off duty possession of the electric control weapon is not authorized.

C. Accessories
Only agency-approved battery power sources shall be used in the electronic weapon. No unauthorized alterations, modifications or accessories will be used.

VI.   Use of Force Model

A. Drive Stun Mode
In drive stun mode the device is a pain compliance tool rather than an electro-muscular disruptor. It may be deployed as a pain compliance technique in response to an active resistant person. It is minimally effective compared to conventional cartridge-type deployments. The effect of drive stun is not as long-lasting as fired probes. Note: Pain compliance may not be effective against someone in a state of "mind-body disconnect," as in a mental health crisis state, under the influence of a mind altering substance, or extremely focused.

B. Firing the device
Firing the device cartridge to deploy electrodes is a defensive tactic. It may be used in response to an assaultive person.

C. Lethal Force
Intentionally firing the device at the head or neck is a deadly force countermeasure in response to a lethal threat. ELECTRONIC CONTROL WEAPONS ARE NOT A SUBSTITUTE FOR LETHAL FORCE. Officers are not expected to respond to a lethal force threat with a less lethal force option such as an electronic weapon. An electronic control weapon may be used in response to a lethal force threat under exigent circumstances as a weapon of available means. Electronic control weapons are best considered an option in situations where the officer has moved to a position of advantage such as cover, concealment or barrier, based upon the subject's behavior or weapons; and an additional officer can safely approach the subject to within effective range to deploy the electronic control weapon.

VII.   Deployment of Device

A full five second cycle deployment should be applied without interruption unless circumstances dictate otherwise. The five second cycle is a potential "window of opportunity" for an officer to immobilize, control, or handcuff a suspect. Secure the suspect as quickly as possible during or immediately following the period of capacitation. A second or subsequent five second cycle may be necessary if, after the first five second cycle, the officer still perceives the subject as a threat. Officers should be aware that an energized subject may not be able to respond to commands during, or immediately following exposure. The officer shall energize the subject the least number of times and no longer than necessary to accomplish the legitimate operational objective.

A. Target Areas
Preferred Target areas include: back, buttocks, lower abdomen and thighs. Avoid aiming at the head or neck unless the encounter justifies a deadly force response.

**B. Forbidden**
   a. Deployment of the device in a punitive or coercive manner.
   b. Use on a handcuffed or secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion.
   c. Use in any environment where an officer knows that a potentially flammable, volatile, or explosive material is present (including but not limited to OC spray with volatile propellant, gasoline, natural gas, or propane). The Springfield Police department only authorizes the use of OC spray that is non-flammable and specifically formulated for use with electronic control devices.
   d. In any environment where the subject's fall could reasonably result in death (such as in water or on an elevated structure).

**C. Susceptible Populations**
   Officers should be aware of the greater potential for injury when using an electronic control weapon against certain individuals. Electronic control weapons should not be used against:
   a. children under the age of eighteen (18);
   b. adults over the age of seventy (70);
   c. women believed to be pregnant; or
   d. those known to be suffering from severe mental illness.
   e. those known to have pacemakers

Electronic control weapons should only be deployed on these vulnerable groups if the officer's assessment at the time is that the individuals have or will cause immediate serious bodily harm to themselves and/or others but could be subdued by an electronic weapon.

**D. Probes**
   Probes may be removed by trained officers after the subject is restrained.

**VIII.   Medical Care**

A. Seek medical attention for:
   a. A person who requests medical attention.
   b. A person who does not appear to recover properly after being engaged with the electronic device.
   c. A person who is in a potentially susceptible population category. See SUSCEPTIBLE POPULATION in this policy.
   d. A person who has been energized more than three times.
   e. A person who has had more than one electronic control weapon effectively used against him or her in any given incident.
   f. A person who has been subjected to a continuous energy cycle of fifteen (15) seconds or more.
   g. A person who has exhibited signs of extreme uncontrolled agitation or hyperactivity prior to electronic control weapon exposure. For further information, see the department policy regarding Use of Force.

B. Transport, by ambulance, the following to a medical facility:
   a. A person who is struck by a probe in the neck, throat, face, female breasts, groin.
   b. A person from whom personnel have difficulty removing the probes.
   c. A case in which the barb separates from the probe upon removal.

## IX.   Reporting

### A. Officer Responsibilities
The deploying officer shall notify his or her supervisor as soon as possible after deploying the device and shall complete the designated ECW form.

Officers shall specifically articulate in their use-of-force report any instance of the following:
   a. An electronic control weapon is energized more than three times on a single subject.
   b. An energy cycle longer than fifteen (15) seconds in duration is used against a subject.
   c. More than one electronic control weapon is used against a subject in any given incident.
   d. An electronic control weapon is used against an individual designated to be in a "susceptible population."

### B. Supervisor Responsibilities
   a. Ensure that photographs of the area impacted by the probes are taken after the probes are removed, if possible.  Officers are advised to protect the privacy and confidentiality of the subject.
   b. Ensure that the subject has received the proper medical attention.
   c. If the device has been fired, the officer shall collect the cartridge, wire leads, darts, and AFIDs as evidence in a proper container. Darts are to be treated as a biohazard material and appropriately handled and tagged.  These will be held until final disposition of any criminal charges, but not less than 90 days.
   d. If the device has been discharged, notification will be made to the Police Commissioner as soon as possible through written reporting requirements.

### C. Administrative Responsibilities
The Springfield Police Department will comply with all data collection and reporting requirements set forth in MGL chapter 140 section 131j and St. 2004, chapter 170 section 2.

There will be an administrative review of each report of the discharge of an electronic weapon. This will be conducted by the captain assigned to Quality Assurance or other command staff officer as directed by the Police Commissioner.  The department will conduct an annual analysis of reported uses of electronic weapons.   Training needs, equipment upgrades, and/or policy modifications will be considered.

John R. Barbieri, Police Commissioner



| Springfield Police Department General Order | |
|---|---|
| **Subject: Use of Force** | |
| Order Number: G.O. 100.20 | Effective Date: 01/01/2015 |
| Issue Date: 01/01/2015 | Date of Next Review: 01/01/2017 |
| Distribution Code: A | Page 1 of 5 |

I.      **Content**

Purpose
Policy
Organizational Procedures
Non-Deadly Force
Deadly Force
Progression of Force
Use of Force Model

II.     **Purpose**

A.   The policy and procedure of the Springfield Police Department regarding the use of force including less lethal [1] force and deadly force are set forth in this order with the purpose of providing officers with specific guidelines.

III.    **Policy**

A.   It is the policy of the Springfield Police Department that an officer's force [2] response must be objectively reasonable [3] in consideration of the officer's perception of the risk/threat presented, and the officer's perception of the subject's action(s).

IV.    **Organizational Procedures**

A.   This order is mandated for all officers [4] of the Springfield Police Department.

B.   An officer shall utilize and carry, and/or have immediately available, only department authorized weapons, restraining devices and chemical agents while on duty. The carrying and use of any unauthorized weapons, restraining devices and chemical agents when on duty is strictly prohibited.

C.   Violation of this order shall be considered misconduct subject to disciplinary action under the written directives [5] of the Springfield Police Department.

---

[1] Less Lethal Force:  Any use of force other than that which is considered deadly.

[2] Force: is the amount of physical effort required by officer(s) to compel compliance from a subject. This includes any use of force by an officer occurring in an official law enforcement capacity whether on or off-duty.

[3] Objectively Reasonable: In determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances including, but not limited to the seriousness of the crime, the level of threat or resistance presented by the subject and the danger to the community.

[4] Officer: Shall include all sworn department members who take the oath of office and are vested with police powers.

[5] Directive: A directive is a written departmental communication in the form of a General Order, Special Order or Administrative Order to disseminate rules, regulations, policies, procedures, or any other information to department employees.

D. As of the effective date of the order, this order supersedes all other rules, regulations, procedures, orders, bulletins, and directives issued previously regarding the use of force.

## V.   Less Lethal Force

A. An officer may use that level of less lethal force that is objectively reasonable to bring an incident and/or subject under control.

B. An officer is authorized to use less lethal force to:

1. Effect an arrest,
2. Protect the officer or another subject(s) from physical harm,
3. Restrain or subdue a resistant subject, and/or
4. Bring an unlawful situation safely and effectively under control.

## VI.   Deadly Force

A. An officer is authorized to use deadly force to:

1. Protect the officer and/or another person(s) from an unlawful attack, which the officer reasonably perceives as an immediate threat of death or serious physical injury [6].
2. Prevent the escape of a fleeing violent felon whom the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others and only when the force employed creates no substantial risk of injury to innocent persons.
3. Render harmless an animal which presents a clear and immediate danger of death or serious injury to a human being, or an animal which is so severely injured that humanity requires its removal from further suffering.

