## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. 3:14-CV-30210-MG

JUSTIN DOUGLAS                )
                             )
           vs.               )
                             )
CITY OF SPRINGFIELD, DET. GREGG BIGDA,  )
DET. STEVEN KENT, DET. ROBERT PATRUNO,  )
DET. THOMAS KAKLEY, DET. MARK TEMPLEMAN, )
DET. EDWARD KALISH, DET. CHRISTOPHER    )
BATES and MASS. STATE POLICE TROOPER    )
LIAM R. JONES,               )

        DEPOSITION of STEVEN KENT, called at
the request of the Plaintiff, pursuant to Rule
30 of the Federal Rules of Civil Procedure,
before Linda Dunlop, Certified Shorthand
Reporter No. 134193 and Notary Public within and
for the Commonwealth of Massachusetts, at the
offices of Hector E. Pineiro, 807 Main Street,
Worcester, Massachusetts, on Monday, November
30, 2015, commencing at 10:52 a.m.

_____

BAY STATE REPORTING AGENCY
8 VINELAND STREET
WORCESTER, MASSACHUSETTS 01604
(508) 753-4121

## Page 2

1   A P P E A R A N C E S:
2   FOR THE PLAINTIFF:
    LAW OFFICE OF HECTOR E. PINEIRO, P.C.
3   807 Main Street
    Worcester, MA 01610
4     BY:  HECTOR E. PINEIRO, ESQ.
5
    FOR THE DEFENDANT LIAM R. JONES:
6   RAFANELLI & KITTREDGE, P.C.
    1 Keefe Road
7   Acton, MA  01720-5517
      BY:  MARGARET A. RUBINO, ESQ.
8
    FOR THE DEFENDANT CITY OF SPRINGFIELD:
9   CITY OF SPRINGFIELD
    36 COURT STREET, SUITE 210
10  SPRINGFIELD, MA 01103
      BY:  JOHN T. LIEBEL, ESQ.
11
    FOR THE DEFENDANT ROBERT PATRUNO, STEPHEN KENT:
12  REARDON, JOYCE & AKERSON, P.C.
    4 Lancaster Terrace
13  Worcester, MA 01609
      BY:  AUSTIN JOYCE, ESQ.
14
    FOR THE DEFENDANTS CHRISTOPHER BATES, MARK
15  TEMPLEMAN, THOMAS KAKLEY, EDWARD KALISH, GREGG
    BIGDA:
16  LAW OFFICE OF KEVIN B. COYLE
    1299 Page Boulevard
17  Springfield, MA 01104
      BY:  KEVIN B. COYLE, ESQ.
18
    ALSO PRESENT:  Robert Patruno
19          Edward Kalish
            Gregg Bigda
20
21
22
23
24

## Page 3

1
2           I N D E X
3
4   DEPONENT:  STEVEN KENT        PAGE
5   EXAMINATION BY MR. PINEIRO        4
6
7
8
9           E X H I B I T S
10  EXHIBITS       DESCRIPTION          PAGE
11    1  Answers to Interrogatories      76
12  EXHIBIT RETAINED BY ATTORNEY PINEIRO
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1        S T I P U L A T I O N S
2        It is agreed by and between counsel
3   for the respective parties that the deponent
4   shall read and sign the deposition transcript
5   within thirty (30) days from receipt of
6   transcript or  the deposition will be deemed to
7   have been signed.  Signature before a notary
8   public is waived.
9        It is further agreed that all
10  objections, except as to form, and motions to
11  strike are reserved for the time of trial.
12        STEVEN KENT,
13        having been satisfactorily
14        identified and duly sworn by the
15        Notary Public, was examined and
16        testified as follows
17        to direct interrogatories
18  BY MR. PINEIRO:
19  Q.  Can you tell us your full name and the county
20      you live in?
21  A.  My name is Steven Kent and I live in Hampshire
22      County.
23  Q.  Do you have any plans of moving from where
24      you're currently living at?

Page 5

1    A.  No.
2    Q.  Fair enough.  I understand that before joining
3        the Springfield Police Department you worked in
4        the South Hadley Police Department?
5    A.  I did.
6    Q.  And did you also work as a police officer in
7        Amherst?
8    A.  I did.
9    Q.  And do you have any military service?
10   A.  I don't.
11   Q.  How old are you?
12   A.  I'm 47.
13   Q.  And are you married?
14   A.  I am.
15   Q.  Fair enough.  And did you attend Holyoke
16       schools?
17   A.  Granby.
18   Q.  Granby.  That's right next to Holyoke?
19   A.  One town over.  There's a town in between.
20   Q.  When did you graduate from the Granby High
21       School?
22   A.  1986.
23   Q.  And from there where did you go to school?
24   A.  I went to Holyoke Community College.

Page 6

1    Q.  Did you get a degree?
2    A.  I did.
3    Q.  What type of degree?
4    A.  Criminal justice, associate's degree.
5    Q.  What year was that?
6    A.  I completed there, I believe, in 1988 but I
7        didn't actually get the degree until several
8        years later when I went back and finalized the
9        paperwork, I guess.
10   Q.  Then subsequently you got a bachelor's degree
11       somewhere else in criminal justice?
12   A.  Yes.
13   Q.  And where was that?
14   A.  At Western New England.
15   Q.  What year was that?
16   A.  I would say around 2002, I believe.
17   Q.  How long were you in Amherst?
18   A.  I worked there in a part-time capacity for two
19       years.
20   Q.  And how long were you on Holyoke?
21   A.  South Hadley.
22   Q.  I'm sorry.  South Hadley?
23   A.  Again, about two years in a part-time capacity.
24   Q.  Fair enough.  When did you go to the academy?

Page 7

1    A.  I went to the academy in June of 1992.
2    Q.  And you attended with Mr. Patruno?
3    A.  No.
4    Q.  You were not a member of the same academy?
5    A.  No.
6    Q.  Did you go to the academy with Templeman?
7    A.  No.
8    Q.  Any of the co-defendants, did they participate
9        in the same academy that you did or members of
10       your class?
11   A.  No.
12   Q.  Tell me what your current position is in the
13       Springfield Police Department?
14   A.  I supervise the narcotics division on the 8 a.m.
15       to 4 p.m. shift.
16   Q.  Is there a captain in the narcotics unit?
17   A.  There is.
18   Q.  Do they do fieldwork, do they do arrests or
19       mostly administrative?
20   A.  Mostly administrative.
21   Q.  So when you're doing a drug raid you are the
22       commanding officer of that unit?
23   A.  Yes.
24   Q.  And on April 26th of 2012, what was your rank?

Page 8

1    A.  I was a sergeant.
2    Q.  And were you the highest ranking officer during
3        the drug raid of Justin Douglas?
4    A.  I was the highest ranking officer on scene.
5    Q.  For all intents and purposes, you were the
6        commanding officer of these officers?
7    A.  Yes.  Other than the trooper.
8    Q.  And as a sergeant of the Springfield Police
9        Department, fair to say you have a number of
10       responsibilities?
11   A.  Yes.
12   Q.  What are the responsibilities as a narcotics
13       sergeant?
14   A.  Well, to ensure that things are done according
15       to rules and regulations both on the street and
16       within the office, to supervise investigations,
17       review paperwork, hand out buy money.  Things of
18       that nature.
19   Q.  So one of your primary responsibilities is to
20       make sure that your officers do what they're
21       supposed to do in the field; right?
22   A.  Yes.
23   Q.  That they follow all the rules and regulations
24       of the police department?

Page 9

1   A.  Yes.
2   Q.  As it relates to the arrest and the detention?
3   A.  Yes.
4   Q.  And as it relates to the investigations?
5   A.  Yes.
6   Q.  And as it relates to the level of force that you
7       use?
8   A.  Yes.
9   Q.  And you also have supervisory responsibilities
10      to make sure when reports are prepared by
11      officers that you review those reports?
12  A.  Yes.
13  Q.  And that you sign those reports?
14  A.  We don't have a practice of signing reports but
15      I review them and I electronically approve them.
16  Q.  Was it your custom and practice to
17      electronically approve all of them?
18  A.  Depending on the type of report.  Certain
19      reports require electronic approval.  Others I
20      would just read and is either verbally approved
21      or --
22  Q.  Are there times when you ask the officer to do
23      any changes on a report?
24  A.  Yes.

Page 10

1   Q.  And does that happen in the narcotics unit?
2   A.  Yes.
3   Q.  Have you ever asked Mr. Bigda to change certain
4       things on his reports?
5   A.  Change, add things, certain things that I
6       thought should be changed.
7   Q.  Clarify certain things?
8   A.  Yes.
9   Q.  And as a sergeant and supervisor of the
10      narcotics unit, the Springfield Police
11      Department has a rule or policy and regulation
12      regarding the truthfulness of reports, does it
13      not?
14  A.  Yes.
15  Q.  Every report that's filed by an officer should
16      contain truthful information?
17  A.  Yes.
18  Q.  And that rule and regulation is really codified
19      from state law; right?
20          MR. JOYCE:  Objection.
21  Q.  Do you know if state law requires police
22      officers to file truthful reports?
23  A.  I don't know.  I assume so.
24  Q.  But at a minimum, the Springfield Police

Page 11

1       Department requires that that happen; right?
2   A.  Yes.
3   Q.  Lieutenant, when did you join the narcotics
4       unit?
5   A.  I was first transferred in there as a patrolman
6       in August of 1995.
7   Q.  And have you stayed in that unit ever since?
8   A.  I stayed in there until October of 2007, at
9       which point I was transferred to Western Mass.
10      Narcotics Task Force and then a year later I was
11      promoted to sergeant and I was transferred back
12      to uniform.
13  Q.  Who composes the Western Mass. Narcotics Task
14      Force?
15  A.  Federal, state and local law enforcement.
16  Q.  You stayed there about a year?
17  A.  I did.  Until I was promoted to sergeant.
18  Q.  Tell me what you did during that year in 2007?
19  A.  Well, we worked on several telephone intercepts
20      and other investigations, primarily targeting
21      drug traffickers in the New England region, I
22      guess.
23  Q.  I'm going to ask you some questions that may
24      sound repetitive but I want to know the nature

Page 12

1       of a relationship you had with the different
2       officers involved in this case.  What type of
3       relationship besides a working relationship do
4       you have with Mr. Patruno?
5   A.  Yes.
6   Q.  But do you also have a relationship outside of
7       work?
8   A.  Yes.
9   Q.  A friendly relationship?
10  A.  Yes.
11  Q.  And would you consider yourself good friends
12      with Mr. Patruno?
13  A.  Yes.
14  Q.  And for how long have you known Mr. Patruno?
15  A.  Twenty-five years at least.
16  Q.  When did you first meet him?  Was it work-
17      related?
18  A.  No.
19  Q.  How did you know him?
20  A.  I don't recall how we first met.
21  Q.  And you vacationed together with Mr. Patruno?
22  A.  Yes.
23  Q.  You went to the Keys?
24  A.  Yes.

Page 13

1   Q.  Only once?
2   A.  Once.
3   Q.  Is that the only vacation that you've taken with
4       him?
5   A.  I don't know if you call it a vacation but we
6       went to Washington D.C. for Police Week once as
7       well.
8   Q.  For police training?
9   A.  Police Week.
10  Q.  What is Police Week?
11  A.  Memorial for police officers killed in the line
12      of duty.
13  Q.  And you went with Mr. Patruno?
14  A.  Well, there was a large number of us that went.
15  Q.  Who else from the narcotics unit went to that
16      Police Week?
17  A.  I think Detective Bigda was there.  I'm not
18      sure.  There may have been others.  I'm not sure
19      exactly.
20  Q.  How would you describe Mr. Patruno's police
21      skills?
22  A.  I would describe him as honest and hardworking.
23  Q.  You respect him?
24  A.  Yes.

