UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JUSTIN DOUGLAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:14-cv-30210-MAP |
| | ) | |
| CITY OF SPRINGFIELD, DET. GREGG | ) | |
| BIGDA, SGT. STEVEN KENT, DET. | ) | |
| ROBERT PATRUNO, DET. THOMAS | ) | |
| KAKLEY, DET. MARK TEMPLEMAN, | ) | |
| DET. EDWARD KALISH, DET. | ) | |
| CHRISTOPHER BATES, and MASS. | ) | |
| STATE POLICE TROOPER LIAM R. | ) | |
| JONES, | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 69)

ROBERTSON, U.S.M.J.

Plaintiff Justin Douglas ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983,

alleging civil rights violations against seven officers of the Springfield Police Department and

one Massachusetts state trooper in their individual capacities (collectively, "the Officers"), and

against the City of Springfield ("Springfield") (Dkt. No. 58). Springfield has moved for

summary judgment as to Count II of Plaintiff's first amended complaint, which alleges that

Springfield maintained customs, policies, and practices that evinced deliberate indifference to the

constitutional rights of citizens who come in contact with certain members of its police

department (Dkt. No. 58, ¶ 97; Dkt. No. 69). Plaintiff has opposed Springfield's motion (Dkt.

No. 79). The motion has been referred to the undersigned for report and recommendation (Dkt.

No. 82).  The court heard the parties at oral argument on July 7, 2016 (Dkt. No. 88).  For the reasons set forth below, the court recommends that Springfield's motion be DENIED.

      I.   FACTUAL BACKGROUND

      A.   Plaintiff's Arrest

On March 26, 2012, the Officers obtained a warrant for Plaintiff's arrest (Dkt. No. 78 at 24, ¶ 1).[1]  They learned that Plaintiff was staying at the Springfield Inn with a female companion, Samantha Rauls ("Ms. Rauls").  Massachusetts State Trooper Liam Jones obtained keys to Plaintiff's room and, along with the other officers, entered the room to execute the warrant and make the arrest (*id.* at 24, ¶¶ 2-3).  The Officers found Plaintiff seated in the bathroom.  Springfield Police Detective Gregg Bigda handcuffed him and began walking him out of the room (*id.* at 24, ¶¶ 4, 7).

As Plaintiff was being escorted out of the room, he saw Ms. Rauls on the floor in handcuffs (*id.* at 24, ¶¶ 5, 7-8).  Plaintiff became agitated at seeing Ms. Rauls on the ground, and told the officers to pick her up and get her off the floor (*id.*).  Bigda yelled at Plaintiff to shut up, swung Plaintiff around and punched him in the jaw (*id.* at 25, ¶ 13).  Other officers joined Bigda in beating Plaintiff as he fell to the ground (*id.* at 25, ¶ 14).  Plaintiff felt a blunt object strike his head, and Ms. Rauls saw an officer hit Plaintiff more than once with the butt of a pistol (*id.* at 24-25, ¶¶ 8, 14).

After the Officers arrested Plaintiff and Ms. Rauls, they were transported to the Massachusetts State Police Barracks in Springfield, Massachusetts (*id.* at 6, ¶ 23 & response).

---

[1] The facts are drawn primarily from Plaintiff's Additional Material Facts Submitted by Douglas in Opposition to Summary Judgment, which appear beginning on page 24 of the document captioned "Plaintiff Justin Douglas' Response to City of Springfield Statement of Undisputed Material Facts and Motion for Summary Judgment [Document 69]" (Dkt. No. 78).  The officers vigorously dispute Plaintiff's account of the facts, including the allegations about the force used to effectuate his arrest.

Plaintiff initially requested an ambulance for an injured jaw and temple, but refused medical treatment when the ambulance arrived (*id.* at 25, ¶ 17).  According to his amended complaint, Plaintiff sustained injuries as a result of the beating, including recurrent headaches, blurred vision, a displaced jaw injury, and injuries to his back and neck (Dkt. No. 58 at 5, ¶ 43).