## VII.   Progression of Force

A. The officer's response options within each of the five force levels identified in the Use of Force Model [7] (see section VIII) are not necessarily listed in the order of use and/or need. The officer may de-escalate, stabilize or escalate his/her response based upon his/her risk assessment and the perceptions of the subject's degree of compliance or non-compliance.

B. The force tactics listed in each of the five force levels identified in the Use of Force Model are those tactics that officers are trained in. The Department recognizes that there are other methods and tactics that can be used at each of the levels of authority. If a tactic is used that is not listed it must be objectively reasonable as it relates to the officer's risk assessment and the subject's action.

## VIII.   Use of Force Model

A. Level One: The Compliant [8] Subject

1. The perceived subject actions [9]: The officer perceives the subject's actions as cooperative and control is maintained via public acceptance, officer presence, verbalization skills, etc.
2. The perceived circumstances [10] are strategic: The officer must maintain a minimum level of awareness and preparedness to enhance the overall and ongoing status of officer safety anytime he/she is working.

---

[6] Serious Physical Injury: A serious physical injury is described as an injury that would create a substantial risk of death, causes serious permanent disfigurement, require the subject be admitted into a hospital, and/or result in extended loss or impairment of the function of any bodily member or organ.

[7] Force Model: Are force options that are divided into five (5) levels to guide the officer during a use of force situation.

[8] Compliant Subject: A subject who submits to the officer's authority and direction through either words or actions.

[9] Perceived Subject Action: The subject's actions as perceived by the reasonable officer that designate the subject at one or more of the Use of Force Model's compliant and/or non-compliant categories.

3. The reasonable officer responses are cooperative controls: The cooperative controls would include, but not be limited to those force tactics listed below.

| Cooperative Controls | |
|---|---|
| Officer presence: | Appearance |
| Communication skills: | Dialogue<br>Verbal commands |
| Approach techniques: | Confrontation equation<br>Relative positioning<br>Contact / cover officer tactics |
| Frisk techniques: | 1 officer on 1 subject<br>2 officers on 1 subject |
| Searching techniques: | 1 officer on 1 subject<br>2 officers on 1 subject |
| Restraining techniques: | Handcuffing<br>Flex-cuffs<br>Leg restraints<br>1 officer on 1 subject<br>2 officers on 1 subject |
| Transporting techniques: | Two officer unit<br>One officer unit |

B. Level Two: The Resistant (passive) Subject

1. The perceived subject actions: This is the preliminary level of subject non-compliance. The subject offers no physical or mechanical energy enhancement toward the resistant effort. The subject has not directed his or her physical strength and energy in establishing, achieving and/or maintaining a posture of resistance.

2. The perceived circumstances are tactical: The officer perceives an increase in the threat potential within the confrontational environment, which would initiate the process where specific tactics and procedures would now be deployed.

3. The reasonable officer responses are contact techniques: The contact controls would include, but not be limited to those force tactics listed below.

| Contact Controls | |
|---|---|
| Restraint techniques: | Elbow grasp |
| Contact controls: | Escort position<br>Handcuffing control position |

C. Level Three: The Resistant (active) Subject

1. The perceived subject actions: The subject's non-compliance has increased in scope and intensity and now includes energy enhanced physical or mechanical defiance. The subject has directed his or her physical strength and energy in establishing, achieving and/or maintaining a posture of resistance.

2. The perceived circumstances are volatile: The officer is now confronted with the presence and/or potential of an increase in the threat intensity, severity, etc. The officer recognizes

---

[10] Perceived Circumstances: Are the reasonable officer's perspective of the severity of any crime, the existence of any and all safety threats to the officer or others, and the degree of compliance and/or non-compliance from the subject at the time of the encounter.

this increase in the threat potential and must deploy techniques and tactics that would overcome and/or control this increased risk.

3. The reasonable officer responses are compliance techniques: These compliance techniques would include, but not be limited to those force tactics listed below.

| Compliance Technique | |
|---|---|
| Compliance techniques: | Front wrist lock<br>Finger grasp<br>Rear wrist lock<br>Arm bar<br>Bent wrist lock |
| Baton control techniques: | Strong side armlock<br>Weak side armlock<br>Strong side wrist drag<br>Weak side wrist drag |
| Non-chemical agents: | Oleoresin Capsicum (O.C.) Spray |
| Electronic Control Weapons (TASER) | Drive stun mode |
| K-9 | Presence<br>Barking |

D. Level Four: The Assaultive (bodily harm) Subject:

1. The perceived subject actions: The officer's attempt to gain lawful compliance has concluded in a perceived or actual attack on the officer or another person(s). The officer makes the reasonable assessment that such actions by the subject would result in his/her or another's bodily harm.

2. The perceived circumstances are harmful: The officer perceives an accelerated assessment of danger. This situation has reached the degree where the physical well being of the officer or another person is in jeopardy if the subject is not stopped and controlled.

3. The reasonable officer responses are defensive tactics: These defensive tactics would include, but not be limited to those force tactics listed below.

| Defensive Tactics | |
|---|---|
| Impact Weapon Techniques: | Expandable Straight Baton strike<br>Long Baton strike |
| Ground fighting techniques | |
| Personal Weapons: | Head strike<br>Hand strike<br>Elbow strike<br>Knee strike<br>Foot strike |
| K-9: | Subject Apprehension |
| Chemical Agents: | CS<br>CN |
| Electronic Control Weapons (TASER) | Probe deployment |

E. Level Five: The Assaultive (serious bodily harm, death) Subject

1. The perceived subject actions: The officer is now confronted by an assaultive act that reaches the ultimate degree of danger. The officer perceives that if these actions are followed through with, that the officer or others would be subject to death or serious physical harm.

2. The perceived circumstances are lethal: The officer perceives the highest degree of threat towards his/her or another's safety. The officer's reasonable assessment would be that if this situation were allowed to continue that he/she or another could be seriously injured or killed. A maximized system of defense must be initiated.

3. The reasonable officer responses are deadly force: These deadly force tactics would include, but not be limited to those force tactics listed below.

| Deadly Force | |
| --- | --- |
| Emergency Vehicular Response: | Vehicular Pursuit |
| Service Weapons: | Handgun<br>Shotgun<br>Rifle<br>Carbine<br>Sub-machine gun<br>TASER (Probe deployment to head or neck) |

John R. Barbieri, Police Commissioner



| | Springfield Police Department<br>General Order |
|---|---|
| | **Subject: Reporting the Use of Deadly Force and Less Lethal Force Tools** |
| | **Order Number: G.O. 500.75** | **Effective Date: 01/01/2015** |
| | **Issue Date: 01/01/2015** | **Date of Next Review: 01/01/2017** |
| | **Distribution Code: A** | **Page 1 of 3** |

**I.    Content**

> Purpose
> Policy
> Organizational Procedures
> General Guidelines
> Firearms Use

**II.    Purpose**

   A.   The policy and procedure of the Springfield Police Department regarding reporting the use of deadly force [1] and less lethal [2] force tools are set forth in this policy with the purpose of providing officers with specific guidelines.

**III.    Policy**

   A.   It is the policy of the Springfield Police Department that an officer shall report any and all utilization of deadly force and less lethal force tools.

**IV.    Organizational Procedures**

   A.   This order is mandated for all officers [3] of the Springfield Police Department.

   B.   As of the effective date, this policy supersedes all other rules, regulations, procedures, orders, bulletins, and directives issued previously regarding the use of authorized firearms.

   C.   Violation of this order shall be considered misconduct subject to disciplinary action under the written directives [4] of the Springfield Police Department.

**V.    General Guidelines**

   A.   An officer shall file a complete and accurate report to the Office of the Police Commissioner when he/she uses;

     1.   Deadly force against a person and/or animal, and/or

     2.   A less lethal force tool against a person and/or animal (i.e. electronic weapon, O.C., baton or other impact tool if used as an impact tactic).

   B.   A supervisor shall ensure that the required report is complete before submittal by the officer.

---

[1] Deadly Force: Any use of force that is reasonably likely to cause death.
[2] Less Lethal Force: Any use of force other than that which is considered deadly.
[3] Officer: Shall include all sworn department members who take the oath of office and are vested with police powers.
[4] Directive: A directive is a written departmental communication in the form of a General Order, Special Order or Administrative Order to disseminate rules, regulations, policies, procedures, or any other information to department employees.

    C. An officer is not required to report force used when routine and normal in controlling, searching, and/or handcuffing a compliant [5] subject, or that force used at approved training exercises.

    D. An officer shall notify his/her immediate Field Supervisor whenever she/he utilizes deadly force and/or a less lethal force tool that results in the death or serious physical injury [6] to a subject, officer or other.