Page 14

1   Q.  And is he a good police officer?
2   A.  Yes.
3   Q.  Proactive?
4   A.  Yes.
5   Q.  Diligent?
6   A.  Yes.
7   Q.  You've done a number of raids with Mr. Patruno?
8   A.  Yes.
9   Q.  Would you say you've done more than 200 raids?
10  A.  I don't know if it was that many.  He was on the
11      dayshift for most of his tenure in narcotics and
12      I was on the 4-to-12 shift but we've done quite
13      a few together, yes.
14  Q.  And what about Mr. Bigda, what type of
15      relationship do you have with Gregg Bigda?
16  A.  Inside of work or outside?
17  Q.  Let's say inside of work and outside of work?
18  A.  He works for me.  We were patrolmen together in
19      there since my promotion.  He worked for me
20      inside of work and we are friendly outside of
21      work.
22  Q.  How would you characterize his skills as a
23      police officer?
24  A.  Yeah.  Honest and hardworking and a good police

Page 15

1       officer.
2   Q.  Proactive guy?
3   A.  Yes.
4   Q.  And what about outside of work, tell me how you
5       know him and how you socialize with him or if
6       you socialize with him?
7   A.  We've been known to have dinner together, been
8       to one another's houses and things of that
9       nature.
10  Q.  On repeated occasions?
11  A.  Yes.
12  Q.  Would you say he's been at your house more than
13      30 times?
14  A.  Probably around there, yes.
15  Q.  And would you say you've been at his house 30
16      times?
17  A.  Probably in that area, yes.
18  Q.  And when he's come to your house what has
19      brought him to your house?
20  A.  Various things.  We share common interests.
21  Q.  Like what?
22  A.  Sports, guns.  He stops by to socialize and I do
23      the same at his house.
24  Q.  So you consider Mr. Bigda a close friend?

Page 16

1   A.  Yes.
2   Q.  And what about Mr. Kalish, do you socialize with
3       Mr. Kalish outside of work?
4   A.  Yes.
5   Q.  And does he come to your house?
6   A.  He has been to my house.
7   Q.  And do you go to his house?
8   A.  I've been to his house as well.
9   Q.  Does your family socialize with Mr. Kalish?
10  A.  They have.  Not on a regular basis.  My family
11      has been to his house.
12  Q.  So your family has socialized with his family
13      but less frequently than Mr. Patruno and Mr.
14      Bigda?
15  A.  Yes.
16  Q.  And have you ever taken vacations with Mr.
17      Kalish?
18  A.  I don't think so.
19  Q.  And you've been involved in drug raids with Mr.
20      Kalish?
21  A.  Yes.
22  Q.  And how would you characterize Mr. Kalish's
23      skills as a police officer?  Is he a good
24      narcotics officer?

Page 17

1    A.  He is.
2    Q.  Would you say he's a cops' cop?
3    A.  Yes.
4    Q.  And do you have any criticisms about his skills
5         or work habits?
6    A.  No.
7    Q.  None whatsoever?
8    A.  No.  Nothing comes to mind.
9    Q.  When you work in the narcotics unit have you
10        ever gone to the Bureau of Professional
11        Standards to complain about one of your
12        employees?
13   A.  No.
14   Q.  Never?
15   A.  No.
16   Q.  And what about Mr. Lopes, is he somebody that
17        you supervise?
18   A.  Yes.
19   Q.  Is he a good cop?
20   A.  He is.
21   Q.  Is he somebody that you socialize with outside
22        of work?
23   A.  Yes.
24   Q.  And do you socialize with him with frequency?

Page 18

1    A.  Yes.
2    Q.  Does he come to your house?
3    A.  I've only been to his house once.  He's been to
4         my house a couple of times.
5    Q.  What about Mark Templeman, is he somebody that
6         has worked for you?
7    A.  Yes.
8    Q.  Has he been a good cop?
9    A.  He is.
10   Q.  Is he somebody that is honest and truthful?
11   A.  Yes.
12   Q.  And you've done numerous drug raids with him?
13   A.  I have.
14   Q.  Have there ever been any times when you work the
15        narcotics unit where you or your officers have
16        been shot at?
17   A.  In the narcotics unit?
18   Q.  Yes.
19   A.  I don't think so.
20   Q.  Or where you came close to a situation where you
21        thought if things weren't handled a certain way,
22        things could have gotten out of hand?
23   A.  That's -- yes.
24   Q.  And were any of these officers that are here

Page 19

1         today involved in any of those raids?
2    A.  I'm sure, yes.
3    Q.  And do you have any criticisms of Mr. Templeman?
4    A.  No.
5    Q.  And I'm not sure if I asked, but do you
6         socialize with him outside of work?
7    A.  Infrequently.  We have.
8    Q.  And Mr. Kakley, I know he's with the ATF Task
9         Force.  Do you socialize with him outside of
10        work?
11   A.  No.
12   Q.  I know that you share common interests with Mr.
13        Bigda, one of them being guns.  Do you go
14        shooting with him at a shooting range?
15   A.  We have.
16   Q.  And where do you normally go to?
17   A.  We have a friend that owns a gravel pit.  We
18        shoot there.
19   Q.  And you shoot there together and any other
20        interests that you have besides guns with Mr.
21        Bigda?
22   A.  Sports, cars.
23   Q.  Do you work on cars together?
24   A.  He does.  I kind of watch.

Page 20

1    Q.  When drug raids happen, who normally breaks a
2         door from your group?  Is that randomly
3         assigned?
4         MR. JOYCE:  Objection.
5    Q.  How is that handled?
6    A.  Depends.  Anybody in the unit for the most part
7         is capable of doing it.  Some guys do it more
8         frequently.  I used to do it a lot when I was
9         younger.
10   Q.  And in your experience, who are the guys that do
11        most of the door breaking when they have to?
12   A.  Again, you're talking over almost 20 years of
13        going through doors.  I did it.  The people that
14        are assigned now, Detective Lopes will do it
15        sometimes.  I'm not sure who is on the
16        four o'clock now.  I don't work with them too
17        much, but, again, anybody's capable of doing it
18        and whoever picks up the ram is whoever does it.
19   Q.  And I'm sure when you do drug raids and stuff
20        there's people that have dogs in their houses?
21   A.  Yes.
22   Q.  And who volunteers if they own a dog when they
23        break through a door?
24        MR. JOYCE:  Objection.

## Page 21

1   A.  There's no really dealing with a dog when you
2       break through a door.  It's just whoever
3       encounters the dog and covers his butt.
4   Q.  I see what you're saying.  So, I mean, am I
5       correct in saying that over the years that you
6       worked in the narcotics unit, you formed not
7       only a very good professional relationship with
8       people like Mr. Bigda, Mr. Patruno, Mr.
9       Templeman, Mr. Kalish, Mr. Lopes and Mr. Kakley;
10      right?
11  A.  Yes.
12  Q.  But you also like all of them outside of work,
13      you think they're good people?
14  A.  Yes.
15  Q.  And you wouldn't want anything bad to happen to
16      any of them?
17  A.  Correct.
18  Q.  And when you've broken through doors, do you
19      feel comfortable with this group of people that
20      if something happens, they're going to do
21      everything that they can to protect you?
22  A.  I do.
23  Q.  And that requires a lot of trust in the group of
24      people that you rely on; right?

## Page 22

1          MR. JOYCE:  Objection.
2   A.  I suppose, yes.
3   Q.  Meaning when you break through a door, you just
4       don't know what you're going to find?
5   A.  Correct.
6   Q.  So you want to have a good group of people that
7       are going to be supportive and do the right
8       thing when you go through that door; correct?
9   A.  That's correct.
10  Q.  Fair enough.  With respectfully to you,
11      Lieutenant, have you ever been investigated by
12      the Bureau of Professional Standards?
13  A.  I have.
14  Q.  And have any of the complaints ever been
15      sustained?
16  A.  No.
17  Q.  And have you been involved in investigations
18      where subordinates of yours were involved in any
19      particular operations were disciplined but you
20      were not or reprimanded but you were not?
21  A.  Are we speaking about investigations where I was
22      also the subject of the investigation?
23  Q.  Yes.
24  A.  I don't believe so, no.

## Page 23

1   Q.  What about other situations where you were the
2       commanding officer of the individuals but the
3       other individuals were reprimanded.  You weren't
4       but they were?
5          MR. JOYCE:  Objection.
6   A.  No.
7   Q.  Have there been lawsuits against you?
8   A.  Yes.
9   Q.  And which lawsuits were brought against you?
10  A.  There was one recently, Michael Ververis.  There
11      was another one.  I don't recall his name.
12      Terrance something or rather.
13  Q.  Is that Terrance Thomas?
14  A.  Terrance Thomas.  I think those are the two that
15      I can remember offhand.
16  Q.  I take it the Terrance Thomas case, that case
17      went to trial?
18  A.  Yes, it did.
19  Q.  And you beat the charges?
20         MR. LIEBEL:  Objection.
21         MR. COYLE:  Objection.
22         MR. JOYCE:  Objection.
23  Q.  Meaning Mr. Thomas lost the case?
24  A.  The judge directed me out before Mr. Thomas lost

## Page 24

1       his case.
2   Q.  Fair enough.  Can you tell me what was your
3       involvement in the Terrance Thomas case?  What
4       happened in your case before you were directed
5       by the court?  What did Mr. Thomas claim you or
6       the other officers did?
7          MR. JOYCE:  Objection.
8   A.  I forget what his exact claims were.  I believe
9       there was an excessive force claim.
10  Q.  Did he complain that he was injured?
11  A.  I don't know.
12  Q.  Do you know if he had medical care?
13  A.  I don't recall.
14  Q.  Did the Bureau of Professional Standards
15      interview you?
16  A.  I'm sure.  Yes.
17  Q.  Did they interview you on the matter that I'm
18      interviewing, asking you what happened?
19  A.  Yes.
20  Q.  Or were you asked simply to fill out a form and
21      explain what happened?
22  A.  I really don't have an independent recollection
23      of the interview but the way they do it is a
24      one-on-one generally speaking.

## Page 25

1  Q.  So in the Thomas case did you testify at trial?
2  A.  I believe that I did, yes.
3  Q.  Did you give a deposition on the Thomas case?
4  A.  I'm sure that I did.
5  Q.  And tell me from your perspective what happened
6     when Mr. Thomas was arrested?
7  A.  I don't recall all the facts of the case.  I
8     know that he was arrested on drug charges and he
9     had some issue with the way he was treated
10    subsequent to his arrest.
11 Q.  Was he bleeding from the face?
12 A.  I don't recall.
13 Q.  Did he have any broken bones?
14 A.  I don't recall.
15 Q.  And which other officers were involved in that
16    arrest?
17 A.  I know that Detective Patruno was involved,
18    Detective Wadlegger.  I don't know.  I'm sure
19    there were others.
20 Q.  And then you said that you were involved in the
21    Ververis case?
22 A.  Yes.
23 Q.  And can you tell me your own version of what
24    happened with Ververis?

## Page 26

1  A.  Well, we had been -- I was the commanding
2     officer in the street crimes unit at the time.
3     We had been given a directive by the
4     commissioner of the Springfield Police
5     Department to post ourselves outside of the bars
6     in the Stearns Square area at closing time to
7     alleviate some of the problems they've been
8     having down there.
9        At some point I was breaking up a
10    fight.  Mr. Ververis was trying to re-instigate
11    that fight.  I directed him to leave the area --
12    he did not -- or him and his friends to leave
13    the area.
14 Q.  What was he doing to re-instigate the fight?
15 A.  He was leaning on a passenger window of a car
16    who was stopped in traffic, basically making the
17    statements to the group that I was separating,
18    insinuating that they were -- not insinuating
19    but saying they were wimps or some words to that
20    effect for letting the police break up the
21    fight.
22 Q.  That they were wimps?
23 A.  I wouldn't say wimps.  Things to that effect and
24    I directed him and his friends to leave the

## Page 27

1     area.  They did not.  We ended up having a
2     confrontation.  At which point I placed him
3     under arrest for disorderly by removing him from
4     a vehicle, another vehicle, and we placed him
5     under arrest for disorderly and took him to the
6     police department.
7  Q.  Fair enough.  So when he was placed under arrest
8     he was inside of a car?
9  A.  Yes.
10 Q.  And was he charged with resisting arrest or
11    assaulting a police officer?
12 A.  He was charged, if I remember correctly, with
13    assault and battery on a police officer,
14    disorderly conduct, attempted larceny, to wit my
15    firearm, and I don't know if there was a
16    resisting charge on top of that.
17 Q.  So an attempted larceny, he tried to grab your
18    gun?
19 A.  Well, when we were attempting to place him in
20    handcuffs, yes.
21 Q.  And he was charged with that for having tried?
22 A.  Yes.
23 Q.  And did he beat the charges or what happened to
24    his charges?