### B.   Additional Allegations Related to Count II

#### 1.   Use of Force Training and Policies

Massachusetts General Laws ch. 41, § 96B mandates that "[e]very person who receives an appointment to a position on a full-time basis in which he will exercise police powers in the police department of any city or town, shall, prior to exercising police powers, be assigned to and satisfactorily complete a prescribed course of study approved by the municipal police training committee" (Dkt. No. 72 at 20, ¶ 42).  The Massachusetts Criminal Justice Training Council is responsible for the program curriculum used at the police academy.  The basic recruit academy spans twenty-six weeks and includes extensive curriculum guidelines pertaining to the use of force.  Included in the curriculum are sections on the use of force and the requirement that officers file truthful police reports (*id.* at 10, ¶ 43).  Documents submitted by the defendants show that each of the Springfield police officers named in the complaint attended the police academy (Dkt. No. 72-18 at 2, 11, 19, 26, 32, 41, 49), and, from at least 2009 or 2010 through 2014 or 2015, attended annual or frequent in-service training about the use of force and defensive tactics (*id.*).[2]

---

[2] Documents submitted by Springfield show that defendant Christopher Bates attended training, including in the use of force and defensive tactics, annually from 2009 through 2015; defendant Gregg Bigda did so annually from 2009-2011, in 2013, and in 2015; defendant Thomas Kakley did so annually from 2010 through 2014; defendant Edward Kalish did so from 2010-2012 and in 2015; defendant Steven Kent did so annually from 2009-2015; defendant Robert Patruno did so annually from 2009-2014; and defendant Mark Templeman did so annually from 2009-2015 (Dkt. No. 72-18).  Without citation to any authority or developed argument, Plaintiff has

2.   Internal Investigation Unit Procedures

The Springfield police department has a specialized unit – the Internal Investigating Unit

("IIU") – charged with investigating citizen complaints (Dkt. No. 72 at 12, ¶ 51).  The IIU is

responsible for investigating matters referred to the unit by the Chief of Police; by any citizen

complaining about police officer misconduct; and by any law enforcement official (Dkt. No. 72-

14).  At the conclusion of any IIU investigation, the Deputy Chief of Police in charge of the IIU

is required to transmit in writing to the Chief of Police the conclusions at which he arrived as a

result of the investigation and his recommendation for the disposition of the complaint.  The

Chief of Police, in turn, is required under the policy establishing the IIU to transmit the IIU

Deputy Chief's written report and recommendations to the Board of Police Commissioners (*id.*).

An IIU report should indicate whether the complaint is (1) "sustained;" (2) "not sustained;" or

(3) "unfounded."  A finding of "sustained" is entered when the IIU investigator finds sufficient

evidence to support a complainant's allegations.  According to former Chief of Police William J.

Fitchet, a finding of "not sustained" is entered by the IIU when, although there may be some

facts that are true, the charge is not upheld and, as a consequence, no discipline will be meted out

to the officer (Dkt. No. 78-28 at 56).

3.   Oversight of the IIU

In 2010, the Mayor's Office created a Community Police Hearing Board ("CPHB"),

which has the authority to act as hearing officer for the Police Commissioner and make findings

---

objected to Springfield's reliance on the Springfield police department training documents and
requested that the court strike them (Dkt. No. 78 at 10-11).  Counsel for Springfield, a member
of the city's law department, has attested that the training documents are true and accurate copies
of the city's records (Dkt. No. 72-1), which appear to be admissible pursuant to Federal Rule of
Evidence 803(6), the business record exception to the hearsay rule.  Accordingly, the court
recommends that Plaintiff's request that these documents be stricken or disregarded by the court
be denied.

as to whether a police misconduct complaint should be sustained and to recommend what form of discipline should be imposed if a complaint is sustained (Dkt. No. 72 at 14, ¶ 55). The CPHB sits as an independent and non-police mayoral agency providing civilian oversight over the investigation of citizen complaints by the Springfield police department (*id.* at 14-15, ¶ 56). The CPHB is also charged with issuing reports that summarize its activities and include observations and recommendations concerning its policies and practices in relation to the Springfield police department (*id.* at 15, ¶ 57). These reports include statistics as to the number, type, and disposition of all citizen complaints (*id.* at 17, 62).

        C.        <u>Prior Complaints and Disciplinary History of Officers Involved in Plaintiff's Arrest</u>

        1.        <u>Bigda</u>

IIU documents show that Bigda has been the subject of twenty-five civilian complaints, of which thirteen involved allegations of physical contact (Dkt. No. 72-15 at 1-3). For example, in 2006, an IIU complainant accused Bidga of mistaking an innocent man for a suspect, and with another officer, dragging him from a car (Dkt. No. 78 at 19, ¶ 68). The complaint alleged that Bigda handcuffed the man and beat him in the head and neck (*id.*). The IIU investigated the complaint and found it "not sustained" (*id.*). In 2006, Bigda was accused of chasing a complainant's son, and when the complainant's son entered her apartment, Bigda was alleged to have broken down her door, choked the son, kicked him, thrown him to the floor, and broken his jaw. It was further alleged that Bigda pointed his gun at the complainant (*id.* at 19, ¶ 69). Again, the IIU's conclusion was that this complaint was "not sustained" (*id.*).