    E. This order is not intended to preclude an officer from reporting the use of any force tactics that are not identified in this directive.

    F. The Identification Unit shall take color photographs of the area of injury or possible injury, for every subject and officer injured or complaining of injury resulting from a reported and/or alleged use of force.

## VI.   Firearms Use

    A. An officer who discharges a department firearm for any reason, except during authorized training or target practice, shall secure his firearm as soon as the need for its use has ended. The officer shall not unload, remove casings, or in any other manner change or tamper with the condition of the firearm when it was fired, with the sole exception of placing the safety on the firearm, which if done shall be specifically mentioned in his/her written report.

    B. The officer shall as soon as practicable and no later than going off duty, file a Use of Force Report Form with the on-duty Commanding Officer of the Uniform Division containing the following information: ·

        1. The date, time and location of the incident,

        2. The number of times the firearm was discharged and the location from which the firearm was discharged,

        3. The location if known, of any brass spent ammunition or casing discarded when the firearm was discharged. Any brass spent ammunition or casings remaining in the firearm after use shall remain in the firearm when it is secured,

        4. The names of all Police Officers present (including officers or from other jurisdictions),

        5. The names and address of victims and witnesses,

        6. The extent and treatment of any injuries, and

        7. The reason for the use of the firearm.

    C. Whenever an officer discharges a department weapon the Internal Investigating Unit shall conduct an administrative investigation. Exceptions to this include discharges during training, target practice, or when used to render harmless an animal in compliance with department policy. The Internal Investigating Unit shall investigate the facts and circumstances surrounding the discharging of the firearm and shall submit a report of the results of their investigation through their Commanding Officer, to the Police Commissioner as soon as possible.

    D. Field Supervisor Responsibilities:

1. A Field Supervisor shall be summoned and immediately respond to the scene of a reported use of deadly force and/or the reported use of a non-deadly force tool by an officer which results in the death or serious physical injury to a subject, officer or other. If necessary, he/she shall assume command of the scene and initiate the preliminary investigation until such time as being relieved by an officer of higher rank.

---

[5] Compliant individual: The officer perceives the subject's actions as cooperative and control is maintained via public acceptance, officer presence, verbalization skills, etc.

[6] Serious physical injury : Is an injury that creates a substantial risk of death, causes serious permanent disfigurement, requires the subject be admitted into a hospital, and/or results in extended loss or impairment of the function of any bodily member or organ.

    a) The responding Field Supervisor shall as soon as possible notify the on-duty Commanding Officer of the Uniform Division that a deadly use of force incident has occurred and shall regularly update him/her as the situation dictates.

    b) The responding Field Supervisor shall ensure that the required Department reports are complete and approved before submittal by the officer.

E.  Commanding Officer Responsibilities:

   1. In cases involving the use of deadly force and/or a less lethal force tool by an officer which results in the death or serious physical injury to a subject, officer or other, the on-duty Commanding Officer of the Uniform Division shall;

    a) Notify the Police Commissioner and/or his/her designee and the Detective Bureau,

    b) Take control of any weapon, tool and/or instrument (e.g. firearm, baton, ECW, or motor vehicle) used and secure it in a safe place until such time as it may be delivered to the officer from the Detective Bureau investigating the incident,

    c) File a complete and accurate report concerning the use of force incident to the Office of the Police Commissioner before the completion of his/her tour of duty,

    d) Notify, as soon as possible, a member of the Department's Critical Incident Support Team to contact the officer(s) directly involved, and

    e) Order the officer(s) directly involved to contact, as soon as possible, a member of the Department's Critical Support Team.

   2. In cases involving the use of deadly force and/or a less lethal tool by an officer which results in the death or serious physical injury to an animal in compliance with Department policy, the on-duty Commanding Officer of the Uniform Division shall be responsible for the initial investigation. The Commanding Officer shall submit a report of the results of his/her investigation to the Police Commissioner and their Deputy Chief before the completion of his/her tour of duty.

    a) The Commanding Officer may take control of any weapon, tool and/or instrument (e.g. firearm, baton, ECW or motor vehicle) used and secure it if he/she feels it is advisable.

    b) The report may also include recommendations for either an Internal Investigation Unit Investigation or a Police Academy review.

    c) The Police Commissioner may order a review of the incident by either the Police Academy or the Internal Investigating Unit.

F.  Bureau Responsibilities:

   1. The Detective Bureau shall respond to the scene of a reported use of deadly force by an officer, which results in the death or serious physical injury to any person. In the case of a use of deadly force that results in a motor vehicle accident, the Traffic Bureau shall also respond to the scene.

   2. The Field Supervisor in charge of the incident shall brief the responding Detective Bureau and/or Traffic Bureau personnel regarding all the facts known concerning the incident.

   3. The Detective Bureau and/or Traffic Bureau personnel shall conduct an investigation to determine the facts of the incident and file a final report to the Office of the Police Commissioner.

John R. Barbieri - Police Commissioner



# Springfield Police Department Policy and Procedure

| | |
|---|---|
| **Subject:** ADMINISTRATION OF SPECIAL POLICE OFFICERS *n/a [handwritten]* | |
| **General Order Number:** G.O. 101.30 *Kunu [handwritten] 1/15/07 DEArt# 04-323* | |
| **Issue Date:** | **Effective Date:** |
| **Distribution code:** | **Page:** 1 of 8 |
| **Supersedes:** Rule 24 sec 1 thru 10 (pages 52 thru 54) | |

## I.   Content

Purpose
Policy
Organizational Procedures
Classifications of Special Police Officers
Sponsoring Agency/Company Responsibilities
Qualifications
Appointment
Authority
Uniforms and Equipment
Code of Conduct
Use of Force

## II.   Purpose

The purpose of this policy and procedure is to provide the Springfield Police Department with specific guidelines related to: the appointment, administration, definition of duties, limitations of police powers, and the procedures for policy enforcement of Special Police Officers and their Sponsoring Agencies.

## III.   Policy

It is the policy of the Springfield Police Department that all Special Police Officers be properly appointed, trained, supervised and disciplined as set forth under the City of Springfield General Ordinances Chapter 2.58 and Chapter 2.60, the Springfield Police Department Rules and Regulations, and under this Springfield Police Department Policy and Procedure.

## IV.   Organizational Procedures

**G.O. 101.30   Page 1 of 8**

A. This order is mandated for all Springfield Police Department appointed Special Police Officers, and the Sponsoring Agencies/Companies that shall employ them.

B. All matters relative to the appointment, discipline and termination of Special Police Officers, will be subject to the control and review of the Board of Police Commissioners, subject to the revised ordinances of the City of Springfield. (Rule 1 SPD Rules and Regulations)

C. As of the effective date, this policy supersedes all other rules, regulations, procedures, orders, bulletins, and directives issued previously regarding Special Police Officers.

D. Violation of this policy and procedure shall be considered misconduct, subject to disciplinary action under the written directives [1] of the Springfield Police Department.

## V.   Classifications of Special Police Officers

### A. Security Officer

1. Every security officer, who is appointed as a Special Police Officer, shall have, while his/her appointment is in force and while on duty, the powers of a police officer, to enforce those Laws and City ordinances, as defined by the Board of Police Commissioners, in and about the premises or locality specified in his/her appointment.

### B. Park Ranger

1. Every park ranger who is appointed as a Special Police Officer shall have, while his/her appointment is in force and while on duty, the powers to preserve order and enforce those Laws, City Ordinances and Park Rules, as defined by the Board of Police Commissioners, in and about the premises or locality specified in his/her appointment.

### C. School Bus Monitor

1. Every school bus monitor who is appointed as a Special Police Officer shall have, while his/her appointment is in force and while on duty, the powers of a police officer, to preserve order on his/her assigned bus and/or bus stops and to provide traffic control while students are entering upon or alighting from his/her assigned school bus.

### D. School Crossing Guard

1. Every school crossing guard who is appointed as a Special Police Officer shall have, while his/her appointment is in force and while on duty, the powers of a police officer, so as to provide traffic control at his/her assigned post, and to provide safe passage for students going to and from school.

## VI.   Sponsoring Agency/Company Responsibilities

A. Every Special Police Officer appointed by the Springfield Police Department, shall have a sponsoring agency/ company, which shall employ him/her. The sponsoring agency/company shall be responsible for ensuring the Special Police Officers compliance with the Rules and Regulations, Policy and Procedures, General Orders, and special bulletins of the Springfield Police Department pertaining to special police officers, which

---

[1] **Directive**: A directive is a written departmental communication in the form of a General Order, Special Order or Administrative Order to disseminate rules, regulations, policies, procedures, or any other information to department employees.

may be issued from time to time, by the Board of Police Commissioners and the Chief of Police.