## Page 28

1  A.  He was --
2            MR. JOYCE:  Objection.
3  A.  He was found not guilty during bench trial.
4  Q.  Did you testify in the trial?
5  A.  I did.
6  Q.  And what other officers were involved in that
7     case?
8  A.  It was myself, Officer Van Zandt, Officer -- now
9     Sergeant Roberson, Officer Mitchell, Officer
10    Collins.
11 Q.  Is that James Collins?
12 A.  Christopher Collins.  Officer Delamarter.  I
13    think that's it.
14 Q.  Was Delamarter also on the vice squad?
15 A.  He is now, yes.
16 Q.  And what level of force did you use to arrest
17    that individual, Mr. Ververis?
18 A.  We used soft hand techniques to remove him from
19    the vehicle.
20 Q.  When you say soft -- I'm sorry to interrupt --
21    when you say soft hand technique, does that mean
22    physical contact with -- in compliance?
23 A.  Yes.  More or less.
24 Q.  And what other force did you use?

Page 29

1    A.  When he -- at the point that he pulled out my
2         gun, I kneed him twice in the area of his upper
3         thigh, two or three times.
4    Q.  How did you hit him?
5    A.  I kneed him.
6    Q.  You kneed him?
7    A.  Yes.
8    Q.  Did he pull out your gun?  Did he actually do
9         that?
10   A.  No.
11   Q.  Was your gun secured by some type of clip
12        mechanism?
13   A.  Yes.
14   Q.  So the only thing is is he grabbed on to your
15        gun?
16   A.  And he pulled on it.
17   Q.  And so you had hands contact and you kneed him a
18        number of times in his thigh?
19   A.  Uh-huh.
20   Q.  Is that yes?
21   A.  Yes.
22   Q.  And was he injured, to your knowledge?
23   A.  He ended up receiving a small cut above his eye.
24   Q.  And how did he get that small cut above his eye?

Page 30

1    A.  I don't know.
2    Q.  Did you cause that small cut up above his eye?
3    A.  I don't know how he got it.
4    Q.  Did any of the officers cause that cut above his
5         eye?
6    A.  Again, I don't know how he got that.
7    Q.  Any of the officers that were involved in the
8         Ververis -- now when Ververis was arrested, were
9         you a sergeant or a lieutenant?
10   A.  I was a sergeant.
11   Q.  Was there anybody above your rank when Ververis
12        was arrested?
13   A.  On scene?
14   Q.  Yes.
15   A.  No.
16   Q.  So you were the highest officer there?
17   A.  I was.
18   Q.  And did you have an opportunity to review the
19        reports that the other officers had prepared?
20   A.  I wrote the arrest report.
21   Q.  Why did you write the arrest report?
22   A.  I don't know.  I was the one who initially
23        removed him from the vehicle and placed him in
24        custody so I wrote the report.

Page 31

1    Q.  Do you know if an injured prisoner report was
2         prepared in connection with Mr. Ververis?
3    A.  I believe there was, yes.
4    Q.  And did you prepare the injured prisoner report?
5    A.  No.
6    Q.  Who prepared the injured prisoner report?
7    A.  I don't recall.
8    Q.  If someone gets hurt during a drug raid and
9         you're the highest officer, do you have an
10        obligation to fill out an injured prisoner
11        report?
12   A.  Yes.  But that report will go through the squad
13        commander's office so, yes, the officer is
14        obligated.
15   Q.  And then you, as the supervisor, have to cosign
16        that report?
17   A.  No.
18   Q.  So then it goes to a lieutenant?
19   A.  It would go to the squad commander which would
20        be either a lieutenant or captain and through
21        the booking sergeant, the injury report's given
22        to the booking sergeant who takes it to the
23        commanding officer.
24   Q.  Then what happens to the report?

Page 32

1    A.  It goes upstairs to the commissioner's office.
2    Q.  And to your knowledge, does the commissioner
3         review those reports?
4    A.  I believe they do.
5    Q.  Do you know that or are you simply --
6    A.  I don't know.
7    Q.  Fair enough.  Do you know if the Bureau of
8         Professional Standards gets injured prisoner
9         reports?
10   A.  I don't know.
11   Q.  Fair enough.  Were any of the officers that were
12        involved in the arrest of Ververis reprimanded
13        or disciplined?
14   A.  There were -- I don't think they were
15        disciplined but there was retraining which is
16        different.
17   Q.  So was there any reprimand?
18   A.  I don't believe so, no.
19   Q.  And what type of retraining was ordered?  Why
20        was retraining ordered?
21   A.  The commissioner ordered Officers Roberson and
22        Mitchell to be retrained on how to carry
23        noncompliant person -- how to carry a
24        noncompliant person.

Page 33

1  Q.  Why did he order that?
2  A.  Because the video of Mr. Ververis's arrest, he
3      was being noncompliant and making himself limp
4      and apparently the commissioner took issue on
5      the way that they carried him, obviously.
6  Q.  Did you see the video?
7  A.  I did.
8  Q.  And what does that video show?
9  A.  It shows two officers picking up Mr. Ververis,
10     pulling him from the middle of Worthington
11     Street into the park and laying him down.
12 Q.  And when they did that was Mr. Ververis moving
13     in the videotape?
14 A.  No.
15 Q.  Was he limp?
16 A.  He was being noncompliant, limp, yes.
17 Q.  Was he unconscious when he was being dragged by
18     those officers?
19 A.  No.
20 Q.  He was just playing dead, playing possum is what
21     you're saying?
22 A.  Yes.
23 Q.  And then did they get to place him on the
24     ground?

Page 34

1  A.  Yes.
2  Q.  Did they throw him on the ground?
3  A.  No.
4  Q.  So what does the video show that they did,
5      though?
6  A.  The video shows them dragging him over and
7      putting him in the snow.
8  Q.  Because you were the officer that prepared the
9      report in Ververis, were there things that you
10     left out of the report that you felt later on
11     that should have been included?
12 A.  Yes.
13 Q.  And what was it that you felt should have been
14     included that was not included?
15 A.  Officer Collins had taken a cell phone from the
16     bystander who had recorded -- we believe who had
17     recorded Mr. Ververis pulling out my gun and
18     neglecting to write that into the report.
19 Q.  And so Officer Collins confiscated a cell phone?
20 A.  Yes.
21 Q.  And who took the cell phone back to the station?
22 A.  He did.
23 Q.  And it was kept as evidence?
24 A.  It was tagged into evidence per Springfield

Page 35

1      Police Department policies.
2  Q.  Was a search warrant obtained to look through
3      the phone?
4  A.  No.
5  Q.  Did somebody look through the phone?
6  A.  No.
7  Q.  You know there was an allegation that somebody
8      erased a video of that that had been taken?
9  A.  Yes.
10 Q.  Did you investigate that?
11 A.  The allegation?
12 Q.  Yes.
13 A.  No.
14 Q.  Do you know that the Bureau of Professional
15     Standards reviewed that allegation?
16 A.  They did.
17 Q.  Did anyone look into the actual video to see if
18     something had been erased that day?
19 A.  They were unable because someone else had given
20     the phone back without anybody's knowledge.
21 Q.  To the individual?
22 A.  To the person who owned it.
23 Q.  To a female?
24 A.  Yes.

Page 36

1  Q.  Just so I'm clear to the only thing that you
2      omitted from the report was the fact that there
3      was a phone that had been confiscated as
4      potentially incriminating evidence and that was
5      the only thing that you left out of the report?
6          MR. JOYCE:  Objection.
7  Q.  Or was there anything else that you left out of
8      the report?
9  A.  I believe that was it.
10 Q.  Mr. Ververis claimed that a choke hold was
11     applied?
12 A.  He did.
13 Q.  And did you see that?
14 A.  He was not choked, no.
15 Q.  Under which circumstances can police use a choke
16     hold?
17 A.  I would assume that that would be a deadly force
18     situation.
19 Q.  Did you say anything in the police report?  You
20     told us earlier that Mr. Ververis had a
21     laceration to his head?
22 A.  Yes.
23 Q.  You said that and you said that you didn't know
24     how he got the laceration?

Page 37

1   A.  Correct.
2   Q.  When you use force in the Springfield Police
3       Department, under what circumstances do you have
4       to file a use of force report?
5   A.  It would be if the baton or a similar weapon or
6       pepper spray, now a taser and, of course, a
7       firearm is used.
8   Q.  If I pull a firearm and I point a firearm at
9       somebody and tell them to get on the ground, do
10      I have to file a report for displaying a gun?
11  A.  No.
12  Q.  So the display of a gun, you don't have that in
13      the use of force?
14  A.  I say that's a use of force but it's not one
15      that would require a separate report.
16  Q.  If I punched somebody and that person suffers an
17      injury and they bleed, do I have an obligation
18      to fill out that information in the police
19      report, in other words, what precise level of
20      force I use and the injury that was caused?
21  A.  Yes.
22  Q.  And that's been your custom and practice?
23  A.  Yes.
24  Q.  And have you ever made exception to that custom

Page 38

1       and practice?
2   A.  Not to my knowledge.
3   Q.  In Ververis did you indicate that Mr. Ververis
4       was injured in your report?
5   A.  I don't recall.
6   Q.  You gave a deposition on the Ververis case?
7   A.  I did.
8   Q.  And you gave a deposition on October 7th of
9       2014?
10  A.  Yes.
11  Q.  Fair enough.  And you were asked on Page 39 now,
12      Line 23 and I'll show you this in a minute.
13          Did you become aware that night that
14      Mr. Ververis sustained a laceration above one of
15      his eyebrows?  Page 40.
16          ANSWER:  Yes.
17          And did you in your report that you
18      wrote describe how that occurred?
19          ANSWER:  Yes.
20          QUESTION:  Having had a chance to
21      watch these videos today, do you believe that
22      that portion of your police report was accurate?
23          Witness -- witness, No.
24          Questioned by -- was it Mr. Ryan that

Page 39

1       was questioning you?
2   A.  Yes.
3   Q.  And he said:
4           How is it -- how is it inaccurate?
5           Mr. Vigliotti objected.
6           The witness:  After reviewing the
7       video it doesn't appear that his head hit the
8       ground.  From where I was standing, they looked
9       like it did.
10          Do you remember having said that?
11  A.  Yes.
12  Q.  So your testimony was that you didn't really see
13      how he had an injury?
14          MR. JOYCE:  Objection.
15  Q.  Am I right?
16  A.  At the time --
17          MR. LIEBEL:  Are you talking about
18      the eyebrow now?
19          MR. PINEIRO:  Talking about what?
20          MR. LIEBEL:  Are you now talking
21      about the cut above the eyebrow?  You just said
22      injury.
23          MR. PINEIRO:  Right.  I'm talking
24      about a cut to the eyebrow.

Page 40

1   A.  Can you ask me the question again?
2   Q.  What did you write in your report about how he
3       got injured, did you say that he fell on the
4       ground?
5           MR. JOYCE:  Objection.
6   A.  Yes.
7   Q.  But then when you were shown the videotape, that
8       turned out not to be true?
9   A.  Correct.
10  Q.  And so did you file a supplemental report?
11  A.  No.
12  Q.  Did the Bureau of Professional Standards ask any
13      questions regarding that discrepancy?
14  A.  I don't recall.
15  Q.  From whom did you learn the information that he
16      sustained a laceration to his forehead as a
17      result of falling to the ground?
18          MR. JOYCE:  Objection.
19  A.  I believe it was one of the officers that
20      transported him to the police station.
21  Q.  And the injury that Mr. Ververis sustained, was
22      than an injury that he sustained during the
23      course of his arrest?
24  A.  I believe so, yes.

1    Q.  Was anyone else arrested along with Mr. Ververis
2        that day?
3    A.  No.
4    Q.  And as you sit here today, do you believe that
5        any of the officers that came in contact with
6        Mr. Ververis acted in an inappropriate or
7        untoward manner?
8    A.  I do not.
9    Q.  You felt they did the right thing?
10   A.  I did.
11   Q.  Fair enough.  So you mentioned the two lawsuits
12       that were filed against you, Mr. Thomas and Mr.
13       Ververis?
14   A.  Yes.
15   Q.  And what was the outcome of the Ververis case?
16       Did it settle?
17   A.  It did.
18   Q.  Did it settle for how much?
19   A.  I don't recall.  I don't know.
20   Q.  So did the arrest or the lawsuit against Mr.
21       Ververis result in any blemish to your record?
22   A.  No.
23   Q.  Have you been investigated for any untruthful
24       reporting while working as a Springfield Police

1        officer?
2    A.  Investigated by the police department?
3    Q.  Yes.
4    A.  Well, that's kind of a blanket charge they put
5        in when they investigate any complaint use of
6        force so I guess technically you could say yes.
7    Q.  But none that have stuck?
8    A.  Correct.
9    Q.  Fair enough.  Let me switch to April 26, 2012.
10       Was Justin Douglas somebody that was known to
11       you?
12   A.  No.
13   Q.  You never heard his name or come in contact with
14       him?
15   A.  I don't believe so.
16   Q.  How did you learn of Justin Douglas?
17   A.  Detective Bigda informed me that he had been
18       receiving information from another department
19       regarding Mr. Douglas.
20   Q.  And what department did he tell you he had
21       received information from?
22   A.  I forget.
23   Q.  And why did Mr. Douglas become a person of
24       interest to Mr. Bigda?