In addition to the instant case, Bigda has been sued for excessive use of force in three lawsuits, two of which settled and one of which resulted in a verdict in his favor. Bigda was sued under § 1983 in 1997 for violating the plaintiff's civil rights (*id.* at 19, ¶ 70 & response).

This case was settled out of court (*id.*).  In 2013, Bigda was accused of repeatedly pointing his gun at unarmed and compliant people during a warrantless search; this case also settled out of court (*id.* at 18, ¶ 66).  In 2012, Bigda, Kent, Templeman, and Patruno were alleged to have removed the plaintiff from his vehicle, pulled his pants down in the middle of the street, kicked and punched him over his entire body, and then strip searched and beat him at the police station (*id.* at 19, ¶ 67).  This case was tried in this court, and the jury returned a verdict in favor of Bigda on all triable issues (*id.*).

In three state court criminal cases identified by Plaintiff, judges of the Superior Court Department of the Massachusetts Trial Court ("Superior Court") have concluded that Bigda provided false testimony.  In 2007, a Superior Court judge suppressed evidence in *Commonwealth v. Earley*, Indictment No. 05-535, and *Commonwealth v. Davis*, Indictment No. 05-536, based on an unlawful search that Bigda ordered (*id.* at 20, ¶ 72; at 48, ¶¶ 226-29; Dkt. No. 78-38).  The judge found that Bigda ordered a United Parcel Service manager to open a package without a warrant and then lied about his actions in court (*id.*).  In 2015, in the case of *Commonwealth v. Brown*, Crim. No. 14-1204, a Superior Court judge allowed a motion to suppress (Dkt. No. 78-36).  The judge concluded that Bigda's testimony was false because it was irreconcilable with testimony offered by Kent (which the judge also concluded was false) (Dkt. No. 78 at 47, ¶¶ 219-22).[3]

---

[3] In March and April, 2016, a female police officer who had been involved in a relationship with Bigda was issued an abuse and prevention order against him on the basis of two threatening visits he made to her home (Dkt. No. 78 at 39, ¶¶ 148-52).  Because this incident of domestic violence occurred in 2016, some four years after Plaintiff's arrest, it has limited relevance to Plaintiff's claims of municipal liability because the incident could not have contributed to knowledge on the city's part, in advance of Plaintiff's arrest, of Bigda's allegedly violent tendencies.  If, however, the City took no precautionary steps in response to an abuse prevention order issued against Bigda in response to a complaint by one of its own officers, any such failure

According to Springfield, the IIU has never sustained a civilian complaint against Bidga during his time with the Springfield police department (*id.* at 20, ¶ 71).  Bigda testified at his deposition that he has never been disciplined, reprimanded, or required to attend retraining (*id.* at 46, ¶ 211).

        2.   <u>Kent</u>

According to IIU records, Kent has been the subject of twenty-three Internal IIU complaints (*id.* at 46, ¶ 209).  Sixteen of these complaints preceded March 2012 and involved allegations of physical force used by Kent in the scope of his employment with the Springfield police department (Dkt. No. 72-15 at 4-6).  For example, in 2006, Kent, in the course of investigating a complaint of loud music, was accused of striking a complainant's step-father in the head with a handgun and kicking him in the head and chest with his boots (Dkt. No. 78 at 28, ¶¶ 39, 42).  Although the IIU investigated the complaint and found it "not sustained" (Dkt. No 72-15 at 5), all charges against the family being investigated were dismissed (Dkt. No. 78 at 28, ¶ 45).  In 2011, Kent was accused of twisting a complainant's wrist and choking him until he fainted (*id.* at 35, ¶¶ 103, 107).  This complaint also was "not sustained" (Dkt. No. 72-15 at 4).

---

might tend to support an inference of the city's indifference to information about Bigda's possible violent tendencies.