B. Every sponsoring agency/company must submit a written application, approved for use by the Board of Police Commissioners, listing its pertinent data and listing the reason(s) that they require their employees to have special police powers.

C. Every sponsoring agency/company must enter into a "hold harmless" agreement with the City of Springfield, the Board of Police Commissioners, and the Chief of Police.

D. Every sponsoring agency/company must carry liability insurance, with a dollar limit to be determined by the Board of Police Commissioners, naming the City of Springfield, the Board of Police Commissioners, and the Chief of Police as additional insured parties.

E. Proof of the aforementioned insurance policy must be presented in the form of a certificate of insurance, with an assigned policy number, at the time of application, and annually, for as long as any employee of the sponsoring agency/company has special police powers.

F. No special police officer shall perform special police officer duty for any person, firm, company or agency, other that for the one for whom he/she was sponsored by, nor at any place except that which is designated in the application for his/her appointment, except by special permission in writing from the Chief of Police.

G. It is the responsibility of the sponsoring agency/company, and/or the individual special police officer, to generate and forward all necessary paperwork required by the District Attorney's Office for prosecution of any individuals arrested by the special police officer. This paperwork should include all forms, reports, signed rights advisory cards, statements, etc... that may have been generated as part of an arrest, and/or any other information which may be determined by the Police Department, and the Office of the District Attorney, as necessary for the booking and prosecution of the arrested individual.

H. The sponsoring agency/company shall insure that any special police officer, needed for purposes of testifying in the prosecution of arrested individuals, report to the appropriate court at such times as deemed necessary by the courts. Any costs incurred for such attendance, exclusive of that provided for by law, shall be the responsibility of the Sponsoring Agency/Company that employs the special police officer, and not that of the Police Department or the Board of Police Commissioners.

I. It is the responsibility of the Sponsoring agency/company to insure that if any special police officer's employment is terminated, that the agency/company shall immediately take into possession that special police officer's badge and identification card, and within three(3) business days send them with a letter of notification to the Office of the Chief of Police, explaining why such employment was terminated.

J. In the event a sponsoring agency/company which employs special police officers closes, ceases doing business, or ceases doing business under the name on file with the Springfield Police Department, it shall be a task of the person(s) responsible for closing that endeavor, to immediately recall all badges and identification cards issued to its special police officers and take possession of them. Within three (3) business days the firm or corporation shall notify the Chief of Police and the Board of Police Commissioners in writing of their actions, including the returning of all badges and identification cards recalled by them, along with a written letter of notification, detailing the success or failure in obtaining all issued badges and identification cards, to the office of the Chief of Police. No special police officer, that is granted police powers through such sponsoring agency/company, shall

**G.O. 101.30  Page 3 of 8**

continue to act as a special police officer, until such time as he/she has reapplied, and has been reappointed as a special police officer with a new sponsoring agency/company.

## VII.  Qualifications

A.  Be a United States Citizen
B.  Be at least 19 years of age
C.  Reside within the Commonwealth of Massachusetts
D.  Be able to read, write and understand the English language
E.  Meet physical and mental standards that may be established by the Board of Police Commissioners
F.  Be capable of understanding and performing the duties of a special police officer within the scope and under the guidelines of the Springfield Police Department Polices and Procedures and Rules and Regulations
G.  Be a person of good moral character, with no felony convictions in any jurisdiction.
H.  Successfully complete the Massachusetts Criminal Justice Training Council Reserve/Intermittent Police Officer Training Course, and any other training that may be required by the Board of Police Commissioners, prior to, and during the tenure of his/her appointment as a special police officer
I.  Submit a completed, Department approved, Special Police Officer Application and designated application/renewal fee, for the appointment classification requested
J.  Submit to all necessary background procedures that may be required by the Board of Police Commissioners, including being fingerprinted and photographed

## VIII.  Appointment

A.  Every Special Police Officer appointed by the Board of Police Commissioners, shall be a unpaid member of the Springfield Police Department.
B.  The City of Springfield and Springfield Police Department shall not be liable for the misconduct of any special police officers. Such misconduct shall be the responsibility of the Special Police Officer and the Sponsoring Agency/Company. Responsibility as to any civil torts, and/or for medical expenses, for injury or illness resulting from any required training pursuant to such appointment, shall be the responsibility of the Sponsoring Agency/Company.
C.  A duly authorized agent must sign a Springfield Police Department approved application for the Sponsoring Agency/Company for each of their employees applying for special police powers.  All applications shall state the nature of their interest in the property or locality for which the officer(s) is to be appointed, and shall state whether the corporation is the owner, lessee, agent or manager of such properties.
D.  The Board of Police Commissioners shall determine whether, and to what extent, special police officer powers shall be granted to an individual, based upon the application for appointment by the Sponsoring Agency/Company.  Special Police Powers, shall be limited to those expressly granted by the Board of Police Commissioners.
E.  No Special Police Officer shall perform the duties of a special police officer for any person, firm or corporation other than the one for whom or which he/she is appointed, nor at any

place except the place, or locality, designated in the application for his appointment, except by special permission, in writing, from the Chief of Police.

## IX. Authority

A. Every Special Police Officer appointed under the provisions of the Department Rules and Regulations shall have, while his/her appointment is in force, the powers of a police officer to make arrests, preserve order and enforce the laws of the Commonwealth and ordinances of the City of Springfield, in and upon the premises or locality specified under his/her appointment, as defined by the powers granted to him/her by such appointment.

B. No Special Police Officer or Sponsoring Agency/Company, shall file any request, or make an application to any Federal, State or Local agency, with regard to requests for police powers, or for grants and/or police equipment/services, without first notifying the Springfield Police Department and receiving written authorization for the request from the Chief of Police or the Board of Police Commissioners

## X. Uniforms and Equipment

A. **BADGES AND IDENTIFICATION CARDS:** Upon payment of a fee as established from time to time by the Board of Police Commissioners, a special Police Officer shall be furnished a numbered Special Police Officer badge, which when acting in the capacity of a Special Police Officer, shall be worn on the outside of the outer most garment, over the left breast. Special Police Officer Identification Cards shall be issued which shall include the Special Police Officers name, the name of his sponsoring agency/company, location(s) where he/she is empowered with his/her special police powers, his/her photograph, and the date of the expiration of his/her appointment. When acting in the capacity of a Special Police Officer, his/her issued identification card shall be carried on his/her person and produced on request by any supervisor or officer of the Springfield Police Department.

B. **UNIFORMS:** No Special Police Officer shall wear a uniform which, in the opinion of the Board of Police Commissioners, is similar to the uniforms of the regular members of the Department, in color or design, nor shall they display the word "POLICE" or "SPRINGFIELD" on their uniforms or equipment, except for the badge issued to them by the Department

C. **SHOULDER PATCHES:** patches shall not have the words "SPRINGFIELD" or "POLICE" incorporated into their design. They shall not be shield shaped or in any way similar to Springfield Police Department shoulder patch.

D. **HATS/CAPS:** Hats and/or caps shall be worn as an integral component of a Special Police Officer's uniform. No metal hat/cap badge will be worn on the hat/cap. Any hat/cap badge shall be of cloth or other non-metallic material and must not be similar to the Springfield Police Department hat/cap badge and shall not have a shield shape nor have the words "POLICE" or "SPRINGFIELD" inscribed upon it.

E. **WAIVERS:** The Board of Police Commissioners may waive the restrictions of uniform colors, patches, insignia or other equipment as it may pertain to Special Police Officers, as they may deem necessary or prudent.

F. **FIREARMS:** No Special Police Officer shall carry firearms while on duty without specific authorization to do so by the Board of Police Commissioners and the Chief of Police. Any

special police officer that receives such authorization is responsible for maintaining all necessary licenses and permits to carry a firearm while on duty. A certification of training for the competency to carry and use firearms, as defined by the Board of Police Commissioners, shall be provided prior to any authorization to carry a firearm on duty. The weapon shall be subject to examination and approval by Department personnel to verify that it meets the minimum specifications on type, caliber and design for authorization to be carried will on duty, and the Special Police Officer shall be examined as to his/her knowledge of the nomenclature, operation and safe handling of his/her weapon, along with the capabilities and effective range of the ammunition he/she is to use. A qualifying score, as determined by the Board of Police Commissioners and the Chief of Police, shall be attained by the special police officer prior to final authorization to carry the firearm while on duty.