1    A.  He had an arrest warrant for -- I believe for
2        breaking and entering.
3    Q.  And it was an arrest warrant from another town?
4    A.  Another jurisdiction, yes.
5    Q.  Was it from Hampshire County?
6    A.  I believe so, yes.
7    Q.  Did Mr. Bigda receive any confidences from
8        anybody else about his whereabouts?
9    A.  He had -- well, Detective Bigda initiated an
10       investigation which eventually lead us to him.
11   Q.  What investigation did he do so he learned that
12       he was there?
13   A.  Mr. Bigda contacted Detective Bates from the
14       Springfield Police saying to the Marshals
15       Service and also contacted the West Springfield
16       Police and through those venues he was able to
17       determine that Mr. Douglas was at the
18       Springfield Inn.
19   Q.  So Mr. Bigda learned that he was at the
20       Springfield Inn from Detective Bates or from
21       somebody else?
22   A.  I believe it was a compilation of information
23       that he received.
24   Q.  Did he receive any compilation of information

1        from a non law enforcement source?
2    A.  I don't know.
3    Q.  Do you know or you're not certain about that?
4    A.  I don't know.
5    Q.  Fair enough.  So was Justin Douglas somebody
6        that was familiar to Mr. Bigda?
7        MR. JOYCE:  Objection.
8    A.  I don't know.
9    Q.  Do you know if Mr. Douglas was familiar to
10       anyone in the narcotics unit of the police
11       department?
12   A.  I don't know.
13   Q.  So who went about getting the arrest warrant?
14   A.  The arrest warrant was secured from another
15       jurisdiction.  I don't know.
16   Q.  And was there some planning to execute the
17       arrest warrant?
18   A.  Yes.
19   Q.  And what type of planning was involved to
20       execute that warrant?
21   A.  We assigned some officers to surveillance.  We
22       enlisted the help of the state police and
23       Detective Kakley and Detective Bigda wrote a
24       search warrant for the body of Justin Douglas.

Page 45

1 Q. So this was just an arrest warrant to bring his
2     body back to the court where the warrant had
3     issued?
4 A. It was a search warrant to enter Room 35 of the
5     Springfield Inn to secure the body of Justin
6     Douglas.
7 Q. So this is what they call a body warrant; right?
8 A. Yes. A search warrant for a body.
9 Q. So how did you guys go about planning the
10     execution of this warrant?
11 A. Again, we put officers on surveillance. We
12     talked amongst ourselves and we decided that we
13     were going to get a key to the room and serve
14     the search warrant.
15 Q. And when did this meeting take place?
16 A. I don't know. It may have been down the street
17     or it may have been in the office. I'm not
18     sure.
19 Q. Fair enough. Do you remember driving to West
20     Springfield?
21 A. I don't have an independent recollection of
22     driving over there but I know that we did.
23 Q. When this happened was the narcotics unit
24     stationed on Pearl Street?

Page 46

1 A. Yes.
2 Q. And how far is Pearl Street from where this
3     motel is?
4 A. I don't know. A few miles as the crow flies.
5 Q. How far is the state police barracks from West
6     Springfield?
7 A. I would say about the same, as the crow flies.
8 Q. Do you know why Mr. Douglas was processed in the
9     state police barracks?
10 A. He was processed at the state police barracks
11     because after we hit the room he incurred
12     additional charges that we didn't have the
13     jurisdiction to charge him with, stolen firearms
14     and ammunition, so they took him to the state
15     police barracks.
16 Q. So is that the only reason he was processed at
17     the state police barracks?
18 A. Yes.
19 Q. Do you remember how you got to the motel besides
20     driving in a car?
21 A. The route?
22 Q. Yes.
23 A. I don't.
24 Q. Do you know, were you the driver of the vehicle

Page 47

1     or did you go with somebody else?
2 A. I believe I was the passenger in Detective
3     Bigda's vehicle.
4 Q. And what type of vehicle was he driving, an
5     undercover vehicle?
6 A. Yes.
7 Q. And were you dressed in plain clothes?
8 A. We were.
9 Q. Including Mr. Bigda and everybody else?
10 A. Yes.
11 Q. And what type of equipment did you carry that
12     day on April 26th?
13 A. Well, a gun, handcuffs. I would be wearing a
14     bulletproof vest and probably my baton.
15 Q. Would you carry pepper spray?
16 A. No.
17 Q. Did any of your officers carry pepper spray?
18 A. I don't know.
19 Q. Were you carrying your baton?
20 A. I'm sure that I was, yes.
21 Q. Other officers, do you know if they were
22     carrying batons?
23 A. I don't know.
24 Q. Were the other officers also -- did they have

Page 48

1     their service weapons with them?
2 A. Yes. I hope so, yes.
3 Q. Fair enough. And what was the service weapon at
4     that time, was that an MP40?
5 A. I don't know. I don't know.
6 Q. Have you changed the type of weapons?
7 A. We have.
8 Q. You've gone to .45s?
9 A. No.
10 Q. Are still using the .40?
11 A. We currently carry the M&P .40 but prior to that
12     we carried a Walther .40 caliber and I don't
13     recall when the switch was made.
14 Q. Fair enough. Do you remember being involved in
15     any other surveillance?
16 A. I wasn't, no.
17 Q. You weren't involved in any of the surveillance?
18 A. No. Other than directing people to police the
19     address under surveillance, I wasn't physically
20     involved in the surveillance.
21 Q. And was Mr. Bigda involved in the surveillance?
22 A. No.
23 Q. He wasn't involved in any of the surveillance
24     but did you remain in his vehicle up until the

Page 49

1      time that the raid occurred?
2    A.  I believe so, yes.
3    Q.  Where did you guys park before the raid took
4      place?
5    A.  I don't recall.
6    Q.  Do you remember where you were in relation to
7      the motel?
8    A.  Somewhere close by but out of sight but I don't
9      recall the exact lot we were in.
10   Q.  At some point in time did you realize that Mr.
11     Douglas left the motel?
12   A.  Yes.
13   Q.  And how did you learn that?
14   A.  By radio, I believe.
15   Q.  And who communicated by radio that he had left?
16   A.  I don't recall which officer.
17   Q.  Were you able to see when he left?
18   A.  No.
19   Q.  Was Mr. Bigda able to see that he left?
20   A.  No.
21   Q.  Do you know who followed him?
22   A.  I don't.
23   Q.  Do you remember what the traffic conditions were
24     that day?

Page 50

1    A.  Riverdale Road is a fairly congested road but I
2      don't have an independent recollection of the
3      traffic that day.
4    Q.  And at some point in time did you learn that he
5      had turned back?
6    A.  Yes.
7    Q.  Were there radio transmissions that were said
8      that we can observe him driving on the road?
9    A.  I don't recall that.
10   Q.  And do you remember Mr. Bigda saying any words
11     to the effect that Mr. Douglas was visible to
12     the police now?
13   A.  I believe somebody saw him going into the --
14     back into the room, yes.
15   Q.  And what happened next after you heard that
16     somebody heard him going back into the room?
17   A.  Well, we formulated a plan.  We got a sufficient
18     number of officers together.  Trooper Jones had
19     secured a key to the room and we responded there
20     and we made entry.
21   Q.  Is Trooper Jones somebody that was known to you?
22   A.  Yes.
23   Q.  Do you work with him?
24   A.  I've never worked directly with him but he was a

Page 51

1      Springfield Police officer for a time.
2    Q.  Do you socialize with him outside of work?
3    A.  Not especially.
4    Q.  Not especially?
5    A.  Not especially.
6    Q.  But have you ever socialized with him outside of
7      work?
8    A.  I've been at functions where he's also been
9      there, but I've never --
10   Q.  There's been some testimony that Trooper Jones
11     went to the management of the motel and got a
12     key?
13   A.  Yes.
14   Q.  Were you there with him when he got the key?
15   A.  No.
16   Q.  Where were you when he got the key?
17   A.  I'm not sure.
18   Q.  Did Mr. Bigda drive his vehicle into the parking
19     lot?
20   A.  I don't recall actually where we parked but at
21     some point we approached the room on foot.
22   Q.  And what do you recall happened next?
23   A.  Trooper Jones knocked.
24   Q.  How many times did he knock?

Page 52

1    A.  I don't recall.
2    Q.  Did you identify himself as, Police.  Open up?
3    A.  I believe he said something to that effect.  I
4      don't recall what the exact words were.
5    Q.  Are you certain about that?
6    A.  I believe so, yes.
7    Q.  And then what happened next?
8    A.  Then we used a key -- he used a key to open the
9      door and we made entry.
10   Q.  And was this a motel that you've raided before?
11   A.  No.
12   Q.  Did you speak with a manager to see what a floor
13     plan looked like?
14   A.  No.
15   Q.  How big was the room?
16   A.  I don't know.  I guess a little smaller than
17     this room.
18   Q.  A little bit smaller than 20 by 20?
19   A.  I guess, yes.
20   Q.  And who was the person that opened the door?
21     Was it Trooper Jones?
22   A.  Yes.
23   Q.  And then where were you in the scheme of things?
24     There must have been a line of officers?

Page 53

1   A.  Yeah.  I was somewhere in the line of officers.
2   Q.  Were you towards the front or towards the back?
3   A.  I'm not sure.
4   Q.  Where was Mr. Bigda in relation to you?
5   A.  I'm not sure.
6   Q.  As you sit here today do you know if he was in
7       front or behind you?
8   A.  I'm not sure.
9   Q.  What about Mr. Patruno?
10  A.  I'm not sure.
11  Q.  What about Mr. Templeman?
12  A.  I'm not sure.
13  Q.  Mr. Kalish?
14  A.  I'm not sure.
15  Q.  Or Mr. Kakley?
16  A.  I'm not sure.
17  Q.  And what about Mr. Lopes?
18  A.  Again, I'm not sure.
19  Q.  And Christopher Bates was not there?
20  A.  I'm not sure.
21  Q.  Were there any other officers there?
22  A.  No.  I don't believe so.  Kakley, he was there.
23  Q.  Did you observe any other officers from the
24      state police?