On September 29, 2016, following a status conference before the court, Plaintiff filed a notice of his intent to move to re-open discovery to seek information about misconduct by Bigda which has been the subject of several recent newspaper articles and which was not disclosed in discovery (Dkt. No. 92).  *See, e.g.,* <u>Fallout from Video of Suspended Springfield Detective Continues as Heroin Dealer Facing 30 Years is Prison Gets Time Served Instead</u>, MassLive (Sept. 27, 2016), http://www.masslive.com/news/index.ssf/2016/09/bigda_case_fallout.html (accessed on Sept. 29, 2016).  At the status conference, the parties requested that the court issue its Report and Recommendation on Springfield's pending summary judgment motion based on the existing record, and indicated that they would reserve argument with respect to new information about misconduct by Bigda for possible de novo review by the presiding District Judge of the Report and Recommendation (Dkt. No. 93).

In addition to the instant case, Kent has been sued for excessive use of force in two other cases, each of which resulted in a settlement.  In 2013, Kent was sued for excessive force stemming from a 2011 incident (Dkt. No. 78 at 44-46, ¶¶ 201-209).  The case included allegations that Kent and three other Springfield police officers dragged the plaintiff from his vehicle, beat him, choked him until he was unconscious, then dragged him through the snow (*id*). The plaintiff in the case further alleged that Kent countenanced the unlawful seizure of a cell phone from a bystander, and that, when the cell phone was returned to its owner, the recording of the incident had been erased (*id.* at 45, ¶ 203).  The city settled the case for $175,000 (*id.* at 45, ¶ 206).  According to Kent, this case had no disciplinary consequences for him (*id.* at 46, ¶ 208). Kent had previously been named in a case involving allegations of the excessive use of force in 2003 (*id.* at 12, ¶ 46).  The plaintiff alleged that Kent and other officers dragged him from his car, threw him against a vehicle, told him "he was being taken to a special place to get his ass kicked," and strip searched him at the police station (*id.*).  The case was settled out of court (*id.*). So far as appears from the records produced by Springfield, twenty-two of the civilian complaints against Kent have resulted in findings of "not sustained" (Dkt. No. 72-15 at 4-6). One complaint, in which the complainant stated that he had been falsely arrested and strip searched, resulted in retraining (*id.* at 5).

In *Commonwealth v. Earley*, Indictment No. 05-535, a Superior Court judge refused to credit Kent's testimony that police officers executing a search warrant knocked and identified themselves before using force to enter an apartment and allowed a motion to suppress (Dkt. No.. 78 at 48, ¶ 230; Dkt. No. 78-38).

3.    Templeman

Templeman has been the subject of some thirty IIU complaints, twenty of which preceded March 2012 and involved allegations of excessive use of force (Dkt. No. 72-15 at 13-15).  For example, in 2008, a complainant alleged that Templeman kicked him in the face causing him to lose consciousness during a narcotics raid (Dkt. No. 78 at 29-30, ¶¶ 53, 61-64).  The IIU's finding on this complaint was "not sustained" (Dkt. No. 72-15 at 13).  In 2008, a female complainant alleged that while Templeman was searching her home, he punched the left side of her face and cursed and used racially derogatory epithets (Dkt. No. 78 at 32, ¶¶ 74-79).  The IIU investigated the complaint and made a finding of "not sustained" (Dkt. No.72-15 at 14).  In 2010, Templeman was accused of attempting to throw a complainant over a front porch and choking him multiple times (Dkt. No. 72-15 at 14).  Again, this complaint was "not sustained" (*id.*).  In 2013, a complainant alleged that he was badly beaten by members of the Springfield Police Department narcotics unit, including Templeman, who allegedly beat the complainant at the police station with a book or a board and kicked at and cursed him (Dkt. No. 78 at 36-39).  According to IIU documents, this IIU complaint was initially sustained, but the ultimate disposition was "not sustained" (Dkt. No. 72-15 at 13).

In 2008, in *Commonwealth v. Reyes*, Crim. No. 2007-28, a Superior Court judge found that Templeman deliberately provided false testimony in an affidavit filed in support of a search warrant application (Dkt. No. 78 at 48, ¶¶ 223-25; Dkt. No. 78-37).  Data from the defendant's electronic monitoring device contradicted Templeman's testimony about the defendant's movements (*id.* at 48, ¶ 224).  Also in 2008, in *Commonwealth v. Vazquez*, a different Superior Court judge allowed a motion to suppress, rejecting as not credible testimony offered by Templeman in support of the search of a car after a traffic stop (Dkt. No. 78-11).

Templeman testified at his deposition that he has never been disciplined for excessive use of force (Dkt. No. 78-34 at 15).  IIU documents show that he has been required to attend retraining twice, once in connection with an IIU complaint of physical abuse (Dkt. No. 72-15 at 13, 14).