G.  **OTHER EQUIPMENT:** Special Police Officers, if authorized and approved in advance, may carry a nightstick or service baton, handcuffs and a flashlight. The carrying of an aerosol or other chemical propellant device, designed to temporarily incapacitate, may be authorized for use by a Special Police Officer, provided approved training is successfully completed by the Special Police Officer, and proper documentation is submitted in advance, to the Chief of Police, and the Special Police Officer is the holder of a valid Massachusetts Firearms Identification Card or a Massachusetts License to Carry a Firearm. A copy of the Massachusetts Firearms Identification Card or Massachusetts License to Carry a Firearm shall be provided to the Department, when applying for the authority to carry the device, and new copies furnished when the Massachusetts Firearms Identification Card or Massachusetts License to Carry a Firearm is renewed. The suspension or revocation of the Massachusetts Firearms Identification Card or Massachusetts License to Carry a Firearm, shall cause the immediate suspension of the Special Police Officer's authority to carry the personal aerosol device. Whenever a Special Police Officer's Massachusetts Firearms Identification Card or Massachusetts License to Carry a Firearm is suspended, the Special Police Officer shall immediately notify his sponsoring agency/company, and the Springfield Police Department in writing, detailing the circumstances surrounding the suspension or revocation. No other personal equipment or weapons, shall be carried, or used while on duty, without the expressed permission of the Board of Police Commissioners and the Chief of Police.

H.  **VEHICLES**

  **1.  STROBE LIGHTS:** Vehicles used by Special Police Officers, for patrolling of their assigned localities, shall not have or display any blue or red strobe or pulsating warning lights for use in violation of M.G.L.A. c.90 s.7E, and no vehicle will display any insignia shaped as a shield, or having the words "Police" or "Springfield" incorporated into its design. Notice of intent to use any strobe/warning lights on any special police officer duty vehicle shall be made in writing to the Office of the Chief of Police, and a designated member of the department shall perform a check of the equipment prior to its implementation.

  **2.  SIRENS:** No siren or horn may be mounted and/or used to stop or detain any person(s) or vehicle(s) without the expressed permission of the Board of Police Commissioners and the Chief of Police.

I.  **DOGS:** The Board of Police Commissioners, and the Chief of Police forbid the use of dogs, for any purpose by a Special Police Officer while on duty, without prior written

authorization, and in no event shall the use of dogs be authorized for crowd control purposes. The Board of Police Commissioners may require any dog used by a Special Police Officer to be tested, and successfully pass a competency course, as may be established by designated Department personnel, prior to its being employed for special police officer use.

## XI.   Code of Conduct

A. Special Police Officers shall be expected to be knowledgeable of, and to comply with this Policy and Procedure and all relevant Department Rules and Regulations and General Orders. Any Special Police Officer found guilty of a violation of any part of this Policy and Procedure, or any Rule and Regulation, or any General Order, may be punished by an oral or written reprimand, or by suspension or revocation of his/her Special Police Powers.

B. **CRIMINAL COMPLAINTS:** In the event a Special Police Officer is arrested, and/or charged with a misdemeanor, he/she will immediately notify his Sponsoring Agency/ Company and the Office of the Chief of Police, detailing the circumstances surrounding the complaint. The Chief of Police or his/her designee shall determine whether to immediately suspend the Special Police Officer pending further investigation by the police department, sponsoring agency/company and a review by the Board of Police Commissioners. In the instances where a Special Police Officer is arrested and/or charged with a felony, the Chief of Police shall immediately suspend the Special Police Officer, and his/her powers will remain suspended pending the disposition of the charge(s). The Special Police Officer will also immediately turn in his Special Police Officer badge and Identification Card to the Office of Chief of Police. The Internal Investigations Unit shall conduct an investigation and file a report detailing the circumstances of the incident(s) when ordered by the Office of the Chief of Police.

C. **NON-CRIMINAL COMPLAINTS:** In the event a Springfield Police Department Supervisor or Officer observes violation(s) of this Policy and Procedures or violation(s) of The Springfield Police Department Rules and Regulations, but does not institute criminal action or arrest of a Special Police Officer, a report shall be forwarded to the Office of the Chief of Police for review and possible suspension pending the Board of Police Commissioners review of the matter.

D. **PUNISHABLE OFFENSES:** Offenses which may result in the suspension or revocation of a Special Police Officer's appointment include but are not limited to the following:

1. A violation of any section of this Policy and Procedure, The Department's Rules and Regulations or any Chief's Order or General Order.
2. A violation of any law under any Federal, State or Local Statute Ordinance.
3. Drinking of alcoholic beverages while on duty.
4. Illegal use of narcotic, harmful or dangerous drugs.
5. Performance of any police powers when not on duty.
6. Interference with any regular police officer while in the performance of his duties.
7. Failure to obey a reasonable order by any regular member of The Springfield Police Department.
8. Violation of any firearms regulation or any violation of the conditions of his/her appointment as a special police officer.

G.O. 101.30  Page 7 of 8

9. Carrying more than one authorized firearm while on duty.
10. Carrying any unauthorized firearms or equipment while on duty.
11. Serving or acting as a special police officer for any other sponsoring agency/company or other business entity other than the approved sponsoring agency/company.
12. Serving or acting as a special police officer while under suspension or revocation.
13. Failure to notify the Department or sponsoring agency of any condition that would cause his/her inability to properly perform his/her duties as a special police officer.

## XII.   Use of Force

A. **USE OF FORCE:** All Special Police Officers shall comply with and be guided by Springfield Police Department General Order G.O. 100.20 when they are required to employ the use of force against any individual.

B. **RESISTANCE TO AUTHORITY:** It is the policy of the Springfield Police Department that a Special Police Officer's force response must be objectively reasonable in consideration of the officer's perception of the risk/threat presented, and the Special Police Officer's perception of the subject's action(s).

C. **USE OF DEADLY FORCE:** Special Police Officers shall comply with and be guided by Springfield Police Department General Order G.O. 100.20 and G.O. 500.10, regarding the use of deadly force.

D. **PROGRESSION IN USE OF FORCE:** Special Police Officers shall comply with and be guided by Springfield Police Department General Order G.O. 100.20 regarding the progression on use of force.

E. **USE OF IMPACT WEAPONS:** Special Police Officers shall comply with and be guided by Springfield Police Department General Order G.O. 500.50 regarding impact weapons such as nightsticks or police batons.

F. **USE OF PERSONAL AEROSOL WEAPONS:** Special Police Officers shall comply with and be guided by Springfield Police Department General Order G.O. 500.60 regarding the use of personal aerosol weapons.

G. **USE OF FORCE REPORTING:** Special Police Officers shall comply with and be guided by Springfield Police Department General Order G.O. 500.75 regarding the use of force, and the required reporting on its use.

Chief of Police, Paula Meara

## 3. ORGANIZATIONAL PROCEDURES:

1. As of this effective date, this order supersedes all other rules, regulations, procedures, orders, bulletins, and directives of the Springfield Police Department.
2. Violation of this order will be considered misconduct subject to disciplinary action under the written directives of the Springfield Police Department.

## 4. AUTHORIZATION

Only personnel who have successfully completed a departmental approved training course in the proper use and deployment of less lethal impact projectiles shall be authorized to use them during actual operations.

## 5. JUSTIFICATION

The employment and use of these devises are decisive actions that can assist in achieving the goal of protection of life and property and/or the restoration of order. They should be considered whenever the use of less lethal options are available and would assist in enabling arrest, restoring order and/or reducing the risk of more serious injury. Circumstances justifying the use of these munitions include, but are not limited to:

- Restoration of maintenance of order during detention cell, jail or civil disturbances.
- Safely controlling violent, assaultive, non-compliant persons.
- Subduing vicious animals.
- Situations wherein the authorizing person deems their use necessary to safely resolve the incident.

## 6. REPORTING

The use of less lethal impact munitions constitutes a use of force and, as such, must be reported in accordance with standard departmental force reporting procedures per General Order # 500.75, Reporting the use of Deadly and Non-deadly Force Tools.

## 7. STORAGE, TRANSPORTATION AND HANDLING

Storage of less lethal munitions should conform to manufacturer's recommendations. Generally, they should be stored in their original container in a cool, dry place. Munitions which have been removed from their original container shall be clearly and conspicuously identified as "less lethal" to prevent confusion with lethal munitions. Under no circumstances shall less lethal impact projectiles be kept in a manner, which might lead to confusing them with lethal munitions. Generally, they should be stored in a separate container or cabinet or on a separate shelf, which is clearly marked.

Except as previously noted, less lethal impact projectiles should be transported in accordance with the department's customary policy or practice for small arms munitions.

Under no circumstances shall any person be authorized to tamper with or alter in any manner, any less lethal impact projectiles. Misfires and duds shall be recovered, rendered safe and removed from service. Appropriate notifications shall be made and munitions, which have malfunctioned or are damaged, shall be handled according to departmental policy governing other types of ammunition.

Upon receiving any munitions, the person actually employing them is ultimately responsible for ensuring that these munitions are "less lethal" and used in accordance with departmental policy.