Page 54

1   A.  After the arrest a uniform -- two uniformed cars
2       arrived to transport Justin Douglas and his
3       wife.
4   Q.  Can you describe to me everything that you saw
5       and heard from the moment that you enter the
6       Room 35?
7   A.  After making entry we proceeded into the room.
8   Q.  Describe the room.
9   A.  It was -- well, you open the door into a
10      hallway.  Off to the right was a bathroom and
11      that door was open.  Mr. Douglas was in there
12      using the bathroom.
13  Q.  Was he sitting on the toilet?
14  A.  He was sitting on the toilet.
15  Q.  Nice.
16  A.  There was just a little bit of a half wall, if I
17      remember correctly.  Then you come into the main
18      room, then against the wall on your right Mr.
19      Douglas's wife/girlfriend was standing at the
20      foot of the bed.  Detective Bigda dealt with Mr.
21      Douglas who at that time was compliant.  Other
22      officers were dealing with whatever her name is,
23      Samantha Rawls.
24          I proceeded farther into the room to

Page 55

1       check the far side of the bed to make sure there
2       was no other occupants in the room and as I was
3       doing that I observed that there was a -- what I
4       knew to be the buttstock of an AR-15 style rifle
5       kind of sticking up and as I came around the bed
6       I realized it was sticking up out of a backpack.
7   Q.  Where was the backpack located?
8   A.  It was on the far side of the bed kind of next
9       to the bed.
10  Q.  So it was not on the bed.  It was on the side?
11  A.  The backpack was on the side of the bed.
12  Q.  And did you observe any other guns that were in
13      plain view?
14  A.  This was a -- what I later learned to be the
15      upper portion of an AR-15 on the bed kind of
16      wrapped in a blanket.  You could see part of the
17      barrel sticking out.
18  Q.  But that was definitely on the bed?
19  A.  That was on top of the bed, that portion of the
20      rifle.
21  Q.  Fair enough.  So let me review your testimony.
22      Did you actually see Officer Bigda approach Mr.
23      Douglas who was in the bathroom?
24  A.  I know that as I went by Detective Bigda was

Page 56

1       dealing with him.
2   Q.  By himself?
3   A.  I don't recall.  I don't think so but I don't
4       recall who else.
5   Q.  Did you have your gun drawn?
6   A.  No.
7   Q.  Did Bigda have his gun drawn?
8   A.  No.
9   Q.  Did Patruno have his gun drawn?
10  A.  I believe he came in behind me.  I'm not sure.
11      I don't believe so.
12  Q.  What about Templeman?
13  A.  I don't believe so.
14  Q.  What about Kalish?
15  A.  Again, I don't believe so.
16  Q.  What about Kakley?
17  A.  I don't believe so.
18  Q.  Had anything been said about this guy being
19      armed or dangerous or anything like that?
20  A.  I believe that we knew he had a history of gun
21      offenses, but I'm not sure exactly what those
22      were but I believe we did know that.
23  Q.  And you went in without a gun in your hand?
24  A.  Not our practice to make entry with guns in our

14 (Pages 53 to 56)

Page 57

1    hands.  We don't do it.
2    Q.  Is there any reason that you guys walked in
3       without your guns in your hand?
4    A.  Because when you're making an entry in that type
5       of situation you need both hands and if you --
6       when you're running into a location where you
7       don't know the layout of the location, you don't
8       know who's in there, you don't know anything,
9       you're basically running into an unknown, you
10      need both of your hands when you're dealing with
11      whatever you're going to run into and you can't
12      physically deal with someone if you have a gun
13      in your strong hand.  It's our practice in the
14      narcotics division that we don't make entry with
15      our guns in our hands.
16         Another reason for that is the
17      obvious danger that when you run into a building
18      or into an apartment in a stack like that, one
19      in front of the other, if someone has a gun in
20      their hands, chances are, unless the first
21      person is running, that gun is pointing to the
22      person in front of them.  As a practice we just
23      don't do that.
24    Q.  So let me get it straight.  When you do drug

Page 58

1    raids, if you break a door, you normally don't
2       bring your gun, not even in the low ready
3       position?
4    A.  Correct.
5    Q.  And in the large majority of the cases when you
6       break through a door in narcotics or a body
7       warrant, your gun is right in your holster;
8       right?
9    A.  Yes.
10   Q.  And that's true for everybody else that you work
11      with in the narcotics unit?
12   A.  Yes.
13   Q.  Did you give any orders for people to have their
14      guns ready or not to pull them out or --
15   A.  No.  I don't have to give that order to the guys
16      that work in the narcotics unit because they
17      know how we do things.  And, obviously, I don't
18      have the authority to give Trooper Jones an
19      order about anything, so --
20   Q.  Fair enough.  But you had heard from Mr. Bigda
21      that this was a guy who may be armed and
22      dangerous and have a history of gun offenses?
23         MR. JOYCE:  Objection.
24         MR. COYLE:  Objection.

Page 59

1    A.  Yes.
2    Q.  And no guns were displayed or drawn as you guys
3       went through the door?
4    A.  Correct.
5    Q.  Were you able to see if Mr. Bigda was assisted
6       by any other officers when Douglas was arrested?
7    A.  I don't recall.  I believe that there was but I
8       don't recall.
9    Q.  And can you tell me every interaction that you
10      witnessed between Mr. Bigda and Mr. Douglas?
11   A.  Again, I ran past him.  Detective Bigda was
12      dealing with him.  He seemed to be -- things
13      were under control at that point.
14   Q.  What is it that he did that things were under
15      control in your view?
16   A.  At that point he was -- I believe he was
17      standing up off the toilet and, again, my focus
18      became getting farther into the room to secure
19      any other subjects who might be in there.
20      Again, we're running into the unknown.
21   Q.  When he stood from the toilet was Mr. Bigda able
22      to handcuff him?
23   A.  Again, I was already past at that point.
24   Q.  So if he was, you weren't able to see that?

Page 60

1    A.  Correct.
2    Q.  When you saw the initial interaction between Mr.
3       Bigda and Mr. Douglas, was Mr. Douglas screaming
4       or saying anything?
5    A.  Initially, I don't believe so.  I didn't hear
6       him say anything.
7    Q.  Did you observe anything, even as you moved
8       toward the interior of the room, to suggest that
9       Mr. Douglas was not compliant?
10   A.  Not at that time, no.
11   Q.  At some point in time did you notice that or
12      heard that Mr. Douglas was not compliant?
13   A.  Yes.
14   Q.  When did you realize that and where were you
15      when you realized that?
16         MR. JOYCE:  Objection.
17   A.  I was over by where the guns were on the other
18      side of the bed and I heard Mr. Douglas begin to
19      yell and I heard what sounded like a struggle
20      going on over there so I started to move that
21      way and by the time I got over there, it was
22      resolved.
23   Q.  How long did it take for you to move from the
24      point where you were when you heard some yelling

1   and screaming?
2   A.  Not long.  A few seconds.
3   Q.  And so when you moved towards Mr. Douglas where
4       was Mr. Douglas and Bigda?
5   A.  They were on the ground, on the floor.
6   Q.  And tell me where was Mr. Douglas in relation to
7       the entrance of the room?
8   A.  He was in the hallway that leads in from the
9       entrance, from the main door.
10  Q.  How far away was he from the door?
11  A.  Not a long hallway.  A couple of feet.
12  Q.  Which part of his body was closer to the door,
13      his feet or his head?
14  A.  I don't recall.
15  Q.  And what position did you find Mr. Douglas?
16  A.  Again, he was on the floor with Detective Bigda
17      and Detective Patruno was there too.
18  Q.  And so did Mr. Bigda seem to have control over
19      Mr. Douglas?
20  A.  At that time Mr. Douglas seemed to be calm.  He
21      wasn't shouting anymore, so yes.
22  Q.  So for how long did Mr. Douglas scream or shout?
23  A.  Again, I heard the shouting and then heard a
24      scuffle.  I don't know exactly how long it was.

1   Q.  You heard a scuffle?
2   A.  Yes.
3   Q.  What did you hear?
4   A.  Sounds of people scuffling, shuffling feet.  I
5       would say bodies banging into the wall or some
6       other objects.  Just a sound that I could tell
7       something was happening around on the other
8       side.
9   Q.  So when you came around and saw Mr. Douglas, Mr.
10      Douglas was prone on the ground or was he on his
11      side?
12  A.  I'm not sure.
13  Q.  And what position did you see Mr. Bigda?
14  A.  He was kind of on top of Mr. Douglas.
15  Q.  And when you say he was on top of him, where was
16      he in relation to him if he was lying on his
17      belly?
18          MR. JOYCE:  Objection.
19  A.  Again, I don't recall if he was lying on his
20      belly.  Detective Bigda was in some position
21      over him.  I don't recall the exact position.
22  Q.  When you saw him was Mr. Bigda moving or was he
23      not moving?
24  A.  I don't recall.

1   Q.  Was Mr. Bigda using force or not using force?
2   A.  Again, I believe that the situation resolved
3       itself so other than -- I believe he had his
4       hands on him.  I don't believe there was any
5       force behind that being used at that time.
6   Q.  And you said that you saw Mr. Patruno holding
7       the legs?
8   A.  Yes.
9   Q.  And when you came around did you say it took you
10      seconds from the time that you heard the yelling
11      to the moment that you saw Mr. Bigda?
12  A.  Yes.  Several seconds.
13  Q.  And during those several seconds things had
14      subsided, things had quieted down?
15  A.  Correct.
16  Q.  And was Mr. Douglas moving at that time?
17  A.  I don't recall.
18  Q.  And were his legs moving at the time or did they
19      stop moving?
20          MR. JOYCE:  Objection.
21  A.  I'm not sure.
22  Q.  Did Mr. Douglas appear to you to be conscious or
23      did he appear to you to have passed out?
24          MR. JOYCE:  Objection.

1   A.  He appeared to me to be conscious.
2   Q.  And did he appear to you to be injured or not?
3           MR. JOYCE:  Objection.
4   A.  I didn't see any signs of injury, no.
5   Q.  You didn't see any blood in the room?
6   A.  No.
7   Q.  Do you know if any blood had to be cleaned in
8       the room?
9   A.  I don't believe so, no.
10  Q.  Do you know if the hotel management cleaned any
11      blood inside of the room?
12  A.  I don't know.
13  Q.  Did you ever make any inquiry on that?
14  A.  No.
15  Q.  Fair enough.  What happened next?
16  A.  Eventually there was an additional firearm
17      found.  We recovered the evidence that we needed
18      to recover and Mr. Douglas and the girl were
19      transported to the state police barracks.
20  Q.  Can you tell me what interactions that you had
21      with Samantha Rawls?
22  A.  I don't believe I interacted with her directly.
23      She was upset, belligerent.  I mean, I don't
24      believe that I dealt with her directly.

Page 65

1  Q.  She was upset and belligerent?
2  A.  Yes.
3  Q.  What did she say?
4  A.  I don't recall but she was making a lot of noise
5      yelling.
6  Q.  Do you know the words that she uttered?
7  A.  I don't recall.
8  Q.  Do you know who she was yelling at?
9  A.  I don't recall if there was any one specific
10     person or just the police in general.
11 Q.  And when you saw Ms. Rawls, who had physical
12     custody of Ms. Rawls?
13 A.  I'm not sure.
14 Q.  And do you know if Ms. Rawls was slapped?
15 A.  I don't believe Ms. Rawls was slapped, no.
16 Q.  Are you having doubts about that?
17 A.  Yes, I do.
18 Q.  You have some doubts whether she was or not?
19 A.  No.  I have no doubt that she was not slapped.
20 Q.  As a commanding officer would there be any
21     reasons, knowing what you know about this
22     arrest, to have slapped her in the face?
23 A.  About in this specific arrest?
24 Q.  Yes.

Page 66

1  A.  No.
2  Q.  And if that was something that you witnessed,
3      what would have been your responsibility as a
4      sergeant of that unit?
5  A.  Again, if this situation had happened, I would
6      have had an issue with it.
7  Q.  What type of issue would you have had?
8  A.  That someone was striking a handcuffed prisoner
9      without proper justification.  I would have a
10     serious problem with that.
11 Q.  Has that ever happened when you worked on the
12     vice squad?
13 A.  No.
14 Q.  What type of issue would you have if you, in
15     fact, witnessed an officer smacking a female
16     that was handcuffed, what would your
17     responsibilities have been?
18 A.  Without justification, my responsibilities would
19     be to write that person up.
20 Q.  And how would you write that person up, what
21     would you do?
22 A.  To report to the commissioner of the police.
23 Q.  Would you report him to the Bureau of
24     Professional Standards?

Page 67

1  A.  I believe my responsibility ends with the report
2      to the commissioner and they do whatever they do
3      up there.
4  Q.  That's beyond your pay route?
5  A.  Yes.
6  Q.  I understand.  Would you be able to draw the
7      room for me?
8  A.  I don't think that I could.
9  Q.  Excuse me?
10 A.  I don't think I could.
11 Q.  You can't?
12 A.  No.
13 Q.  Is it that you're not a good drawer or you don't
14     have a good memory?
15 A.  I don't know if I could give you an accurate
16     floor plan of the room based on my memory.
17 Q.  Well, you said there was a wall and there was a
18     bathroom.  Could you be able to draw the
19     bathroom and the wall and where the bed was
20     because I want to find out where these weapons
21     were?
22 A.  I don't think I could give you an accurate
23     layout of the room.
24 Q.  But you didn't seem to have any problems

Page 68

1      describing what the room looked like inside so
2      is the problem that you couldn't draw it or the
3      problem is you don't remember it?
4  A.  The problem is the dynamics of where that little
5      wall was, where the bed was situated as opposed
6      to the rest of the room and the bureau.  I don't
7      feel comfortable doing that.
8  Q.  So when you open the door you said there was a
9      wall?
10 A.  There was a hallway.
11 Q.  It was a hallway and how long was the hallway?
12 A.  A couple of feet.
13 Q.  And to get to where the bedroom was did you have
14     to turn left or right?
15 A.  I believe that you went straight in.
16 Q.  You went straight in?
17 A.  I believe so.
18 Q.  And you said that there was a wall that was like
19     two feet long?
20 A.  Yeah.  There was -- I don't recall how long it
21     was but I believe there was a wall that came out
22     before you got into the bedroom area but, again,
23     how far down the hallway that was situated and
24     where the bed and the rest of it was in relation

Page 69

1    to that, I'm not quite certain.
2    Q.  What verbal interactions, if any, did you have
3        with Justin Douglas?  Did you talk to him?
4    A.  I'm sure that I did.  I don't have any
5        independent recollection of what was said but at
6        some point he was under the understanding that
7        he was going to go to jail, that he was under
8        arrest.  I'm not sure if I conveyed that to him
9        or somebody else did.
10   Q.  Did you go to the state police barracks?
11   A.  No.
12   Q.  Where did you go from there?
13   A.  We took the firearms and ammunition and the
14       jewelry back to the police department,
15       Springfield Police Department.
16   Q.  Fair enough.  And did you have any verbal
17       interactions with Samantha Rawls?
18   A.  I don't believe that I did.
19   Q.  Did Mr. Bigda tell you whether he used any
20       physical force to arrest Mr. Douglas?
21   A.  Yeah.  At some point he did.
22   Q.  And when did you learn what level of force he
23       used?
24   A.  I don't recall specifically whether he told me.