### 4.  Patruno, Kakley, Bates, and Kalish

According to the IIU report produced to Plaintiff, Patruno has had nine IIU complaints filed against him (Dkt. No. 72-15 at 7).  Three of those alleged excessive use of force (*id*).  Patruno was ordered to undergo retraining on the basis of one of the complaints alleging excessive use of force.  The IIU finding in the other two excessive use of force complaints was "not sustained" (*id.*).  Kakley has been the subject of thirteen IIU complaints (*id.* at 8-9).  Of five IIU complaints alleging excessive use of force, the IIU concluded that three were unfounded, while two resulted in dispositions of "not sustained" (*id.* at 8).  Bates has been the subject of twelve IIU complaints, three of which have alleged the use of physical force (*id.* at 10).  The IIU's finding on these three complaints was "not sustained" (*id)*.

Kalish has been the subject of nineteen citizen complaints, of which eleven preceding March 2012 have included allegations of excessive use of force (*id.* at 11-12).  In 2005, Kalish received a verbal reprimand as the disposition of one of these eleven complaints (*id.* at 11).  The IIU exonerated him as to one of these complaints.  According to IIU records, one of these complaints was initially sustained, but the final disposition was "not sustained" (*id*. at 12).  The remaining IIU excessive force complaints against Kalish were "not sustained" (*id.* at 11-12).

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the summary judgment context, "[a] factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (citations and internal quotation marks omitted)). "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 73 (1st Cir. 2000) (quoting *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998)).

   B. Plaintiff's § 1983 Claim

Springfield has moved for summary judgment on Count Two of the amended complaint, in which Plaintiff seeks damages against the city under a theory of municipal liability.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  When a plaintiff alleges excessive use of force by municipal police officers,

> [u]nder *Monell* and its progeny, local governments can be held liable for alleged constitutional deprivations when those deprivations arise from a governmental policy or practice.  In addition to establishing a constitutional deprivation, the plaintiff must show that: (1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it demonstrated a 'deliberate indifference' to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation.

*Cox v. Murphy*, Civil No. 12-11817-FDS, 2016 WL 4009978, at *7 (D. Mass. Feb. 12, 2016) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Monell*, 436 U.S. at 690-92; *DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005)).  Practices, policies, and customs that are not officially authorized may be actionable under *Monell* if they are "'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of [those practices, policies, and customs] yet did nothing to end the practice.'"  *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 13 (1st Cir. 2005) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).

Plaintiff claims in Count II of the amended complaint that Springfield is liable to Plaintiff for the alleged excessive use of force by Springfield police officers because Springfield "failed to maintain a minimally appropriate training program to train its officers in key areas of law enforcement including on the use of force" (Dkt. No. 58, ¶ 97).  He further alleges that Springfield is liable because the city has failed to supervise and discipline officers who have engaged in a widespread practice or custom of using excessive force against citizens, such that a

factfinder could reasonably infer that municipal authorities had either actual or constructive knowledge of the practice and were deliberately indifferent to the risk posed of future constitutional violations (*id.*, ¶ 96).  These are distinct claims, and the court will address them separately.

1. Failure to Train

"The Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto *respondeat superior*, has set a very high bar for assessing municipal liability under *Monell*."  *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005). Accordingly, "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing."  *Id.* at 27 (citing *Canton*, 489 U.S. at 391; *Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003); *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997)).  While all reasonable inferences are to be drawn in Plaintiff's favor at this juncture, *see, e.g., Euromotion, Inc.*, 136 F.3d at 869, it is Plaintiff's burden to demonstrate a causal link between an alleged failure to train police officers adequately and the claimed constitutional violation.  *See Young*, 404 F.3d at 9.