## 8. PROCUREMENT AND INVENTORY CONTROL

These munitions shall be procured in accordance with normal departmental purchasing procedures. Inventory, serviceability, and tracking shall be the responsibility of the department armorer, range staff, or other designee responsible for handling other types of munitions.

## 9. REVIEW

This policy shall be reviewed and evaluated as to direction, completeness, execution and management by the last day of each odd-numbered year by the Tactical Response Unit Commanding Officer and the Academy Director. Modifications to this policy shall be incorporated depending upon circumstances, technology, and/or experience. Input from all personnel is enthusiastically sought and encouraged at any time.

## 10. PROCEDURE

### I. Less lethal Extended Range Impact Devices

There are many projectiles considered "less-lethal". The primary types used by the Springfield Police Department are the:
- 40 mm Foam Projectile
- Pepperball Projectile

### A. 40 mm Foam projectile

1) The authorized 40 mm less-lethal systems are used to disperse chemical munitions and less lethal projectiles:
    (a) One 40mm rifled barrel multi-launcher, manufactured by Defense Technology/Federal Laboratories
    (b) Four single rifled barrel launchers, manufactured by Defense Technology/Federal Laboratories.

2) The authorized 40 mm less-lethal rounds are:
    (a) The Defense Technology "exact impact" 40mm sponge round. The standard sponge round travels @ 325 fps, and has an optimal energy range from 10 to 75 feet.
    (b) 40mm sponge rounds made by CTS/Combined Tactical systems. The standard round travels at 250 fps, and has an optimal energy range from 10 to 75 feet.

### B. Pepperball projectile

1) The authorized Pepperball delivery system is manufactured by Pepperball Technologies. The company refers to this as Chem-netics technology. The system launches a projectile shaped like a paintball that delivers a standard kinetic impact of 8 to 10 foot pounds of force. The standard velocity is 350 fps, and is accurate at distances of 30 feet, and can be used for area saturation at distances of 100 feet. The rounds burst open on impact and deliver a dose of Pava/Capsaicin, similar to O.C.

II. Evaluation of Projectiles

Kinetic energy impact projectiles will be evaluated on the following criteria:

1. Accuracy

This is the primary consideration, since proper shot placement greatly assists in controlling the other two evaluation criteria. This will be evaluated based on the anticipated ranges of deployment. A minimal standard of accuracy for such rounds is: 12 -inch group at 25 yards for the 40 mm system. This standard is achieved from a secure rest.

2. Effectiveness

This is the potential of the round to cause incapacitation and reduce the subject's ability to continue his/her inappropriate behavior. The level of energy necessary to cause incapacitation creates the potential for injury, but when properly deployed, with a low probability for causing serious physical injury of death.

3. Potential for Causing Death or Serious Physical Injury

The potential for causing death or serious physical injury with such projectiles is a reality. This potential is greatly reduced when impacts to the head and neck are avoided and when appropriate medical examination is provided in cases where the subject is struck in an area that might conceal a closed injury, including such areas as the chest, back, thoracic and abdominal cavities and the groin. When engaging a target, the officer should evaluate the effectiveness of each round during the volley. Compliance and/or incapacitation are the desired goal, and alternative target areas/response should be considered when rounds are not effective. Alternative target area/response considerations will be based on the circumstances the officer is encountering and the established department safety priorities..

4. Deployment Areas

The less-lethal projectiles will be delivered to suspect target areas based on the circumstances, the established safety priorities, and the level of force authorized. The Monadnock use of force model training chart is the recognized Springfield Police Department model for determining contact areas for kinetic energy impact weapons, based on potential for injury. See appendix.

Green Areas - These areas will be considered when incapacitation is necessary and a minimal potential for injury is the appropriate response.

Yellow/Red Areas -These areas will be considered when an escalation of force above green (areas) is necessary and appropriate, acknowledging an increase in the potential for death or serious physical injury.

Head/Neck -Intentional impacts to these areas will be avoided unless the use of deadly force is justified, necessary and appropriate.

5. Force Continuum

The Springfield Police Department recognizes five distinct levels of force (I-V). See appendix – Massachusetts Police Training Council: *Use of Force Reference Guide*. The use of 40 mm sponge round kinetic energy impact projectiles is considered a level IV use of force. The use of pepperball kinetic energy impact projectiles is considered a level IV use of force. The use of any kinetic energy impact projectiles is considered a level V -Deadly Force, if intentionally deployed at the head or neck.

6. Deployment Techniques

All less-lethal delivery systems will be maintained and deployed only by those officers who have successfully completed the appropriate approved training and qualification program. Lethal cover should be used in all cases involving any armed and/or dangerous subjects, even if no firearms are involved. This is consistent with the safety priority safety system placing the safety of the officer above that of the subject. The second or subsequent officers arriving at the scene would then provide the less -lethal option.

7. Handling of Injured Suspects

In custody suspects who are known to have been struck by a less-lethal round, will be cursively examined by an on scene supervisor and at the supervisor's discretion may be transported to a medical facility for examination.

8. Investigation

At the discretion of the Police Commissioner, an investigation may be conducted into any situation involving the firing of a less-lethal round at a suspect. The depth of investigation will be decided by the Police Commissioner and will be based on the extent of the suspect's injuries. The operational use of a kinetic energy impact projectile will be documented as a use of force per General Order 500.75, Reporting use of Deadly and Non-deadly Force Tools.

9. Training

Training in the use of extended -range kinetic energy impact projectiles will consist of a departmentally approved program and annual recertification.

# MPTC USE OF FORCE
# REFERENCE GUIDE



The Totality Triangle © depicts the three elements which must be considered in determining whether an application of force was objectively reasonable.

Perceived Circumstances - the officer's perspective of the severity of any crime, the existence of an immediate safety threat to the officer or others, and the degree of compliance / non-compliance from the subject; culminating in its identification on the Use of Force Model.

Perceived Subject Action (s) - the subject action (s) as perceived by the reasonable officer that designate the subject at one or more of the Use of Force Model's compliant / non-compliant categories.

Reasonable Officer Response (s) - the "balanced" response (s) appropriate for the reasonable officer's selection from the Use of Force Model's identified response categories, in order to maintain or gain subject compliance and control.

## MPTC
## Use of Force Model



*The Use of Force Model was developed in 1991 by Dr. Franklin Graves, Federal Law Enforcement Training Center and Professor Gregory J. Connor, University of Illinois Police Training Institute. ™1998, G. Connor. All rights reserved.*

Threat Perception Color Code - the tactically applied and color adapted correlation of the Threat Perception Categories on the Use of Force Model.

Control Superiority Principle © - the understanding and visualization method utilized to reinforce the inherent principle of officer force superiority over the subject's degree of compliance / non-compliance.

Assessment / Selection Arrows - the mechanism utilized to indicate the dynamic nature of an officer's decision-making process of Tactical Transition © during the enforcement encounter.

Threat Perception Categories



# MONADNOCK BATON CHART
Escalation Of Trauma By Vital And Vulnerable Striking Areas

Temple (1)
Ears (2)
Eyes (3)
Bridge of Nose (4)
Upper Jaw (5)
Lower Jaw (6)
Throat (7)
Collarbone (8)
Shoulder
Upper Abdomen
Solar Plexus (9)
Forearm
Rib Cage
Groin (11)
Lower Abdomen (10)
Thigh
Knee Joint (12)
Shin (13)
Instep (14)

Hollow behind Ear (16)
Back of Neck (15)
Upper Arm
Shoulder Blade (17)
Kidney (18)
Spine
Inside of Wrist (21)
Elbow Joint (22)
Back of Hand (23)
Tail Bone (Coccyx) (19)
Buttock
Achilles Tendon (20)
Calf

## S T R I K I N G

**GREEN TARGET AREAS**
REASONING: Minimal level of resultant trauma. Injury tends to be temporary rather than long-lasting, however, exceptions can occur.

Except for the HEAD, NECK, and SPINE, the whole body is a green target area for the application of baton blocking and control skills.

**YELLOW TARGET AREAS**
REASONING: Moderate to serious level of resultant trauma. Injury tends to be more long-lasting, but may also be temporary.

**RED TARGET AREAS**
REASONING: Highest level of resultant trauma. Injury tends to range from serious to long-lasting rather than temporary and may include unconsciousness, serious bodily injury, shock or death.

©1998 MONADNOCK POLICE TRAINING COUNCIL, INC. Fitzwilliam, New Hampshire USA

**Strategic** - the broad "mind set" of the officer, represented by the blue baseline on the Threat Perception Color Code ©. The contemporary officer must maintain this functional foundation, centered upon strategies designed to enhance the status of safety.

**Tactical** - the second level on the Use of Force Model, depicted by the color green. Here the officer perceives an increase in threat potential within the confrontational environment and tactical procedures are designated and deployed.