Page 70

1        I knew that there was some sort of force used
2        because they all ended up on the floor.  I don't
3        know when we had specifics about it but at some
4        point I was advised.
5    Q.  Has he ever told you what he did?
6    A.  What was in the report that I reviewed, so --
7    Q.  He punched him?
8    A.  Twice.
9    Q.  Did he have to file a use of force report in
10       regards to his incident report?
11   A.  No.
12   Q.  Have you ever seen the police report in the
13       documents from the state police barracks?
14   A.  Yes.
15   Q.  Do you know that Mr. Douglas complained of pain
16       in his temple and his jaw?
17   A.  I know that he was -- that they called an
18       ambulance for him, yes.
19   Q.  And did you make any inquiry to find out what
20       happened to him?
21   A.  No.
22   Q.  Do you know that an injury report was prepared?
23   A.  I don't know what the state police do with
24       their -- I don't know what their protocol is.

Page 71

1    Q.  The state police didn't write a report.  The
2        person that wrote the report was Mr. Bigda;
3        right?
4    A.  Yes.
5    Q.  He wrote a report on the letterhead of the state
6        police?
7    A.  Yes.
8    Q.  So do you know if Mr. Bigda filled out an
9        injured prisoner report?
10   A.  No.  He wasn't our prisoner.
11   Q.  But he was the person that he arrested.  This
12       was a Springfield Police arrest?
13   A.  Well, it was a joint arrest between the
14       Springfield Police as the state police.
15   Q.  Who put the handcuffs on him?  Was it the state
16       police?
17   A.  It was Detective Bigda.
18   Q.  Got it.  So to this day do you know if Detective
19       Bigda filled out an injured prisoner report?
20   A.  He was not required to so I'm going to say no.
21   Q.  Let me ask you a slightly different question.
22       Have you ever testified in any court and the
23       court found -- not credit your testimony, the
24       testimony that you gave in court?

Page 72

1    A.  Yes.
2    Q.  How often has that happened?
3    A.  Not very.
4    Q.  Not a good experience, is it?
5    A.  No.
6    Q.  When has that happened?
7    A.  There was an incident recently where Judge Mason
8        decided that because Detective Bigda and I's
9        testimony was inconsistent, it was not credible.
10       That was within the past few months.
11   Q.  And what case was that, sir?
12   A.  I forget his name.  It was -- I forget the
13       defendant's name.
14   Q.  Was that the case of Derrick Brown?
15   A.  Brown, yes.
16   Q.  And who was the judge that wrote the opinion?
17   A.  Judge Mason.
18   Q.  And that was in August of 2015?
19   A.  That sounds about right, yes.
20   Q.  You testified at a motion to suppress?
21   A.  I did.
22   Q.  And Mr. Bigda testified at a motion to suppress?
23   A.  Yes.
24   Q.  And tell me in your own words what happened

Page 73

1   during that incident?
2       MR. JOYCE:  Objection.
3   A.  During the arrest or during the incident that
4       led to the criminal charges that led to the
5       testimony?
6   Q.  Yes, sir.
7   A.  We had Detective Templeman making an undercover
8       purchase of crack cocaine in a house on Nee
9       Street in Springfield.  This particular person
10      whom he was making the purchase from would call
11      other crack dealers who would call crack dealers
12      in to deliver the crack and in this case she
13      called Derrick Brown.
14          He arrived in a rental car.  She
15      walked out of the house to meet him.  They went
16      for a short ride and then she got out of his car
17      and walked back in the house and sold the crack
18      cocaine to Detective Templeman.
19  Q.  And what happened to the money that she had been
20      given, was it ever retrieved back?
21  A.  No.  It wasn't that type of --
22  Q.  Why wasn't her money retrieved back?
23  A.  Because we were making multiple buys out of that
24      house and there was -- there would be no way for

Page 74

1       us to retrieve the money.
2   Q.  And if you can tell us, what is it that the
3       judge found in the way of inconsistent answers
4       between your testimony and Mr. Bigda's?
5   A.  Well, the judge said that, I believe, Detective
6       Bigda wasn't quite sure what street we were
7       parked on when we were out there in support of
8       Detective Templeman and I was.  There was also
9       an issue of whether or not when we drove by Mr.
10      Brown's car, I believe that I remembered that
11      the female subject in the investigation hadn't
12      gotten into it yet and at the time Bigda had a
13      recollection that she did.
14  Q.  And she was?
15  A.  And she was in the car.
16  Q.  And because of that he suppressed the evidence?
17  A.  He did.
18  Q.  Did the Commonwealth take an appeal on that
19      case?
20  A.  I'm not sure.
21  Q.  Is that the only time that the court has not
22      credited your testimony?
23  A.  Yes.
24  Q.  This was the only occasion?

Page 75

1   A.  Yes.
2   Q.  In 2006 were you a sergeant in the vice squad?
3   A.  I was a detective.
4   Q.  You said that you became a sergeant in 2007?
5   A.  2008.
6   Q.  2008.  To your knowledge, have other judges
7       refused to credit the testimony of Mr. Bigda on
8       other cases?
9   A.  I don't recall any offhand.
10  Q.  What about Judge Courtland?
11  A.  Judge who?
12  Q.  Courtland.
13  A.  I don't know Judge Courtland.
14  Q.  I'm sorry.  Carhar?
15  A.  I don't know.  I know Judge Carhar.  I don't
16      know of an incident with Detective Bigda.
17  Q.  Were you ever involved in an investigation in
18      2006 where a fellow by the name of William Reyes
19      was arrested?
20  A.  I'm not sure.  I don't recall.
21  Q.  Or a case in which Mr. Adorno was arrested, both
22      Reyes and Adorno were arrested?
23  A.  I don't recall the case offhand, no.
24          MR. PINEIRO:  Can I mark that as the

Page 76

1   next exhibit?
2           (Answers to Interrogatories
3            marked Exhibit No. 1.)
4           MR. PINEIRO:  Let's take a five-
5   minute break.
6           (Short recess.)
7           MR. COYLE:  So this is 1 for Kent?
8           MR. PINEIRO:  Yes.
9   Q.  Lieutenant Kent, have you been able to examine
10      Exhibit 1?
11  A.  I'm doing that now.  Is there any particular
12      question you want me to --
13  Q.  I just wanted to find out if those were your
14      answers to interrogatories.
15  A.  Okay.  They are.
16  Q.  Do those answers have your signature?
17  A.  They do.
18  Q.  And it contains your answers to the questions
19      that you were asked?
20  A.  Yes.
21  Q.  The interrogatories?
22  A.  Yes.
23  Q.  And to the best of your knowledge, those answers
24      are truthful?

Page 77

1    A.  Yes.
2    Q.  Very good.  Do you know if a Federal Court
3        refused to credit your testimony or the
4        testimony of Mr. Bigda?
5            MR. JOYCE:  Objection.
6    A.  I don't.
7    Q.  Were you involved in an arrest of Sahire Sahalla
8        (phonetic), 2011?
9    A.  Yes.
10   Q.  A guy by the name of Mr. Barnett, William
11       Barnett (phonetic)?
12   A.  Yes.
13   Q.  Was Mr. Bigda involved in that case?
14   A.  He may have been.
15   Q.  And you were involved in that case?
16   A.  Yes.
17   Q.  And a Delamarter was also involved in that case?
18   A.  Yes.
19   Q.  Can you tell me about that investigation and the
20       testimony you gave in court?
21           MR. JOYCE:  Objection.
22   A.  We were working an overtime detail targeting
23       drugs and gangs.  We observed Mr. Barnett make a
24       drug transaction.  We stopped him and eventually

Page 78

1        recovered drugs from his person.  He was
2        indicted federally and I don't recall if it went
3        through trial or just a motion, but testimony
4        was given.
5            It was my understanding that the
6        judge took issue with something that I don't
7        recall exactly.  Something to do with the MDT,
8        the mobile data terminal printout and the fact
9        that the mobile data terminal displayed the fact
10       that he was arrested based on a suspended
11       license.
12   Q.  What, if anything, was checked to ascertain his
13       identity?
14   A.  I'm not sure what you mean.
15   Q.  Did the individual that was arrested have a
16       valid license or not?
17   A.  He did not.
18   Q.  And did you confirm that?
19   A.  Yes.
20   Q.  Who confirmed that, was it you or Mr. Bigda?
21   A.  It was somebody.  I don't recall who it was but
22       using the mobile data terminal in the cruiser.
23   Q.  Did the court disagree with your assessment on
24       whether he had a license or not?

Page 79

1    A.  I thought it was more at issue that they
2        didn't -- the judge didn't believe that that
3        was -- that that display from the MDT gave us
4        probable cause to arrest him for a suspended
5        license.  I believe that was the issue.
6    Q.  Could you go back to Exhibit 1?
7    A.  Exhibit 1?
8    Q.  Yes.  To Question No. 1, Have you ever been
9        subject to any civilian complaints?  You gave a
10       number of answers.
11   A.  Yes.
12   Q.  You spoke about the case of Michael Ververis and
13       that's a case we already discussed?
14   A.  Yes.
15   Q.  And then you mentioned the name of Isaac
16       Bradley?
17   A.  Yes.
18   Q.  And when you filled out these answers did you
19       review any documents that had to do with
20       Ververis or Bradley?
21   A.  No.
22   Q.  How did you remember that Isaac Bradley had
23       filed a complaint against you?
24   A.  Because of the circumstances of the arrest.

Page 80

1    Q.  And tell me about the circumstances of the
2        arrest of Isaac Bradley?
3    A.  I was sergeant on the midnight shift riding by
4        myself.  We received a shot spotter indication
5        behind Sandy's Bar.  I had been right down the
6        street.  I drove in the alley behind the bar.
7        Mr. Bradley fled from me.  He fled from me into
8        the bar and I chased him.  I caught him.
9            We fought over his -- he had a loaded
10       .357 caliber revolver.  We fought over that.
11       During that struggle I struck him once in the
12       head with my Maglite and I was able to
13       eventually place into custody and recover the
14       firearm.
15   Q.  What bar did this happen?
16   A.  What was it called?  Mr. D's it's called now or
17       it was called back then.  Now I'm not sure what
18       it's called now.
19   Q.  And where is Mr. D's located?
20   A.  The south end of Springfield on Main Street.
21           (Mr. Liebel exits room.)
22   Q.  And your attention had been drawn to him because
23       the shot spotter had signalled that something
24       came from that area?