Plaintiff's allegation that Springfield has a practice, custom, or policy of not adequately training its police officers in the appropriate use of force finds scant support in the record.  It is undisputed that each of the defendants in this case completed training in the use of force at the police academy and that each has annually, or very regularly, attended refresher training addressing the appropriate use of force and defensive tactics.  Plaintiff has pointed to no evidence of deficiencies in the training offered by the city.  *See DiRico*, 404 F.3d at 469 (affirming dismissal of § 1983 failure to train claim where evidence showed that municipality

regularly gave police officer copies of its policy on use of force and provided him with formal

instruction on the matter); *Cox*, 2016 WL 4009978, at *12 (granting municipality's summary

judgment motion on failure to train aspect of § 1983 claim where the plaintiff failed to submit

evidence indicating deficiencies in municipality's police officer training program).  Nor has

Plaintiff offered any developed argument establishing a causal connection between any alleged

failure in training and the claimed excessive use of force by Springfield police officers against

him during his arrest (Dkt. No. 79 at 11-12).  It is his burden to do so.  *See Young*, 404 F.3d at

10.  Thus, the court recommends that Springfield's summary judgment motion be granted insofar

as Plaintiff's claim relies on the city's alleged failure to train its officers adequately on the use of

force.  *See DiRico*, 404 F.3d at 469; *Cox*, 2106 WL 4009978, at *12.

2.    <u>Failure to Supervise, Investigate, and Discipline</u>

The remaining aspect of Plaintiff's § 1983 claim stands on a different footing.  Plaintiff

argues that the sheer volume of prior complaints of excessive use of force against some of the

officers who participated in his arrest, viewed in conjunction with a consistent pattern of "not

sustained" as a disposition of citizen complaints against these officers, provides a sufficient basis

for a factfinder to infer that the officers had a pattern or practice of using excessive force,

particularly during the execution of search and arrest warrants.  Based on the volume of prior

complaints, for which there was, according to Chief of Police Fitchett, some supporting

evidence, Plaintiff argues that these prior complaints actually or constructively alerted

Springfield to behavior which was likely to result in the violation of the constitutional rights of

its citizens, and that the municipality's deliberate indifference to this risk and persistent and

long-standing failure to address it was causally connected to Plaintiff's alleged injuries (Dkt. No.

79 at 11-12).

For its part, Springfield denies that it has a practice or custom of inadequately supervising or disciplining officers who use unreasonable force.  Springfield points out that it has policies in place concerning the use of force, including requirements that Springfield police officers be trained annually on the use of force and defense tactics and that officers check arrestees for injuries and file written reports about any such injuries following any use of force by an officer. Springfield also relies on the existence of the police department's IIU and its process for investigating civilian complaints and reporting the results of the investigations to senior officers in the department and its system for civilian review of IIU investigations.  Springfield further maintains that the complaints and lawsuits alleging excessive use of force that were identified in the amended complaint and in discovery would not provide it with the requisite notice that the officers "posed a grave risk of harm" in light of the fact that neither the IIU nor a jury has ever sustained a complaint against any of the officers who were involved in Plaintiff's arrest.

The First Circuit recently revisited the standard a plaintiff must meet to state a claim for § 1983 liability against a municipality in the case of *Saldivar v. Racine*, 818 F.3d 14 (2016).  In *Saldivar*, the plaintiff alleged that a Fall River police officer went to the plaintiff's apartment in response to the plaintiff's call for police assistance.  When the officer arrived, the plaintiff alleged, he pointed his service weapon at her and assaulted, battered, and raped her.  *Id*. at 16. Plaintiff named the municipality as a defendant on the basis of allegations about the officer's past disciplinary history.  *Id.* at 17.  The First Circuit affirmed the district court's dismissal of the *Monell* claim because, while the complaint alleged a number of disciplinary violations prior to the officer's alleged rape of the plaintiff, "the [disciplinary] violations [did] not . . . include any that would indicate that [the officer] had any propensity for violence or any other sufficiently related conduct."  *Id.*  The First Circuit concluded that the absence of allegations about a prior

history of violence or sexual misconduct by the officer rendered "speculative any inferences that one might otherwise arguably draw that any officer who would commit such an offense likely had a record that would suffice to give such an indication." *Id.* at 19.

Springfield also relies on decisions by the First Circuit in *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10 (1st Cir. 2014), and *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87 (1st Cir. 1994). In *Ramirez-Lluveras*, a divided panel of the First Circuit affirmed the district court's decision to grant summary judgment on the plaintiff's *Monell* claim against a police officer's supervisors. The officer who shot the plaintiff had been found by the police department to have engaged in incidents of domestic violence some eight years prior to the shooting. Other disciplinary episodes on his record were not based on violent behavior. *See Ramirez-Lluveras*, 759 F.3d at 14-15. In light of the facts of record in the case, the majority concluded that the contents of the officer's disciplinary record, which was, with the exception of the domestic violence incidents, devoid of complaints about any inappropriate use of force, was not sufficient to put his supervisors on notice of that he presented a substantial, unusually serious, or grave risk, of shooting an arrestee. *See id.* at 21. The majority stressed, however, that the commission of domestic violence was "indeed relevant to whether [the officer] could be thought to pose a risk of violence to others while he was on official duty." *Id.* In *Febus-Rodriguez*, which also involved a claim of excessive use of force, the First Circuit affirmed the district court's ruling that five prior disciplinary complaints against an officer were not of a kind that would have alerted supervisory personnel to a propensity for violence. *See id.* at 93-94. *See also Eason v. Alexis*, 824 F. Supp. 2d 236, 245-46 (D. Mass. 2011) (granting summary judgment on *Monell* claim where seven disciplinary complaints against officer did not have anything to do with constitutional violation alleged by the plaintiff); *Barker v. City of Boston*, 795 F. Supp. 2d 177,