**Volatile** - the third level on the Use of Force Model utilizing the color yellow to indicate an activated level of alertness and threat potential. Here the officer is confronted with the presence or potential of critical dynamics, including threat intensity and severity within the enforcement encounter.

**Harmful** - at this level on the Use of Force Model the color orange denotes an accelerated perception of threat directed upon the officer or others. In this regard the officer must deploy initial defensive force in the effort toward eventual subject compliance and control.

**Lethal** - the highest level on the Use of Force Model correlates to the most intense color in the Threat Perception Color Code ©, red. Although this potentially lethal degree of threat is most infrequent, it remains most crucial for the continuation of officer safety and security.

<u>Perceived Subject Action (s) Categories</u>

**Compliant** - represents the vast majority of officer / citizen confrontations in the form of cooperation and control. Such cooperation is generally established and maintained via cultural acceptance, verbalization skills, etc.

**Resistant** (*Passive*) - the preliminary level of citizen non-compliance. Here, the citizen, although non-compliant, offers no physical or mechanical energy enhancement toward the resistant effort.

**Resistant** (*Active*) - the subject's non-compliance is increased in scope and / or intensity. The subject's non-compliance now includes energy enhanced physical or mechanical defiance.

**Assaultive** (*Bodily Harm*) - the officer's attempt to gain lawful compliance has culminated in a perceived or actual attack on the officer or others. The officer makes the reasonable assessment that such actions by the subject would <u>not</u> result in the officer's or other's death or serious bodily harm.

**Assaultive** (*Serious Bodily Harm / Death*) - the officer's attempt to gain lawful compliance has culminated in the perception of an attack or the potential for such an attack on the officer or others. The officer makes the reasonable assessment that such actions by the subject could result in serious bodily harm or death to the officer or others.

<u>Officer Response (s) Categories</u>

**Cooperative Controls** - include contemporary controls developed to preserve officer safety and security, including: communication skills, restraint applications, etc.

**Contact Controls** - includes resistant countermeasures designed to guide or direct the non-compliant subject. These "hands on" tactics would include the elbow / wrist grasp, Hand Rotation Position ©, etc.

**Compliance Techniques** - includes resistant countermeasures designed to counter the subject's enhanced degree of resistance. These tactics could include the Hand Rotation Technique ©, chemical irritants, etc.

**Defensive Tactics** - includes assaultive countermeasures designed to cease the subject's non-lethal assault on the officer or others, regain control, and assure continued compliance. These tactics could include baton strikes, kicking techniques, etc.

**Deadly Force** - includes assaultive countermeasures designed to cease an assault which is lethal or could cause great bodily harm on the officer or others. These tactics could include the use of a firearm, lethal strikes, etc.

© **Copyright, 2000, G. Connor. All rights reserved.** For any questions relating to the Use of Force Model contact David Standen @ (413) 218 4510 or E-mail: DTfStanden@comcast.net



| Springfield Police Department General Order | |
|---|---|
| Subject: Emergency and Non-Emergency Vehicular Responses | |
| Order Number: G.O. 500.40 | Effective Date: 03/15/01 |
| Issue Date: 03/01/01 | Date of Next Review: 03/15/02 |
| Distribution Code: A | Page 1 of 7 |

I. **Content**

Preamble
Purpose
Policy
Organizational Procedures
Non-Emergency Vehicular Responses
Emergency Vehicular Responses
Motor Vehicle Stops
Vehicular Pursuits

Amendment

II. **Preamble**

Officers, in the course of their duties, are called upon almost on a daily basis to engage in an emergency vehicular response such as; a motor vehicle stop, vehicular pursuit or to an assignment that requires immediate police intervention. During such a vehicular response, enhanced demands are placed upon the officer in the areas of; mechanical skills, knowledge of laws governing the operation of motor vehicles, knowledge of the rules of the road, visibility, physical reflexes, knowledge of the streets, mature judgement, and an attitude which complies with Department policies.

The law permits an officer to use force directed against a subject so long as the force used is objectively reasonable based on the perceived circumstances and the subject's actions. There are many police symbols that represent force and authority such as; a badge, firearm, baton, handcuffs. The patrol car, with its lightbar and markings is also a symbol of authority. It is intended to be conspicuous and as a result, tends to intimidate other drivers. People will often yield their lawful right of way to a patrol car when in traffic. They may also hesitate to pass, and even hang back from a patrol car due to the apprehension of being stopped. Therefore, the use of a police vehicle by an officer to either respond to a routine call or to participate in a high-speed pursuit should be viewed as a "use of force" situation that has inherent danger associated with it.

It is difficult, if not impossible, to describe exactly how a fleeing motorist can or should be apprehended, or the manner in which the Department should respond to calls for emergency assistance, except to say that it must be done legally and safety. Officers involved in an emergency vehicular response situation will have to; use their own best judgement, collect their total resources including their training and experience, remember Department policies, and apply all these issues collectively to the existing circumstances usually within a very short period of time.

Personal and public safety is the primary responsibility of the Springfield Police Department. The Department recognizes its responsibility in apprehending offenders but is also aware that

A. An officer shall not be issued and/or use O.C. spray without successfully completing a basic qualification course as determined by the Springfield Police Academy. Thereafter, all officers are responsible for maintaining a continued degree of proficiency.

## VI.    O.C. Spraying Procedures

A. An officer is allowed to use O.C. spray when he/she perceives the subject to be a Level Three (resistant, active) subject or higher in accordance with the Springfield Police Use of Force Model.

B. An officer will not use O.C. under circumstances that will create an unreasonable risk to the subject being sprayed (i.e., at the top of a staircase, in front of an open flame, while operating a motor vehicle, etc.) unless exigent circumstances exist.

C. The officer shall indicate by sign or word to other officers present that O.C. is to be dispersed, when tactically feasible. The officer shall then deploy the O.C. in short bursts such as; two, half second bursts or one, full second burst in order to maximize the effect of the formulation. The officer can re-spray the subject if the O.C. is not effective after the initial spray.

D. The officer should disperse O.C. at a minimum distance of four (4) feet and at a maximum distance of eight (8) feet from the subject, targeting the subject's face. Any distance less than four (4) feet and greater than eight (8) feet may reduce the overall effectiveness of the O.C.

E. The spraying of a subject with O.C. shall cease once the subject is distracted and/or submits to the officer's authority and direction through either words or actions. The spraying of a compliant subject [4] with O.C. is strictly prohibited.

## VII.    First Aid Procedures

A. After the subject in custody who has been sprayed has been secured, and the situation diffused, the arresting officer will immediately;

   1.  Bring the subject to his feet, or turn and maintain the subject on his/her side to prevent any difficulties with breathing,

   2.  Move the subject away from the area of contaminated air to an area of fresh air, and

   3.  Monitor the subject and act to calm the individual through verbal directions.

B. When a subject in custody who has been sprayed with O.C. shows any unusually significant abnormal effects or requests medical attention, the officer shall provide the subject with medical attention.

C. As soon as reasonably possible, the subject in custody shall be transported to the police station for booking. One of the transporting officers will continue to monitor the subject during the entire course of transport. The sprayed subject will be monitored for a minimum of one hour from the time of the initial exposure. If, after 45 minutes, the subject is having little or no relief from the affect of the O.C. spray the officer shall provide the subject with medical attention.

D. The officer who sprayed the subject with O.C. shall notify the transporting officer of the spray, where tactically feasible. The transporting officer shall notify the booking supervisor upon arrival at the station that the subject has been sprayed as well as any observations and medical attention the subject has received. If due to exigent circumstances the transporting officer should relinquish custody of the subject under arrest before notifying the booking supervisor, the transporting officer shall make the notification.

E. At the police station and prior to the booking process, cool potable tap water should be applied to the face area of the sprayed subject unless the subject refuses.

---

[4] Compliant Subject: A subject who submits to the officer's authority and direction through either words or actions.

G.O. 500.60 / Page 2 of 3



| Springfield Police Department General Order | |
|---|---|
| **Subject: Use of Authority** | |
| **Order Number: G.O. 100.20** | **Effective Date: 03/15/01** |
| **Issue Date: 03/01/01** | **Date of Next Review: 03/15/02** |
| **Distribution Code: A** | **Page 1 of 5** |

## I.     Content

Purpose
Policy
Organizational Procedures
Non-Deadly Force
Deadly Force
Progression of Force
Use of Force Model

## II.    Purpose

A.  The policy and procedure of the Springfield Police Department regarding the use of authority including non-deadly [1] force [2] and deadly force are set forth in this order with the purpose of providing officers with specific guidelines.