Page 81

1  A.  Yes.  The shot spotter pinpointed a single shot
2      from the rear of Mr. D's Bar.
3  Q.  And how was your attention drawn to Isaac
4      Bradley?  Was he somebody that was known to you?
5  A.  No.
6  Q.  Is it because he ran away when he saw you?
7  A.  When I drove back behind the bar there was a
8      crowd hanging out.  He was standing in the alley
9      drinking a beer.  If I remember correctly, there
10      was some people over here standing behind the
11      car.  He initially was compliant.  He put his
12      beer down and was watching these people behind
13      the car directing him to come into my view
14      obviously so I could see their hands.
15          As I diverted my attention to these
16      people behind the car, he turned and fled and he
17      was wearing a holster actually on his -- I think
18      it was his right side --
19          (Mr. Liebel present.)
20  A.  -- and he fled into the bar and I chased him.  I
21      caught him in the foyer.  We had a pretty good
22      struggle in there.  He was eventually placed in
23      cuffs.
24  Q.  And you used your Maglite that you hit him

Page 82

1      where?
2  A.  I'm sorry?
3  Q.  You hit him where?
4  A.  In the neck.
5  Q.  In the neck?
6  A.  In the neck.
7  Q.  And was he injured?  I take it he was injured?
8  A.  I think he got stitches, yes.
9  Q.  Fair enough.  Who assisted you in that arrest?
10  A.  I believe that Officer Jose Diaz was the first
11      one to arrive.  I'm sure there were others
12      there.
13  Q.  What was Mr. Bradley's complaint to the police
14      department, that you hit him with a flashlight?
15  A.  I guess so.  Yes.  I don't recall the exact
16      nature of his complaint but it would have to do
17      with being hit.
18  Q.  How long ago did that happen?
19  A.  I was on the dogwatch as a sergeant so it was
20      sometime between 2008 and -- I was there about a
21      year and a half so sometime in 2008 or 2009, I
22      believe.
23  Q.  And what happened with the charges against Mr.
24      Bradley?

Page 83

1  A.  He was convicted and sent to state prison.
2  Q.  And so the complaint was unfounded?
3  A.  Yes.
4  Q.  And who is Angel Montalvo, how do you remember
5      Angel?
6  A.  I don't know.
7  Q.  Did you review documents having to do with Angel
8      Montalvo?
9  A.  I don't recall Angel Montalvo.
10  Q.  Did you go through some records to refresh your
11      memory as to who Angel Montalvo was?
12  A.  I did not.
13  Q.  Do you remember what he claimed, what Mr.
14      Montalvo claimed?
15  A.  I don't.
16  Q.  And you wrote here that he claimed the officers
17      twisted his wrist and choked him and the results
18      were not sustained?
19  A.  Yes.
20  Q.  Were you interviewed by the Bureau of
21      Professional Standards on that case?
22  A.  Again, I don't recall him or the circumstances
23      of that case.
24  Q.  Do you remember how long ago that was?

Page 84

1  A.  I don't.
2  Q.  Do you remember if that was a drug raid or not?
3  A.  I don't.
4  Q.  Do you remember anything with Michael Miller?
5  A.  Michael Miller, I remember that, and this is a
6      long time ago, that he had -- he tried to stab
7      somebody with a needle and a car chase ensued
8      and myself and other officers ended up catching
9      him in the woods off Maple Street, I believe.
10  Q.  And who were the officers that caught --
11  A.  I don't remember.
12  Q.  And that was not sustained?
13  A.  Correct.
14  Q.  What about Hilton Dobbins?
15  A.  Hilton Dobbins, we had raided a house on King
16      Street.  Hilton Dobbins was the supplier of that
17      house who supplied crack to the residents there.
18  Q.  What street?
19  A.  King Street.  Hilton Dobbins showed up to
20      deliver an additional amount of crack after we
21      were already in the house.  He walked up with
22      this uniformed officer -- we had a uniformed
23      officer approach him on the front steps.  He
24      pushed him out of the way.  I chased him into

Page 85

1    King Street. I tackled him. He received a
2    broken leg. I received a severed ACL as result
3    of that.
4    Q. Did you have surgery?
5    A. I did. Two.
6    Q. Were you out of work for a period of time?
7    A. I was.
8    Q. And how did his leg break?
9    A. I don't know. It happened during the tackle.
10   Q. What happened to the charges brought against Mr.
11      Dobbins?
12   A. I don't know.
13   Q. Who is Ibis Boria?
14   A. I don't know.
15   Q. How did you remember that name? You wrote it in
16      your response.
17   A. I don't know. I don't recall that complaint.
18   Q. And this person alleged that he was struck in
19      the face with a flashlight by officer and the
20      results were not sustained. Do you remember
21      anything about that?
22   A. I don't remember the name at all.
23   Q. Besides the case of Mr. Bradley have you ever
24      struck a prisoner in the face with a flashlight?

Page 86

1    A. No. Well, yeah. Not intentionally in the face.
2    Q. When you say not intentionally, meaning
3       accidentally?
4    A. Yeah. As far as striking a shoulder or an arm
5       or something to that nature and I may have hit
6       someone in the face, yes.
7    Q. How many times has that happened where you've
8       hit somebody accidentally in the face with a
9       flashlight?
10   A. I don't recall. Again, I say it may have
11      happened.
12   Q. Was it five times?
13   A. No.
14   Q. So you don't remember anything about Mr. Boria?
15   A. I don't.
16   Q. When it happened?
17   A. No.
18   Q. The outcome of the case?
19   A. I don't.
20   Q. What about Nigel Campbell?
21   A. I don't remember him either.
22   Q. What about Tara Sikorski?
23   A. I don't remember her either.
24   Q. Do you remember where you arrested Tara

Page 87

1    Sikorski?
2    A. I don't.
3    Q. Do you remember what she claimed?
4    A. I don't other than what I can read here.
5    Q. And when you filled this out, did you have a
6       document that you reviewed so that your memory
7       would be refreshed about what happened of Tara
8       Sikorski?
9    A. I didn't.
10   Q. What about Jose Rivera, alleged thrown to the
11      floor during a police call, then punched, kicked
12      and choked. Results, not sustained?
13   A. I don't remember him either.
14   Q. Do you remember what other officers were
15      involved?
16   A. I don't.
17   Q. What about Derek Besaw?
18   A. I don't remember Derek Besaw.
19   Q. Where he claimed, Alleged several officers
20      punched him in the face and gut then shoved his
21      face into a brick wall. Result, not sustained?
22   A. I don't have an independent recollection of
23      that.
24   Q. What about Scott St. Laurent, alleges his head

Page 88

1    was banged against a cruiser. Results, not
2    sustained?
3    A. I remember Scott.
4    Q. Tell me what you remember about Scott?
5    A. Scott St. Laurent, somewhere in the downtown
6       area. I don't recall exactly where. An officer
7       tried to place him into custody. He dragged the
8       officer down the street with a car. Myself and
9       another uniformed officer were able to box him
10      in at Federal and Worthington Street when we
11      took him out of the car, put him over the hood
12      and handcuffed him and took him to jail.
13   Q. And that was not sustained?
14   A. Yes.
15   Q. How long ago did that happen?
16   A. That was -- I think that was probably as far
17      back as the '90s. Probably the late '90s.
18   Q. What about Taurean Bethea, if I pronounced his
19      name right?
20   A. I don't remember him.
21   Q. Claimed officer approached him with duty weapon
22      drawn and another officer threw him to the
23      ground. Results, exonerated. Do you remember
24      anything about that?

Page 89

1    A.  I don't.
2    Q.  What about Hector Soto, alleged officer
3        violently arrested him.  Results, not sustained?
4    A.  I don't remember him either.
5    Q.  You told me that you didn't remember anything
6        about Derek Besaw?
7    A.  I don't remember that, no.
8    Q.  Were you here when I questioned Mr. Patruno
9        about the case of Derek Besaw?
10   A.  I was.
11   Q.  Did that refresh your memory as to what happened
12       with Derek Besaw?
13   A.  I don't remember that.
14   Q.  This is the individual that claimed that he was
15       punched on the right side of his jaw and his
16       stomach and slammed into a wall?
17   A.  Yes.
18   Q.  And so you don't know what Mr. Besaw looks like?
19   A.  I don't.
20   Q.  Do you know if he's light skinned, black, kind
21       of heavyset guy?
22   A.  I don't.
23   Q.  I see.  Do you know who Mr. Wyszinski is,
24       Sergeant Wyszinski?

Page 90

1    A.  A lieutenant now.
2    Q.  According to this, I interviewed Officer Steven
3        Kent, Squad C narcotics unit and he authored a
4        report as similar and corroborative with his
5        interview.  The following is a text of the
6        report.
7            On 1/19/07 members of the narcotics
8        bureau executed a search warrant at 95 Federal
9        Street, Apartment 2B.  After completing the
10       search of the residence and exiting the
11       building, several officers and I observed Besaw
12       and his companion walking on Federal Court
13       towards the entrance of 95 Federal Street.
14           Do you know where that area is?
15   A.  Yes.
16   Q.  Do you remember arresting anybody in that area?
17   A.  I've arrested hundreds of people in that area.
18       I don't remember this particular incident.
19   Q.  After circling the block onto Federal Street we
20       were able to look down the alley leading to
21       entrance of 95 Federal Street and observed Besaw
22       and is companion entering the building.
23           Believing that Besaw and his
24       companion were drug purchasers en route to the

Page 91

1        apartment that we had just vacated, Detectives
2        Patruno, Wadlegger, Petrie and I entered the
3        building to conduct a threshold inquiry.  After
4        entering the building we encountered the two
5        walking down the stairs from the area of
6        Apartment 2B.
7            At this time Detective Patruno and I
8        spoke with Besaw while Detectives Petrie and
9        Wadlegger spoke with his companion.  Neither
10       party could provide a plausible or even sensible
11       reason for being in the building.  After
12       confirming that neither was the subject of
13       outstanding warrants, they were advised to leave
14       the building.
15           At no time during the encounter with
16       Besaw and his companion did I or any other
17       officer present strike either individual or act
18       in anything other than a professional manner.
19           Respectfully submitted, Steven M.
20       Kent, No. 175.
21           Was that your ID number at the time?
22   A.  I assume -- again, I don't remember the
23       incident, but, yes, I assume that was my badge
24       number.

Page 92

1    Q.  And at that time you were a detective in 2007?
2    A.  Yes.
3    Q.  And you told me that you didn't remember
4        anything about the arrest of Isaac Bradley?
5    A.  No.  That's the one I just described behind the
6        bar.
7    Q.  That's the guy that had the .357?
8    A.  Yes.
9    Q.  At the D's Bar?
10   A.  Mr. D's.
11           MR. PINEIRO:  Counsel, can I ask a
12       question?  Why was the report of Mr. Kent
13       blocked out completely, the narrative of Mr.
14       Kent in the document request?
15           MR. LIEBEL:  I don't know what you're
16       talking about.  This is in response to the City?
17       Is this a City response?
18           MR. PINEIRO:  City response
19       completely blocked out of Mr. Kent.
20           MR. LIEBEL:  It was probably a
21       prior -- probably a record from a report we took
22       out of a public records request.  I thought we
23       had a whole bunch of pending discovery issues
24       outstanding --

1      MR. PINEIRO:  Off the record.
2      (Short recess.)
3  Q.  You said that you didn't remember the complaint
4      of Mr. Bethea?
5  A.  I don't.
6  Q.  I will tell you what he claimed here.  This is a
7      complaint from July 14th, 2010.  So it says,
8      "Taurean Bethea, 63 Chester Street, Springfield,
9      Mass. filed a citizen's complaint.  The
10     following is the text of his complaint including
11     any grammatical errors:"
12        On the evening of July 14th, 2010 at
13     7 p.m. I was pulled over in the parking lot of
14     L.A. Fitness, Hall of Fame Avenue.  As Officer A
15     approached my vehicle with his firearm drawn he
16     directed me to turn my car off and put my hands
17     out the window.  I followed his directions.  As
18     I was being approached at gunpoint another
19     officer approached my vehicle, opened my door as
20     I was pulled out of my car violently thrown on
21     the back of my car and placed in handcuffs.
22        Four other officers arrived on the
23     scene, all plain clothes officers identifying
24     themselves as Springfield Police officers.  As I

1      was against my vehicle in handcuffs I continued
2      to ask, What's going on?  I also asked, What's
3      this all about?  I received no answer and then
4      another officer approached and said, What,
5      you're going to have our jobs?  I'll fuck you
6      up.  I didn't respond to his threat and the
7      officer reached into my pocket and removed
8      everything in my pocket, my identification
9      included.  They took my ID back to the cruiser.
10     About ten minutes later an officer returned and
11     asked, How long have you been driving?  I
12     responded, For a long time now.  As my ID was
13     being ran, I continued to ask the officer, What
14     is this all about?  He continued to just stare
15     at me and he said -- he didn't respond at all.
16        When another officer returned with my
17     ID I said, What is this about?  And an officer
18     replied, You were speeding.  I replied, Then
19     give me a ticket.  I then was released out of
20     the handcuffs and then I asked, Can I have a
21     badge number?  And an officer responded, It will
22     be on the ticket.  I responded, Then give me the
23     ticket.  All six officers went back to their
24     vehicles, two marked cruisers, two unmarked

1      vehicles.  I sat back in my vehicle, drove
2      around to park and by the time I came back
3      around to the scene the officers quickly sped
4      off and exited the L.A. Fitness parking lot.  No
5      speeding ticket was issued until three days
6      later which I received by mail.
7        What I just read to you, does that
8      refresh your memory of what happened?
9  A.  I don't remember him.
10 Q.  Who is Officer Laviolette?
11 A.  Officer Laviolette worked in the street crimes
12     unit.
13 Q.  What about Officer Soler, did he work in the
14     vice squad?
15 A.  He did.
16 Q.  And Templeman works in the vice unit?
17 A.  Yes.
18 Q.  Do you know who Sergeant Maloney is?
19 A.  Yes.
20 Q.  Have you ever raided an address by the name of
21     57-59 Chester Street?
22 A.  Yes.
23 Q.  Do you know who Carl Sepheus is?
24 A.  Sepheus.