124-25 (granting motion to dismiss where complaint failed to allege specific instances in which the city failed to discipline officers who used excessive force).

This case, however, is more similar to the *Cox* case, in which the district court denied the City of Boston's motion for summary judgment on the plaintiff's *Monell* claim.  The *Cox* case was also based on the allegation that the municipality had failed adequately to supervise, investigate, and discipline police officers who used excessive force, including the officers who were involved in the plaintiff's arrest, each of whom had a comparatively lengthy history of civilian complaints and lawsuits alleging excessive use of force.  *See Cox*, 2016 WL 4009978, at *4-7, 8.  In *Cox*, the district court stated that

> [t]he difficult question . . . is whether [the city's showing] is sufficient to exonerate the [c]ity as a matter of law.  More specifically, the core question is whether a reasonable jury could conclude that the [c]ity should have looked beyond the formal findings to address the possible propensity of [the defendant officers] to use excessive force, and whether its failure to do so demonstrated a custom or practice of tacitly condoning or approving the use of that excessive force.

*Cox*, 2016 WL 4009978, at *8.

"Notice is a salient consideration for determining the existence of [municipal] liability." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (citing *Febus-Roriguez*, 14 F.3d at 93). Here, as in *Cox*, the question is whether Springfield should have looked behind repeated findings of "not sustained" to address a possible propensity for an excessive use of force by some of its officers in the execution of search and arrest warrants and in similar encounters with civilians. As in the *Cox* case, a number of the officers who arrested Plaintiff had very significant histories of civilian complaints.  In addition, the city chose to settle out of court with several plaintiffs who filed a § 1983 lawsuit in which the plaintiffs alleged excessive use of force by Bigda or Kent, two of the officers allegedly involved in the assault on Plaintiff.  Cases settle for many

17

reasons, and the decision to settle may say little about the merits of the asserted claims.

Nonetheless, a settlement of $175,000, as occurred in a case in which Kent was named as a

defendant, supports a reasonable inference that at least some of the claims asserted in that suit

had merit (Dkt. No. 78 at 44, ¶¶ 201-208). "As with many issues, the question is to a

considerable extent one of degree: while a single accusation of excessive force is not enough, at

some point as the accusations and claims begin to pile up, a critical mass may be reached

requiring an affirmative response from supervisors." *Cox*, 2016 WL 4009978, at *10. *See Beck*

*v. City of Pittsburgh*, 89 F.3d 966, 969-70 (3d Cir. 1996) (plaintiff presented sufficient evidence

that city tacitly tolerated excessive use of force where plaintiff presented evidence of five other

civilian complaints alleging excessive use of force by officer who assaulted plaintiff); *Galindez*

*v. Miller*, 285 F. Supp. 2d 190, 197 (D. Conn. 2003) (plaintiff alleging § 1983 excessive use of

force claim against municipality may meet burden of demonstrating deliberate indifference by

showing the existence of repeated complaints of civil rights violations and inadequacy of

investigations or actions by municipality to prevent future incidents); *see also Garcia v. City of*

*Newark*, Civil Action No. 08-1725 (SRC), 2011 WL 689616, at *4  (D.N.J. Feb. 16, 2011)

(denying summary judgment where plaintiff showed that civilians had filed a collective 55

complaints against six of the officers involved in his arrest).