## III.   Policy

A.  It is the policy of the Springfield Police Department that an officer's force [3] response must be objectively reasonable [4] in consideration of the officer's perception of the risk/threat presented, and the officer's perception of the subject's action(s).

## IV.   Organizational Procedures

A.  This order is mandated for all officers [5] of the Springfield Police Department.

B.  An officer shall utilize and carry, and/or have immediately available, only department authorized weapons, restraining devices and chemical agents while on duty. The carrying and use of any unauthorized weapons, restraining devices and chemical agents when on duty is strictly prohibited.

C.  Violation of this order shall be considered misconduct subject to disciplinary action under the written directives [6] of the Springfield Police Department.

---

[1] Non-Deadly Force:  Any use of force other than that, which is considered deadly.

[2] Deadly Force:  Any use of force that is reasonably likely to cause death.

[3] Force: Is the amount of physical effort required by officer(s) to compel compliance from a person. This includes any use of force by an officer occurring in an official law enforcement capacity whether on or off-duty.

[4] Objectively Reasonable: In determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the known circumstances including, but not limited to; the seriousness of the crime, the level of threat or resistance presented by the subject and the danger to the community.

[5] Officer: Shall include all sworn department members who take the oath of office and are vested with police powers.

[6] Directive: A directive is a written departmental communication in the form of a General Order, Special Order or Administrative Order to disseminate rules, regulations, policies, procedures, or any other information to department employees.

D. As of the effective date of the order, this order supersedes all other rules, regulations, procedures, orders, bulletins, and directives issued previously regarding the use of authority.

## V.    Non-Deadly Force

A. An officer may use that level of non-deadly force that is objectively reasonable to bring an incident and/or subject under control.

B. An officer is authorized to use non-deadly force to;

1. Effect an arrest,
2. Protect the officer or another person(s) from physical harm,
3. Restrain or subdue a resistant subject, and/or
4. To bring an unlawful situation safely and effectively under control.

## VI.    Deadly Force

A. An officer is authorized to use deadly force to;

1. Protect the officer and/or another person(s) from an unlawful attack, which the officer reasonably perceives as an immediate threat of death or serious physical injury [7].

2. Prevent the escape of a fleeing violent felon whom the officer has probable cause to believe will pose a significant threat of death or serious physical injury to the officer or others and only when the force employed creates no substantial risk of injury to innocent persons.

3. Render harmless an animal which presents a clear and immediate danger of death or serious injury to a human being, or an animal which is so severely injured that humanity requires its removal from further suffering.

## VII.    Progression of Force

A. The officer's response options within each of the five force levels identified in the Use of Force Model [8] (see section VIII) are not necessarily listed in the order of use and/or need. The officer may de-escalate, stabilize or escalate his/her response based upon his/her risk assessment and the perceptions of the subject's degree of compliance or non-compliance.

B. The force tactics listed in each of the five force levels identified in the Use of Force Model are those tactics that officers are trained in. The Department recognizes that there are other methods and tactics that can be used at each of the levels of authority. If a tactic is used that is not listed it must be objectively reasonable as it relates to the officer's risk assessment and the subject's action.

## VIII.    Use of Force Model

A. Level One: The Compliant [9] Subject

1. The perceived subject actions [10]: The officer perceives the subject's actions as cooperative and control is maintained via public acceptance, officer presence, verbalization skills, etc.

2. The perceived circumstances [11] are strategic: The officer must maintain a minimum level of awareness and preparedness to enhance the overall and ongoing status of officer safety anytime he/she is working.

---

[7] Serious Physical Injury: A serious physical injury is described as an injury that would create a substantial risk of death, causes serious permanent disfigurement, require the subject be admitted into a hospital, and/or result in extended loss or impairment of the function of any bodily member or organ.

[8] Force Model: Are force options that are divided into five (5) levels to guide the officer during a use of force situation.

[9] Compliant Subject: A subject who submits to the officer's authority and direction through either words or actions.

[10] Perceived Subject Action: The subject's actions as perceived by the reasonable officer that designate the subject at one or more of the Use of Force Model's compliant and/or non-compliant categories.

3. The reasonable officer responses are cooperative controls: The cooperative controls would include, but not be limited to those force tactics listed below.

| Cooperative Controls | |
|---|---|
| Officer presence: | Appearance |
| Communication skills: | Dialogue<br>Verbal commands |
| Approach techniques: | Confrontation equation<br>Relative positioning<br>Contact / cover officer tactics |
| Frisk techniques: | 1 officer on 1 subject<br>2 officers on 1 subject |
| Searching techniques: | 1 officer on 1 subject<br>2 officers on 1 subject |
| Restraining techniques: | Handcuffing<br>Flex-cuffs<br>Leg restraints<br>1 officer on 1 subject<br>2 officers on 1 subject |
| Transporting techniques: | Two officer unit<br>One officer unit |

B. Level Two: The Resistant (passive) Subject

1. The perceived subject actions: This is the preliminary level of subject non-compliance. The subject offers no physical or mechanical energy enhancement toward the resistant effort. The subject has not directed his or her physical strength and energy in establishing, achieving and/or maintaining a posture of resistance.

2. The perceived circumstances are tactical: The officer perceives an increase in the threat potential within the confrontational environment, which would initiate the process where specific tactics and procedures would now be deployed.

3. The reasonable officer responses are contact techniques: The contact controls would include, but not be limited to those force tactics listed below.

| Contact Controls | |
|---|---|
| Restraint techniques: | Elbow grasp |
| Contact controls: | Escort position<br>Handcuffing control position |

C. Level Three: The Resistant (active) Subject

1. The perceived subject actions: The subject's non-compliance has increased in scope and intensity and now includes energy enhanced physical or mechanical defiance. The individual has directed his or her physical strength and energy in establishing, achieving and/or maintaining a posture of resistance.

2. The perceived circumstances are volatile: The officer is now confronted with the presence and/or potential of an increase in the threat intensity, severity, etc. The officer recognizes

---

[11] Perceived Circumstances: Are the reasonable officer's perspective of the severity of any crime, the existence of any and all safety threats to the officer or others, and the degree of compliance and/or non-compliance from the subject at the time of the encounter.

this increase in the threat potential and must deploy techniques and tactics that would overcome and/or control this increased risk.

3. <u>The reasonable officer responses are compliance techniques</u>: These compliance techniques would include, but not be limited to those force tactics listed below.

| Compliance Technique | |
|---|---|
| Compliance techniques: | Front wrist lock<br>Finger grasp<br>Rear wrist lock<br>Arm bar<br>Bent wrist lock |
| Baton control techniques: | Strong side armlock<br>Weak side armlock<br>Strong side wrist drag<br>Weak side wrist drag |
| Non-chemical agents: | Oleoresin Capsicum (O.C.) Spray |

D.  Level Four: The Assaultive (bodily harm) Subject:

1. <u>The perceived subject actions</u>: The officer's attempt to gain lawful compliance has concluded in a perceived or actual attack on the officer or another person(s). The officer makes the reasonable assessment that such actions by the subject would result in his/her or another's bodily harm.

2. <u>The perceived circumstances are harmful</u>: The officer perceives an accelerated assessment of danger. This situation has reached the degree where the physical well being of the officer or another person is in jeopardy if the subject is not stopped and controlled.

3. <u>The reasonable officer responses are defensive tactics</u>: These defensive tactics would include, but not be limited to those force tactics listed below.

| Defensive Tactics | |
|---|---|
| Impact Weapon Techniques: | PR-24 Expandable Baton<br>Expandable Straight Baton<br>Elbow grasp |
| Ground fighting techniques | |
| Personal Weapons: | Head<br>Hands<br>Elbows<br>Knees<br>Feet |
| Assault Defenses: | Hands<br>Feet |
| K-9: | Subject Apprehension<br>Riots and Public Disturbances |
| Chemical Agents: | CS<br>CN |

E.  Level Five: The Assaultive (serious bodily harm, death) Subject

1.  <u>The perceived subject actions</u>: The officer is now confronted by an assaultive act that reaches the ultimate degree of danger. The officer perceives that if these actions are followed through with, that the officer or others would be subject to death or serious physical harm.

2.  <u>The perceived circumstances are lethal</u>: The officer perceives the highest degree of threat towards his/her or another's safety. The officer's reasonable assessment would be that if this situation were allowed to continue that he/she or another could be seriously injured or killed. A maximized system of defense must be initiated.

3.  <u>The reasonable officer responses are deadly force</u>: These deadly force tactics would include, but not be limited to those force tactics listed below.

| Deadly Force | |
|---|---|
| Emergency Vehicular Response: | Vehicular Pursuit |
| Service Weapons: | Handgun<br>Shotgun<br>Rifle<br>Carbine<br>Sub-machine gun |

Paula C. Meara, Chief of Police