1  Q.  Does this ring a bell now that I mentioned the
2      name Carl Sepheus?
3        MR. JOYCE:  Objection.
4        MR. LIEBEL:  Are we back on the
5      ticket?  You had a long conversation about this
6      ticket event.
7        MR. PINEIRO:  Right.  He said he
8      didn't remember.
9        MR. LIEBEL:  But is that what you're
10     asking him?
11       MR. PINEIRO:  No.  No.  I'm asking
12     him about the name Carl Sepheus.
13 Q.  Does it refresh your memory as to the complaint
14     that was brought by Taurean Bethea?
15 A.  No.
16 Q.  Was Carl Sepheus someone that the police were
17     interested for guns?
18 A.  Yes.
19 Q.  Let me see if this is a report that you wrote
20     portions of it.  The operator of the vehicle was
21     removed at gunpoint and handcuffed for the
22     safety of all involved.  He was eventually
23     identified as Taurean Bethea of 63 Chester
24     Street.  63 Chester Street located immediately

1  next door to 57-59 Chester Street.  At this time
2  Sergeant Arpin recognized Bethea as being a
3  person that he had arrested in the past for
4  illegal possession of firearms and ammunition
5  and the discharge of a firearm within 500 feet
6  of a dwelling.
7        Bethea was immediately belligerent
8  towards the officers on scene using profanity,
9  issuing threats and demanding to know why he was
10  being stopped.  Due to the nature of the
11  circumstances and Bethea's criminal history,
12  explaining the entire purpose of the stop to him
13  was not possible as it would have compromised
14  the integrity of the ongoing investigation at
15  57-59 Chester Street and jeopardize the safety
16  of officers attempting to serve the search
17  warrant.
18        To this end Bethea was only informed
19  of traffic violations he had committed, to wit,
20  excessive speed and failure to immediately stop
21  for the police upon being signalled to do so.
22  Upon hearing this Bethea expressed his belief
23  that plain clothed detectives would be on the
24  scene to enforce traffic laws and, again, issued

1  several threats including the threat of having
2  the officers fired.
3        Bethea was checked for outstanding
4  warrants and license status.  There were no
5  warrants active for his arrest and his license
6  was found to be active.  However, his IMC
7  history showed a record of violence including
8  arrests for assaulting and battering at least
9  three different women and the arrest on
10  firearms-related charges.  In addition, this
11  record showed a recent arrest for outstanding
12  warrants and traffic offenses including speeding
13  and operating with a suspended license.
14        While Bethea was being detained other
15  officers were able to contact officials from the
16  office of probation and they were able to
17  determine that Sepheus was, in fact, inside of
18  57-59 Chester Street.  Upon learning this, the
19  decision was made to execute the search warrant
20  as soon as possible in order to ensure Sepheus
21  did not leave the residence.  Due to the
22  inherent danger of the search warrant service I
23  ordered that all officers immediately respond to
24  a predetermined staging location to prepare to

1  serve the warrant.
2        At this time I felt based on the
3  information obtained, this investigation and his
4  criminal history, that Bethea, if not directly
5  involved with Sepheus, was probably an
6  associate.  At this time I was also concerned
7  that Bethea could possibly have observed
8  officers on Chester Street and used himself as a
9  decoy to confirm officers' presence in the
10  neighborhood or even lure them away.  If this
11  were the case, it was reasonable to believe that
12  Bethea could warn Sepheus if allowed to have
13  access to a telephone or leave the area.
14        For these reasons I briefly
15  contemplated detaining Bethea until the search
16  warrant was served but decided that manpower
17  shortages would not allow this.  Bethea was
18  released and informed that he would be receiving
19  a citation in the mail.  After being released
20  Bethea raced to return to his vehicle, instead
21  choosing to stand in the parking lot berating
22  and challenging the officers as they left the
23  area.
24        The search warrant was served and

1  Carl Sepheus was located in the residence and
2  arrested.  Seized as a result of the
3  investigation was a bullet resistance vest, a
4  M-1, one assault pistol loaded with 16 rounds, a
5  .32 caliber revolver and 22 rounds of .22
6  caliber ammunition.
7        At no time during his detention was
8  Bethea physically or verbally abused.  All
9  officers on the scene acted professionally and
10  within policy despite Bethea's threats, taunts
11  and belligerent attitude.
12        Does this refresh your memory as to
13  the report that you filed involving Mr. Bethea?
14  A.  I remember the Sepheus investigation.  I do not
15  remember that traffic stop.
16  Q.  You said you didn't remember the case of Ms.
17  Sikorski?
18  A.  I don't.
19  Q.  Of 91 Marion Street, does that ring a bell?
20  A.  No.
21  Q.  Let me tell you what Ms. Sikorski says.  This is
22  a complaint dating back to August 23rd, 2006.
23        I was sitting on the back porch of
24  95 -- I guess Cliftwood when about 10 to 15

1      officers came running up and running in the
2    apartment next door.  All this happened on
3    August 23rd, 2006.  The cop was saying to sit
4    down -- doom, misspelled.  I had an eight-year
5    old girl and I asked the officer if I could
6    bring her to the house and he said, No.  Sit the
7    fuck down and elbowed me in my eye.
8           Complaints have been -- and does that
9    refresh your memory?
10  A.  It does not.
11  Q.  And do you know if Templeman, Bigda were also
12    involved in this raid?
13  A.  I don't even recall the incident.
14  Q.  Let me see if I read the report here.  So here's
15    what it says, I interviewed Officer Steven Kent,
16    Squad C, narcotics division and he authored a
17    report that is similar and corroborated with his
18    interview.  The following is a text of that
19    report:
20           Sir, on 8/23/06 I participated in a
21    search warrant execution and subsequent arrest
22    of a Jose Rivera at 95 Cliftwood Avenue, first
23    floor apartment.  During the search warrant
24    service I approached from the rear along with

1      other officers and observed several persons
2    loitering on the rear porches.  I had no contact
3    with these persons.  I did not observe any other
4    officers interact with them.
5           After entering the residence I placed
6    at least one person in custody either in the
7    kitchen or in the living room area.  At this
8    time I was made aware that Jose Rivera had fled
9    to the bathroom and was secured after flushing
10    evidence down the toilet.  I have known Rivera
11    for several years having arrested him on several
12    occasions.
13           Let's see -- I spoke with him briefly
14    in the living room.  At this time he was not
15    bleeding and did not complain of any injuries or
16    abuse.  During this search of the apartment an
17    elder Hispanic male continually shouted in
18    Spanish and attempted to stand and walk about
19    the apartment.  I spoke with Rivera about this
20    subject's irrational behavior and told him that
21    this man was his father and that he had a
22    medical or mental condition and that he was not
23    responsible for his actions.
24           At no time did I observe any officer

1      treat this individual in anything less than a
2    professional and respectful manner.  At no time
3    during the search warrant service did I or any
4    other officers present use anything but
5    reasonable forces to secure the residence and
6    place the occupants in custody.
7           Does that refresh your memory as to
8    that particular encounter?
9    A.  I don't have an independent recollection of it,
10    no.
11  Q.  And do you have any independent recollection of
12    Mr. Rivera's complaint that the officers then
13    punched him in the head, struck him with
14    flashlights in the ribs and kicked him about the
15    body?
16  A.  I don't.
17  Q.  So if you look at Interrogatory No. 2, Jose
18    Rivera appears to be an incident related to a
19    narcotics case; right?
20  A.  Yeah.  From your report that's what I -- it
21    looks like that.
22  Q.  Do you remember anything on the arrest of Hector
23    Soto?
24  A.  No.

1    Q.  Do you remember anything about the arrest of
2      Rubin Adabula, one that you did not list in your
3      complaints?
4    A.  Who?
5    Q.  Rubin Adabula, does he ring a bell?
6    A.  No.
7    Q.  Of 52 Thompson Street?
8    A.  No.
9           MR. PINEIRO:  Thank you, Lieutenant,
10    for your time.
11           MR. JOYCE:  All set.
12           MR. COYLE:  No questions.
13           MR. LIEBEL:  No questions.
14           MS. RUBINO:  Nothing.
15           (Whereupon, the deposition was
16    concluded at 1:03 p.m.

## Page 105

1    Excerpt from Rule 30 (e):
2    Submission to Witness; Changes; Signing
3         When the testimony is fully
     transcribed, the deposition shall be submitted
4    to the witness for examination and shall be read
     to or by him/her,  unless such examination and
5    reading are waived by the witness and by the
     parties.  Any changes in form or substance which
6    the witness desires to make shall be entered
     upon the deposition by the officer with a
7    statement of the reasons given by the witness
     for making them.  This procedure must be
8    accomplished within 30 days of receipt of the
     transcript.
9
10   *****************************************
11
12        I have read the foregoing, and it is a
     true transcript of the testimony given by me at
13   the taking of the subject deposition.
14
15
16
               STEVEN KENT
17
18             ____
     DATE
19
20
21
22
23
               CASE NAME:  Douglas vs. City of Springfield
24             DATE TAKEN:  November 30, 2015

## Page 106

1         ERRATA SHEET
2         In accordance with the rules of
     procedure governing depositions, you are
3    entitled to read and correct your deposition.
     Accordingly, please carefully read your
4    deposition and, on this errata sheet, make any
     changes or corrections in form or substance to
5    your deposition that you feel should be made.
     PLEASE DO NOT MARK THE TRANSCRIPT.  After
6    completing this procedure, sign at the
     conclusion of such changes/corrections (if any)
7    and return it in accordance with your
     instructions.
8
9
     PAGE LINE
10   ____ ____  CHANGE:_____
           REASON:_____
11   ____ ____  CHANGE:_____
           REASON:_____
12   ____ ____  CHANGE:_____
           REASON:_____
13   ____ ____  CHANGE:_____
           REASON:_____
14   ____ ____  CHANGE:_____
           REASON:_____
15   ____ ____  CHANGE:_____
           REASON:_____
16   ____ ____  CHANGE:_____
           REASON:_____
17   ____ ____  CHANGE:_____
           REASON:_____
18   ____ ____  CHANGE:_____
           REASON:_____
19   ____ ____  CHANGE:_____
           REASON:_____
20   ____ ____  CHANGE:_____
           REASON:_____
21
22   I have read the foregoing transcript.
23
     _____ DATE:_____
24   STEVEN KENT

## Page 107

1    Commonwealth of Massachusetts
     South Middlesex, ss.
2
3         I, Linda Dunlop, Notary Public in and
     for the Commonwealth of Massachusetts, do hereby
4    certify that there came before me on the 30th
     day of November, 2015, STEVEN KENT, who was
5    satisfactorily identified and duly sworn by me;
     that the ensuing examination upon oath of the
6    said deponent was reported stenographically by
     me and transcribed into typewriting under my
7    direction and control; and that the written
     transcript is a true record of the questions
8    asked and answers given at said deposition.
9
10        I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or
11   employed by any of the parties to the action in
     which this deposition is taken; and, further,
12   that I am not a relative or employee of any
     attorney or financially interested in the
13   outcome of the action.
14        IN WITNESS WHEREOF I have hereunto
     set my hand and affixed my seal of office this
15   27th day of January, 2016 at Framingham.
16
17   _____
18   Linda Dunlop, CSR
     Notary Public,
19   Commonwealth of Massachusetts
     My Commission
20   Expires: 1/07/22
21
22
23
24