A reasonable finder of fact could also infer that there were flaws in the city's

investigation of civilian complaints that demonstrated deliberate indifference to the risks posed

by officers against whom large numbers of civilian complaints about excessive use of force had

been made.  The IIU documents submitted as evidence by Plaintiff show what appears to be a

consistent pattern of rejecting civilian complaints against police officers.  *See Garcia*, 2011 WL

689616, at *4 (pattern of routine rejection of civilian complaints evidence of municipality's

deliberate indifference to risk of excessive use of force); *see also Beck*, 89 F.3d at 969-70 (as evidence in support of claim, plaintiff submitted series of detailed excessive use of force claims filed against the defendant officer who allegedly injured plaintiff, none of which were sustained or resulted in disciplinary action). By far the majority of the civilian complaints against Bigda, Templeman, Kent, and Kalish resulted in findings of "not sustained." According to deposition testimony by former Chief of Police William J. Fitchet, however, civilian complaints with a disposition of "not sustained" are complaints that are supported by some facts (Dkt. No. 78-28 at 56). It reasonably could be inferred that Springfield's IIU had a practice of entering dispositions of "not sustained," in effect crediting the evidence from an accused officer, whenever there was no neutral observer (or preserved video recording) of the alleged incident. Plaintiff, however, also produced evidence from which it could be inferred that Bigda, Kent, and Templeman were prepared to be untruthful when it suited their purposes (Dkt. No. 78 at 20, ¶ 72; at 47, ¶¶ 219-22; at 48, ¶¶ 223-30). Nor does it appear from the evidence that the IIU tracked and weighed the number of complaints against an officer as a factor in its responses to citizen complaints. Any failure to take into account repeated complaints against a particular officer could contribute to an ineffective process for investigating civilian complaints. *See, e.g., Galindez*, 285 F. Supp. 2d at 199. Taking these factors into account, a reasonable finder of fact could conclude that Springfield's investigative process was less than effective at identifying officers prone to the use of excessive force. *See Beck*, 89 F.3d at 974; *Galindez*, 285 F. Supp. 2d at 198 (mere existence of complaint procedure not sufficient to entitle municipality to summary judgment). If a jury concluded that Springfield's IIU process was ineffective or weak, it could further conclude that a resulting failure to take appropriate action in response to complaints of excessive force might lead Springfield's officers to believe such conduct would be tolerated. *See, e.g., Comfort v.*

*Town of Pittsfield*, 924 F. Supp. 1219, 1233 (D. Me. 1996) (police chief's management style created atmosphere in which officers believed that he would not punish their use of excessive force).

In view of the disciplinary histories of Bigda, Kent, Templeman, and, to a lesser extent, Kalish, there are genuine issues of material fact as to whether Springfield was deliberately indifferent to the risk that these officers would use excessive force in executing arrest and search warrants and in other charged interactions with civilians. *See Cox*, 2016 WL 4009978, at *12; *contrast Saldivar*, 818 F.3d at 19 (the plaintiff could not show deliberate indifference on municipality's part where there was no history of complaints indicating that officer had propensity for violence or sexual misconduct). Because Plaintiff claims to have been the victim of excessive use of force during the execution of an arrest warrant, he has "produce[d] evidence that serious prior incidents similar to the alleged constitutional violation in question put the municipality on inquiry notice of [the officers'] danger to the public and that the police department's policy of ignoring or covering up those incidents was 'the moving force' behind the alleged violation." *Eason v. Alexis*, 824 F. Supp. 2d 236, 246 (D. Mass. 2011) (citing *Young*, 404 F.3d at 25-28); *see also Galindez*, 285 F. Supp. 2d at 199-200 (when a plaintiff alleges injury from excessive use of force, prior complaints against officers alleged to have injured the plaintiff establish causal link between municipality's deliberate indifference to risk and violation of the plaintiff's constitutional rights).

The court draws no conclusions as to whether Plaintiff has presented sufficient evidence to support a determination that Springfield knew about and tolerated or acquiesced in a custom or practice of excessive use of force by some members of its police department. *See Beck*, 89 F.3d at 976. This is simply a recommendation that the court should not "rule in [Springfield's]

favor as a matter of law, and that the claims against the [c]ity should be submitted to a jury for resolution." *Cox*, 2016 WL 4009978, at *12.

III.   CONCLUSION

For the foregoing reasons, the court recommends that Springfield's motion for summary judgment on Count II of Plaintiff's amended complaint be granted insofar as it alleges *Monell* liability on the basis of a failure to train police officers, and denied insofar as it alleges *Monell* liability for failure adequately to supervise and discipline certain police officers.[4]

Dated: October 14, 2016                              /s/ Katherine A. Robertson
                                                     KATHERINE A. ROBERTSON
                                                     U. S. MAGISTRATE JUDGE

---

[4] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within fourteen (14) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.