UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUSTIN DOUGLAS,                           )
        Plaintiff,                    )
v.                                        )   Civil Action No.
                                      )   3:14-cv-30210-MAP
CITY OF SPRINGFIELD, ET AL                )
        Defendants.                   )

MEMORANDUM IN SUPPORT OF
OBJECTION BY CITY OF SPRINGFIELD TO
REPORT AND RECOMMENDATION ON SUMMARY JUDGMENT.

## I.   Introduction

The City of Springfield ("City") has filed an Objection to the Magistrate-Judge's report and recommendation in this case based on the denial of partial summary judgment as to Count II of the Plaintiff Justin Douglas's complaint. Count II seeks damages pursuant to 42 U.S.C. § 1983 under *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690 (1978). The court heard the parties at oral argument on July 7, 2016 [Dkt. No. 88]. A report and recommendation was issued on October 14, 2016. [Dkt. # 94]. [1]Springfield objects to the report and recommendation to the extent that summary judgment as to Count II is denied.

The City maintains that the record in this case is insufficient to support a plausible claim under *Monell* of deliberate indifference to the constitutional rights of citizens who come in contact with certain members of its police department and causally related to the alleged deprivation. A review of the undisputed factual record submitted in support of the motion for summary judgment shows that, considering the objective evidence of the injuries alleged here; the failure of the Plaintiff to utilize established complaint procedures in the Police Department; and steps taken by municipal policymakers to improve and professionalize the operation and management of the police department; and implementation of a civilian oversight entity in response to both complaints and lawsuits involving allegations of police misconduct, the list of alleged misconduct relied upon by

---

[1] The report recommends that summary judgment as to Count II be allowed in favor of the City as to the allegations that the City caused a civil rights deprivation based on a theory of a failure to train Springfield police officers, but recommends denial of the summary judgment as to allegations of a failure to investigate, discipline or supervise officers.

the Plaintiff in this case is insufficient to establish either "deliberate indifference" or a causal relationship to any deprivation of civil rights in this case.

The Plaintiff's *Monell* claim relies on incidents dating back some twenty years. As noted in the record, during that time frame the City responded appropriately to concerns about police misconduct and litigation. The police department management was professionalized from a part time volunteer civilian Board of Police Commissioners to a full-time, trained and experienced professional with the educational background and experience suited to manage a modern police department. [Dkt#72 Ex.15-9][2] As noted in the history related in the record, [Dkt#72 Ex.15-9] a complaint was brought by a group of Pastors concerning an incident of alleged police misconduct. In response to the Pastor's complaint and lawsuit in federal court, the City funded a study by experts in the field of criminal justice to determine an appropriate civilian oversight entity to review complaints of police misconduct, and has implemented civilian oversight. The Community Police Hearing Board (CPHB) continues to serve and to evolve as it provides civilian oversight and recommendations to the Police Commissioner in the police disciplinary process. The CPHB reviews all complaints brought by citizens to recommend whether disciplinary charges should be issued, and whether a hearing should occur. The CPHB sits as a hearing officer to consider the evidence presented in disciplinary hearing as a fact finder for purpose of determining whether there is "just cause" for discipline under the civil service statutes and collective bargaining agreement. The CPHB strives to provide more openness and transparency through the dissemination of information concerning the reports it reviews and undertakes community outreach in response to complaints. [Dkt#72 Ex.15-9].

In response the Plaintiff has attempted to meet his burden by submitting a list of past lawsuits and allegations of police misconduct, many predating the City's efforts to improve its police department, which are unsubstantiated. The complaints were discussed in the City's motion for judgment, and will not be repeated here. A closer review of the arguments put forth in the

---

[2] See also http://www.springfield-ma.gov/cos/index.php?id=city-ordinances

opposition to summary judgment, case precedents, and undisputed facts showing the City's efforts to investigate, supervise and discipline misconduct in the police department, shows the Plaintiff has failed to meet his extremely strict burden of "deliberate indifference" required to survive summary judgment. Plaintiff also cannot show a custom or practice adopted by policymaking officials sufficient to establish a causal connection between any alleged failures in discipline or supervision and the claimed use of excessive use of force by Springfield police officers against him during his arrest [Dkt. No. 79 at 11-12]. For the reasons set forth below, the City objects to the report and recommendation and requests that Springfield's motion be GRANTED as to all theories of liability under Count II.

**II.**       **Background.**
A.       *Alleged deprivation.*

Plaintiff does not challenge the basis for his arrest on March 26, 2012 on an arrest warrant executed by Defendants at the Springfield Inn for serious gun and weapon charges. Rather, the underlying basis for the claimed civil rights violation arises from the allegations that Plaintiff was punched by Defendant Bigda in the jaw (*id.* at 25, ¶ 13) and that other officers joined Bigda in beating Plaintiff as he fell to the ground (*id.* at 25, ¶ 14). Plaintiff alleges that he felt a blunt object strike his head, and it is alleged that a witness, Ms. Rauls, saw an officer hit Plaintiff more than once with the butt of a pistol (*id.* At 24-25, ¶¶ 8, 14).

The truth of these allegations is vigorously contested and the objective evidence contradicts the Plaintiff's allegations. After the arrest of the Plaintiff he was transported to the Massachusetts State Police Barracks in Springfield, Massachusetts. Complaint at ¶ 32; Answer at ¶32. The Plaintiff was then booked and photographed. Ex. 6  - MSP Booking Photo. Plaintiff stated, in his deposition, that the black line on his left side as shown in the booking photograph was "blood" that was "coming down my left shoulder," Douglas Depo at p. 201 ¶¶ 12-13, yet the photograph clearly shows a chain necklace, and there is a lack of any indication of bruising or blood in the photograph, contrary to Plaintiff's claim that he was hit an additional "twenty or thirty times" See Douglas Depo

at p. 135 ¶5, and that Detective Bigda "pistol whipped" him in the head. Complaint at ¶24.   The

Plaintiff, refused medical treatment when an ambulance arrived at the State Police Barracks.

Douglas Depo at p. 148 ¶ 15; Ex. 3 -  Refusal of Transport. (*id.* at 6, ¶ 23 & response).

These undisputed facts call into question the plausibility of the underlying complaint and the

sufficiency of the underlying claim to be submitted to the jury. "[M[inor physical injuries simply

are insufficient to support an inference that the officers used inordinate force to effect the intended

arrest in the 'tense, uncertain, and rapidly evolving circumstances,' " See *Dean v. City of Worcester*,

924 F.2d 364, 369 (1st Cir.1991) citing *Graham v. Connor*, 490 U.S. 386 (1989) (summary

judgment granted to officers on claim of excessive force). Municipal and supervisory claims based

on the failure to discipline and train must fail, where the individual defendant officers are not found

to have violated a plaintiff's constitutional rights. *Young v. City of Providence ex rel. Napolitano*,

404 F.3d 4, 12 (1st Cir. 2005).

While the individual officers in this case have not submitted a motion for summary

judgment based on these disputed facts, the credibility of Plaintiff's underlying claim has relevance

to whether a City policymaker was "deliberately indifferent" to violations of civil rights. For

example, the failure to take any action in response to severe injuries alleged to have occurred from

police misconduct, where an obvious violation of civil rights has occurred, without any response by

supervisors is more supportive of a claim of deliberate indifference. On the other hand, where there

are little or no signs of physical injury, it is difficult to say that the "failure to discipline" stems from

a "reckless disregard" or "deliberate indifference" to the civil rights of inhabitants. Deliberate

indifference is a stringent standard of fault, requiring proof that a State actor disregarded a known or

obvious consequence of his action. See *County Commrs. of Bryan County v. Brown,* 520 U.S. 397,

410 (1997).

Even a concessions solely for the purposes of the motion for summary judgment that there

are disputed facts as to whether excessive force was used during Plaintiff's arrest, the plausibility of

the claim must be factored into the issue of municipal liability as a necessary element of Count II, and in weighing whether the required standard of "deliberate indifference" has been met. To succeed under this "exceptionally stringent" standard of "deliberate indifference", Plaintiff must show that "the City ha[s] disregarded a known or obvious risk of serious harm from its failure" to adequately investigate incidents involving constitutional violations by officers, as well as its failure to supervise and discipline such officers. *Young,* 404 F.3d at 28.

In an attempt to show a pattern of previous constitutional violations, Plaintiff plans to use each of the incidents of police misconduct alleged here as the subject of a "mini trial" should the *Monell* claim be presented to a jury.[3] Missing from that "mini trial" will be any review of how a complaint involving Mr. Douglas was investigated. "Evidence of citizen complaints against an officer, without more, does not suffice to show a municipal custom of permitting or encouraging excessive force". *Eason v. Alexis***,** 824 F.Supp.2d 236(D. Mass. 2011) *citing Trinidad v. City of Boston,* No. 07–11679–DPW, 2010 WL 2817186, at *11 (D.Mass. July 16, 2010) (plaintiff must, at the very least, produce evidence that serious prior incidents similar to the alleged constitutional violation in question occurred putting the municipality on inquiry notice of an officer's danger to the public and that the police department's policy of ignoring or covering up those incidents was "the moving force" behind the alleged violation). As such, some review of the underlying allegations and comparison to other complaints of misconduct as well as any response by policymakers to the allegations presented to them, is required in the assessment of the plausibility of a *Monell* claim at the summary judgment stage. Perhaps additional evidence would have been available to investigators in the IIU contemporaneous with the time the alleged injuries occurred. However, under the circumstances, there were no injuries complained of at the time to undertake any investigation, and it is not plausible to claim to any jury that the City "failed" to investigate or discipline officers because of a civil rights violation to Mr. Douglas.

---

[3] A motion to bifurcate the trial of the *Monell* claim from the underlying claim is pending. In the event that Plaintiff's underlying claim in the bifurcated trial is unsuccessful, the failure to prove a civil rights deprivation would preclude liability under the derivative nature of a *Monell* claim. *City of Los Angeles et al. v. Heller,* 475 U.S. 796 (1986).

B.        *Notice to final policymaking official, deliberate indifference and causation.*

The City's motion for summary judgment included undisputed evidence as to the allegations made by Mr. Douglas and the evidence shown in the booking photograph. There is no evidence Plaintiff ever submitted a complaint to the Police Department for investigation by the Internal Investigating Unit (IIU) and review by the City's civilian oversight entity. As noted in the most recent publicly disseminated annual report compiled by the City's civilian oversight, since 2010 a review of every citizen complaint of police misconduct has been undertaken by the CPHB[4]. [Dkt#72 Ex.15-9].

That report documents the history of some of the reform efforts that policymakers have instituted over the years encompassing the complaints relied upon to support the *Monell* claim here. The history recited in the report notes that the original study funded by the City that recommended instituting civilian oversight, occurred in 2007 after a complaint of misconduct which was the subject of a lawsuit in *Douglas Greer v. Springfield, et al*., 3:05-cv-30001-MAP.  The record shows such reform efforts continued to expand, and in 2010 the CPHB was provided greater authority contemporaneously with complaints involved in the case of *Melvin Jones v. Jeffrey Ascher,* et al., 3:10-cv-30244-MAP, alleging that Defendant Asher's past misconduct was sufficient basis for a *Monell* claim.

At the time of the incident in the *Greer* case, as with many of the complaints and lawsuits used as the basis of the *Monell* claim here, the Police Department policymaking was directed by part-time civilian volunteers who made up a Board of Police Commissioners. Similarly, with regard to the prior allegations as to misconduct involving Defendant Asher in the *Jones* case, policy making in the SPD was in the hands of the Board of Police Commissioners. That Board was replaced by a full time professional police commissioner as a reform instituted by the Finance Control Board, the state entity created in response to Springfield's financial crisis to take over

---

[4] CPHB reports dating back to 2010 are posted on the City's website: http://www.springfield-ma.gov/cos/index.php?id=clerk

management of Springfield's government during the crisis. See Chapter 169, of the Acts of 2004 ("*An Act Relative to the Financial Stability in the City of Springfield*"). [5]

These various efforts of professionalizing management and implementing civilian review and oversight of discipline document a response to complaints of misconduct, carried out with the assistance of criminal justice experts and oversight from the Commonwealth of Massachusetts. Without availing himself of the Police Department investigatory and complaint review process, and in light of the City's undisputed efforts to respond to civilian complaints, Plaintiff has failed to show deliberate indifference or a causal connection between any incidents or lawsuits occurring prior to 2010 and the underlying incident alleged to have occurred during the course of his arrest.

Reliance on a Connecticut case, *Galindez v. Miller,* 285 F.Supp.2d 190,199 (D. Conn.2003), or the Third Circuit decision in *Beck v. City of Pittsburgh*, 89 F.3d 966, 974 (C.A.3 1996), is misplaced. In both *Galindez*, and *Beck* the Plaintiffs, unlike this case, had availed themselves of the civilian complaint process and the evidence was sufficient to infer that the process, as applied to those plaintiffs, was weak or ineffective. In the Hartford case, a municipal policymaker (the Chief of Police) had condoned or ratified those failures in the investigation and process of the Plaintiff's complaint. Similarly, in the Pittsburgh case, a complaint had been filed under the civilian review process, and the municipality's handling of the Plaintiff's complaint was found to be carried out under a "sterile and shallow" system of investigation, where "each complaint was insulated from other prior and similar complaints". *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (C.A.3 1996).

As noted above, Mr. Douglas did not avail himself of SPD's IIU or civilian review process and there is no evidence of any policymaking authority ratifying or condoning a deprivation of Mr. Douglas's civil rights. As such, there is no "affirmative link" between allegations of a failure to investigate or discipline and the civil rights violations alleged. The explanation of a causal

---

[5] The control board approved a City Ordinance creating the Officer of Police Commissioner by the Control Board which transferred policy making authority for hiring, firing, and disciplining police officer from the Board of Police commissioners to a professional Police Commissioner. See Springfield Ordinances, Article IV. Police Department § 27-22, and Article XIII. Police Commissioner. § 67-74 (Qualifications) and § 67-75 (Authority); http://www.springfield-ma.gov/cos/index.php?id=city-ordinances

relationship in the amended complaint here is allegedly tied to a "failure to train" on the duty to report injuries to prisoners; a theory which has been dismissed. (See Complaint, ¶ ¶ 49-51). Considering the lack of plausibility of Plaintiff's failure to train theory and the lack of any complaint for the IIU to investigate, the *Galindez* and *Beck* cases are distinguishable from the case here. Contrary to the Report and Recommendation, there is no evidence that the City's policy makers failed to "track or weigh" the number of complaints against an officer. In fact, the documents submitted in the record include printouts from that database. [Dkt#72 Ex.15-4(b)]

Similarly, the report and recommendation reliance on Superior Court decisions involving motions to suppress is insufficient to impute "deliberate indifference" to municipal policymakers. [Dkt. No. 78 at 20, ¶ 72; at 47, ¶¶ 219-22; at 48, ¶¶ 223-30]. There is no explanation of how or even whether these decisions on motions to suppress filed in criminal cases were ever the subject of any complaints of misconduct, brought to the attention of any official in the police department, or whether they were, or should have been, the basis of disciplinary action. Moreover, Mr. Douglas's federal lawsuit does not challenge the underlying basis for his arrest or conviction, and does not dispute any testimony related to his conviction. The amended complaint links the "untruthfulness" of failing to file a prisoner injury report as part of the "failure to train" theory. Under the circumstances, whatever inferences which may be drawn as to the truthfulness or untruthfulness of the officers involved in the suppression motions, the record is insufficient to base an inference of a policy or custom of deliberate indifference towards police misconduct by final policymakers that is causally related to the underlying injuries and deprivation claimed here.

The Maine case of *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1233 (D. Me. 1996), cited in the report and recommendation, as with the *Galindez* and *Beck* cases, also involved facts where it was claimed that an investigation occurred and the officers and the Chief were implicated in an alleged  post arrest "cover-up" conspiracy. Here, whatever conspiracy claim may be filed against the officers (See Count VII) there are no allegations that any policymaker was involved in

or aware of such a conspiracy. Given the failure of Mr. Douglas to submit a complaint through the investigative and disciplinary process, a jury cannot conclude that the City's process for investigating or disciplining officers was weak or ineffective or that some final policymaking official failed to take appropriate action, or in any way condoned the alleged deprivation set forth in the amended complaint.

C.      *Recent evidence of misconduct.*

An incident involving an arrest and interrogation of juveniles in Palmer, which occurred after the close of discovery[6], is also referenced in the report and recommendation.[7] Additional evidence concerning the new incident is provided here in the form of Affidavits from Defense Counsel and Police Commissioner Barbieri submitted with this memorandum. The materials provided show that the Police Department's handling of this recent incident does not evidence deliberate indifference and is not causally related to the alleged civil rights deprivation by Plaintiff in this matter. As noted in the affidavit, Defendant Bigda received a sixty-day suspension related to the incident in Palmer during February of 2016. (Ex. A - Barbieri Aff. ¶ 15). The incident has become the subject of a criminal investigation by state and federal authorities. (See copies of documents provided by Affidavit of Pikula – Exhibit B).  Barbieri asserts that the depictions on the video recordings and records of the IIU investigation concerning the behavior of the officers in relation to the arrest and interrogation of the juveniles are contrary to the rules, regulations and policies of the SPD and, as indicated by the 60-day suspension, were fully investigated by the IIU and not tolerated by the Commissioner or the command staff of the police department. Such actions are not representative of behavior, actions or culture exhibited by the vast majority of officers who serve and protect the residents of the City.

A stated in his affidavit, when the Commissioner gained knowledge of the allegation of

---

[6] The record shows that discovery closed January 22, 2016; prior to the February 27, 2016 incident in Palmer.
[7] As noted at the status conference in this case held September 29, 2016, the parties requested that the court issue its report and recommendation on Springfield's pending summary judgment motion based on the existing record, and indicated that they would reserve argument with respect to new information about misconduct by Defendant Bigda for possible de novo review by the presiding District Judge of the Report and Recommendation [Dkt. No. 93].

excessive force he ordered an investigation, followed the recommendation of the CPHB in issuing interdepartmental disciplinary charges, and scheduled the matter for hearing.   Upon subsequently becoming aware of the details of the interrogation of the juveniles, he sought legal advice, and imposed discipline in accordance with his best judgment.  This response precludes the use of this incident as evidence of deliberate indifference, and in fact shows just the opposite.

The Police Commissioner learned of the allegations, not from any citizen complaint, but when Hampden County District Attorney Gulluni referred his concerns about kicking allegations during the arrest of the juvenile in Palmer to Commissioner Barbieri and an IIU investigation was ordered in March and completed in June of 2016. (Ex. A - Aff of Barbieri). The IIU submitted its investigation to the CPHB for a preliminary review. The CPHB, in turn, recommended that disciplinary charges issue against the officers involved and that a hearing be held. Subsequently, the District Attorney's concerns about the interrogation of the juveniles were also communicated to the Police Commissioner. The Police Commissioner sought legal advice concerning this information. When faced with the prospect of a disciplinary hearing before the CPHB, one of the officer's involved resigned from his employment, while Defendant Bigda agreed to a sixty-day suspension (Aff. of Barbieri).

As a result of the video discovered during the course of the investigation into the kicking, the District Attorney ordered the video tape, which was part of CPAC's investigatory materials and part of the IIU investigation, turned over to defense attorneys in criminal cases where Bigda was a percipient witness. The incident became the subject of a motion to dismiss charges in three drug cases scheduled for trial before the Hampden County Superior Court. The Superior Court, did not feel the evidence warranted dismissal of the cases, but believed a protective order was warranted relative to the videotape. (Exhibit B).

While the potential for criminal charges involving Defendant Bigda or any other officers over the arrest and interrogation of the juveniles has not been resolved, the damage to pending cases

in which the officers involved were potential witnesses is evident. The likelihood of guilty persons having shorter sentences, or no sentences at all is part of the chaos that has been created, and the integrity of the criminal justice system has been shaken at a time of heightened concern over police misconduct across our nation. Police Commissioner Barbieri, experienced in IIU investigations, has cooperated with other law enforcement authorities in a criminal investigation of this incident. The City received a request from the FBI relating to the actions depicted on the videotape and provided the records requested by October 6, 2016. (Aff. of Barbieri).

As indicated in the email correspondence with Plaintiff's counsel in this case, (Ex. B - Aff. of Pikula - ¶ 3) Mayor Sarno asked the Law Department to review the investigatory materials available to the City and determine what could be publicly released. In addition, the evidence was the subject of public records requests from the media as well as the subject of discovery in this case. Plaintiff's legal counsel has notified this court of his intent to seek to reopen discovery. In consultation with Plaintiff's counsel on this issue, Defense Counsel indicated in an email on October 4, 2016:

> "The defendants have discussed your proposed motion to reopen discovery. Your request does not seem to contain any limitations in time, scope, or subject matter. Under the circumstances, a broad based reopening of discovery does not seem warranted. However, a review of the discovery provided indicates that the incident involving Det. Bigda may be subject to supplementary discovery and it is the City's intent to submit a supplemental privilege log identifying the IIU report and video at issue. You should note that these documents are in the possession of the DA's office, and the City has been notified that the materials are the subject of a protective order in a Superior Court criminal case and ongoing investigation by officers in the state police unit assigned to the DA's office. The City has been informed that the protective order in Superior Court prohibits distribution in order to protect the identity of the juvenile suspect involved. The City is in the process of arranging to ask permission of the Superior Court to release the video and the report on the condition that the identity of the juvenile be protected. This would include redaction of identifying information in the report and digitally blurring the face of the juvenile in the video."
> (See ¶ 3 – Aff. of Pikula).

The Law Department contacted the District Attorney on Friday October 7, 2016 in preparation of filing its proposed motion to modify the protective order issued by Judge Paige. During a conversation with the DA about the City's proposed motion, District Attorney Gulluni

informed the City Solicitor that he had been in communication with Kim West of the Criminal Bureau of the Massachusetts Attorney General's office, and Mr. Gulluni suggested that the Solicitor contact her to discuss the proposed motion and plan for public release of the video-tape. The Solicitor spoke to Attorney West that afternoon who indicated she would review the issue and respond. Later that evening, Defense Counsel was contacted by Assistant U.S. Attorney Kevin O'Regan who indicated he wanted to discuss whether the tape should be released, and if so, under what circumstances. (Aff. Pikula ¶ ¶ 4 and 5).

The Hampden County District Attorney, Mass. Attorney General's Office, U.S. Attorney's Office, Commissioner Barbieri, Mayor Sarno, his Chief of Staff, and City Solicitor met on Saturday, October 8, 2016. Because of that meeting, the District Attorney issued a letter stating he was turning over his investigation to the Massachusetts Attorney General and U.S. Attorney. (Aff. Barbieri). The City also sent a letter of referral to the state and federal authorities. (See Aff. Pikula). Thereafter, both state and federal authorities notified the City of their objection to release of any audio or video recordings or investigative reports. (See Aff. Pikula). As a result, a privilege log has been presented to Plaintiff's Counsel setting forth the items in its possession as per prior discovery practices used in this case.[8]

While neither the Massachusetts Attorney General, nor the U.S. Attorney need any permission to initiate any type of investigation, the letters between the District Attorney, City, and state and federal law enforcement authorities show that all parties have agreed to be fully cooperative with the ongoing criminal investigations, the scope of which is as described in the letter from the City and responses from the agencies. The vagueness of the notification letters does not indicate any level of guilt on the part of the officers involved or culpability on the City. Moreover, while the agencies involved maintain the prerogative to investigate "pattern and practice" cases, the

---

[8] The video-tape and IIU investigation are available for this court's *in camera* inspection should the court request that they be produced. Plaintiff's counsel has requested copies of these materials, and the parties have agreed to submit the issue of whether to turn over these materials, in what form, and under what conditions to this court for consideration in light of the Superior Court protective order and the ongoing criminal investigation by state and federal authorities.

response letter shows that a criminal investigation has been initiated as to the Palmer arrest and interrogation of the juveniles.

Under the circumstances, and considering other cases reviewed by the federal District Court, while one may criticize the imposition of the 60-day suspension of Defendant Bigda related to this recent case, compared to other cases involving prior misconduct, the policy maker cannot be considered by a jury to be "deliberately indifferent" to police misconduct or that the City itself caused any civil rights violation. See *Trinidad v. City of Boston,* No. 07–11679–DPW, 2010 WL 2817186, at *11 (D.Mass. July 16, 2010)(granting summary judgment on *Monell* claim which was based on a sexual assault where prior incident of police officer's misconduct involving sexual assault was settled between officer and City through negotiations and settlement agreement and officer accepted a sixty-day suspension without pay, with twenty days to be served and the remainder to be held in abeyance for one year).

### III.    Argument.

#### A.    *Precedents relied upon by the Plaintiff are distinguishable from the case here.*

The complaint here alleges that "Springfield is liable because the city has failed to supervise and discipline officers who have engaged in a widespread practice or custom of using excessive force against citizens, such that a factfinder could reasonably infer that municipal authorities had either actual or constructive knowledge of the practice and were deliberately indifferent to the risk posed of future constitutional violations" (*id.*, ¶ 96). The report and recommendation compares this case to the decision in *Cox. V. Murphy*, 2016 WL 4009978 (2016).  In that case, as with the case here, the Defendant officers were named in past complaints and lawsuits.

Regarding the applicable standards to judge whether *Monell* liability should attach, the *Cox* opinion cited in the report and recommendation states:

> As with many issues, the question is to a considerable extent one of degree: while a single accusation of excessive force is not enough, at some point, as the accusations and claims begin to pile up, a critical mass may be reached requiring an affirmative response from supervisors. *See Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (affirming a denial of

qualified immunity for police supervisors; "Notice is a salient consideration in determining the existence of supervisory liability"). Put simply, a very large amount of smoke could reasonably compel the inference that there must be at least a small amount of fire.

Citing this language from the *Cox* case, the report and recommendation as to denial of summary judgment hinges on the following reasoning:

> Here, as in *Cox*, the question is whether Springfield should have looked behind repeated findings of "not sustained" to address a possible propensity for an excessive use of force by some of its officers in the execution of search and arrest warrants and in similar encounters with civilians. As in the *Cox* case, a number of the officers who arrested Plaintiff had very significant histories of civilian complaints. In addition, the city chose to settle out of court with several plaintiffs who filed a § 1983 lawsuit in which the plaintiffs alleged excessive use of force by Bigda or Kent, two of the officers allegedly involved in the assault on Plaintiff. Cases settle for many reasons, and the decision to settle may say little about the merits of the asserted claims. Nonetheless, a settlement of $175,000, as occurred in a case in which Kent was named as a defendant, supports a reasonable inference that at least some of the claims asserted in that suit had merit (Dkt. No. 78 at 44, ¶¶ 201-208).

The comparison between the *Cox* case and the Plaintiff's claims focuses on whether there was sufficient "notice" of wrongdoing to establish liability; citing: "Notice is a salient consideration for determining the existence of [municipal] liability." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998) (citing *Febus-Roriguez*, 14 F.3d at 93). An important difference from the present case and the Cox case is, however, the fact that there is evidence that the prior complaints had "an affirmative response" from supervisory personnel, i.e. complaints were and are investigated by the IIU and the CPHB. Moreover, *other* salient considerations, which are part of the proper application of *Monell* and its progeny must also be considered.

A "policy or custom" attributable to the City means that it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Estate of Bennett v. Wainwright,* 548 F.3d 155, 177 (1st Cir.2008) (quoting *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989)). The City has cited to several cases noting the speculative nature of basing liability on unsubstantiated allegations. It is undisputed that the SPD has a specialized unit dedicated to investigating complaints of misconduct. The report and recommendation mistakenly references

"recommendations" from IIU as to discipline. IIU reports do not include any recommendations as to whether discipline should be imposed. The IIU reports provided through discovery show that all complaints are thoroughly investigated.  In fact, the only reason the Plaintiff has a record of citizen complaints is because of the IIU process of investigating and documenting complaints. Ironically, Plaintiff complains of a failure to investigate, yet never availed himself of the process. Under the circumstances, a list of unsubstantiated complaints of prior misconduct is likely to be more prejudicial than probative.

The number of complaints against an officer or group of officers can vary widely depending on the population of a municipality, the size of the police force, and the number of interactions between the police and members of the community. Springfield has over 400 sworn officers and receives each year between 150,000 to 200,000 calls for service through its 911 call system. The Plaintiff has submitted approximately 130 incidents, some substantiated and some not, gathered over a period of some twenty years. The CPHB data reported summarized calls for service and numbers of arrests since 2011. These statistics show that the number of complaints referenced in the complaint and lawsuits as a percentage of arrests is a small number. The Plaintiff has submitted a total of approximately 130 incidents, involving seven members of a police department over a span of some twenty plus years. Combined, the seven officers have 178 years of experience among them. As shown on the table taken from the annual report, when compared with the number of calls for service, and the number of arrests, the number of complaints of police misconduct is very small. [9]

| Year | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| CFS | 183,839 | 173,463 | 176,897 | 186,220 | 141,521 |
| Arrests | 5,627 | 4,432 | 3,952 | 4,196 | 4,205 |

A review of the data from the CPHB annual reports documents that the number of complaints received further reveals that the City employs a meaningful response to such complaints.

[9] With 153,991 people Springfield is the 3rd most populated city in the state of Massachusetts out of 351 cities based on July1, 2014 estimates on the U.S. Census Bureau website.

The most recent report concerning the work of the CPHB as posted on the City's website shows 64 matters have been reviewed so far in 2016 (56 from citizens and 8 internally generated). (3rd quarter report of CPHB attached to Aff. of Pikula). A total of 115 different allegations of misconduct have been reviewed by the CPHB this year contained in these 64 complaints, as one complaint can have several different charges spanning multiple categories. The allegations have involved categories ranging from criminal to discourtesy. The third quarter report shows that 11 charges stemming from citizen complaints have been sustained and 71 charges not sustained so far this year. In 10 of the cases where charges were sustained, the Police Commissioner imposed requirements of retraining. In one case he imposed a suspension. With regard to internally generated complaints, the CPHB has sustained 10 of the 33 charges considered which resulted in 5 terminations, 3 suspensions, and 2 written reprimands.

There is no basis in the record to allow a jury to conclude a "custom or practice" exists such that the violation of a federal right alleged by Mr. Douglas was "a highly predictable consequence" of the City's alleged failures. (See *County Comm'rs of Bryan County v. Brown,* 520 U.S. 397 (1997)) The list of allegations occurring over a twenty year period, in light of significant efforts responding to complaints, are insufficient here, without any comparison to any appropriately similarly situated municipality for comparison, to allow liability other than on the basis of guesswork and speculation.

However, even if the disciplinary history submitted by the Plaintiff does in fact provide evidence as to "notice" that can be said to satisfy the touchstone of "knowledge" required by the Supreme Court's calculus of municipal liability, the other salient points (as to whether any *policymaking* officials were on notice, and if so, did they do "nothing to end it") needs to be examined before allowing a municipal liability claim to advance beyond summary judgment.

B.        *The lack of proof as to deliberate indifference by a final policy making official precludes municipal liability in this case in light of the City's response to misconduct complaints and lawsuits.*

*Monell* makes clear that liability is only imposed when the acts or officials "whose acts or edicts may fairly be said to represent official policy," *Monell, supra,* 436 U.S., at 694, and whose decisions therefore may give rise to municipal liability under § 1983, have been the moving force of the deprivation. The denial of summary judgment in the case here would allow the imposition of liability in a vacuum as no policy maker has been named as a defendant and no supervisory official is identified as responsible for the failures alleged. "Aware that governmental bodies can act only through natural persons, the [Supreme] Court [has] concluded that these governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights." *City of St. Louis v. Praprotnik*, 108 S.Ct. 915, 923, 485 U.S. 112, 122 (1988) "[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it. And certainly, there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself". *City of St. Louis v. Praprotnik*, 108 S.Ct. 915, 925–26, 485 U.S. 112, 126 (1988). Here, denial of summary judgment would allow a jury to speculate on whose decisions were at issue to show "deliberate indifference". Allowing the imposition of liability based on the mere exercise of discretion by some employee as the moving force to give rise to a constitutional violation, would be indistinguishable from *respondeat superior* liability prohibited under *Monell*.

The undisputed facts here show that official policy changes, as set forth in City Ordinances and the Executive Orders of the Mayor, have been made in response to complaints of police misconduct. The record shows official policymakers for the City working to improve and professionalize the management and operation of the SPD. The majority of the complaints and lawsuits considered as the basis for denying summary judgment predate many of these changes, and stem from a time when authority over policymaking for the police department was in the hands the police commission.  This was changed when the state imposed Finance Control Board created the

position of Police Commissioner to professionalize the management of the department and place accountability in a professional policy maker.

Since 2010, and to the extent permitted by law, including civil service rules and any union contracts, the City has maintained a civilian oversight entity, known as the CPHB for the Springfield Police Department. The structures and protocols of the CPHB adhere to the principles of a study conducted by experts in the field of criminal justice. The experts who wrote the report held meetings in order to work with a spectrum of the Springfield community stakeholders to determine the appropriate form and scope of civilian oversight, within the parameters of civil service law and collective bargaining agreements. The union contract here, dating back to the former Board of Police Commissioners, has limiting language that the Police Commissioner has found to be a challenge to the imposition of discipline. (See attached) The CPHB has evolved from the original civilian oversight entity dating back to 2007 and is likely to continue to evolve.

Recently, Mayor Sarno amended the Executive Order creating the CPHB and the City provided additional resources to the CPHB in an effort to meet the challenges of providing greater transparency to the public as to the handling of police misconduct complaints. Under the amendment, the same statistical unit that tracks crime for the police department now provides statistical reports to the public. The Quarterly reports on posted on the City's website.[10] The CPHB plays an important outreach role by participating in neighborhood meetings to educate the community as to the opportunity to file a complaint, and the rights of the community in dealing with the police. The CPHB also issues annual reports that summarize its activities, and includes observations and recommendations concerning its policies and practices in relation to the Police Department.

These efforts to modernize and respond to complaints and lawsuits involving police misconduct are undisputed and not merely fodder for a jury to weigh when considering municipal

---

[10] https://www.springfield-ma.gov/cos/index.php?id=58

liability. The mere fact that Springfield has modernized its police department to move away from a Board of untrained volunteers, to a single professional willing to stake his or her professional reputation and be held accountable as a policy maker demonstrates the Plaintiff is not able to meet his burden of proof to show deliberate indifference. A lower standard, mere negligence, may be satisfied by the record presented in order to allow a jury to consider liability of the City itself, *Grajales v. P.R. Ports Auth.,* 682 F.3d 40, 47 (1st Cir.2012), but "[p]roof that the supervisors were negligent is also insufficient". *See, e.g., Ramos v. Patnaude,* 640 F.3d 485, 490 (1st Cir.2011); *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 92 (1st Cir.1994) ("[A] supervisor cannot be [held] liable for merely negligent acts."). *Ramirez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (C.A.1 2014). "Rather, a supervisor's acts or omissions must amount to a reckless or callous indifference to the constitutional rights of others." *Gutiérrez–Rodríguez,* 882 F.2d at 562; *see Bordanaro v. McLeod,* 871 F.2d 1151, 1163 (1st Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989). *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994). In light of official policy changes in response to police misconduct complaints, the City cannot, as a matter of law, be found to have been deliberately indifferent to the civil rights of its inhabitants in so far as the investigation, discipline or supervision of police officers.

Similarly, the fact that the city chose to settle out of court with several plaintiffs who filed a § 1983 lawsuit in which the plaintiffs alleged excessive use of force by Bigda or Kent, two of the officers allegedly involved in the assault on Plaintiff, should not be the basis of an inference of deliberate indifference. In any given case, once facts have been properly established, the inferences to be drawn from those facts must be viewed in the light most favorable to the party opposing summary judgment. However, no reasonable inference of deliberate indifference can be drawn from the mere fact that a lawsuit alleging police misconduct was settled out of court. The issues in all such cases involve motive and intent of underlying individual defendants. A claim that deliberate indifference can be inferred from the dollar value of the amount paid in a settlement is unsupported

speculation. *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990); *see also Key Capital Corp. v. M. & S. Liquidating Corp.,* 27 Mass. App. Ct. 721, 727-28 (1989) (bare assertions and conclusions, unsupported by specific facts, cannot withstand a well-pleaded motion for summary judgment). A factfinder would be left to guess at the reasons behind the settlement. It is too large a leap to apply the reasoning that a settlement of $175,000, as occurred in a case in which Kent was named as a defendant, that "at least some of the claims asserted in that suit had merit" (Dkt. No. 78 at 44, ¶¶ 201-208).   Moreover, even if such an inference were somehow reasonable, it cannot provide the basis of proving a policy or custom of "deliberate indifference". The best that can be said about the settlement is that it contains bare assertions and conclusions regarding an assessment of risk of exposure given the circumstances of a particular case and an assessment of the potential testimony of available witnesses. That is not enough to withstand a well pleaded motion for summary judgment.

As part of the settlements referenced in the report and recommendation the City and the Plaintiffs therein executed settlement documents, including a signing of a release by the Plaintiffs. Each release at issue expressly states that no inference of liability can be drawn from the fact of the settlement.   Using the fact of a settlement as affirmative evidence of the validity of "at least some" of the claims in the underlying lawsuit, will undoubtedly have a chilling effect on the likelihood of future settlements.   Neither case law nor public policy would support such a result.

Even if a "reasonable finder of fact could infer that there were flaws in the city's investigation of civilian complaints" there is insufficient evidence to show "a consistent pattern of rejecting civilian complaints against police officers"[11].   The report and recommendation incorrectly attributes authority to reject complaints to the IIU. There is no such evidence in the record. It is just the opposite; IIU is charged with investigating all complaints thoroughly. [Dkt#72 Ex.15-4(a&b)]

---

[11] There was a "flaw" in the IIU investigation of the Palmer incident in that the interrogation of the juveniles was never the focus of the IIU investigation due to the time of its discovery. However, the interrogation was not the subject of any citizens' complaint that had been ignored, its discovery resulted in the imposition of a sixty day suspension and continues to be the subject of a criminal investigation such that the "flaw" is not evidence of "deliberate indifference".

However, IIU does not have any authority to make recommendations or dismiss a complaint.  As previously noted, since 2010, all complaints and IIU investigations are reviewed by a civilian review entity; nothing is swept under the rug.

### IV.      Conclusion.

The *Monell* claim should not be submitted to a jury considering the complaints and lawsuits in light of the responses of policy making officials to past allegations of misconduct; case precedents; and the lack of notice of the deprivation alleged here. No genuine issues of material fact sufficient for a jury to decide the alleged deprivation here was "a highly predictable consequence" of the City's alleged deliberate indifferent to the risk that these officers would use excessive force.

<table>
<tr><td>

**CERTIFICATE OF SERVICE**
The undersigned hereby certifies that a true copy of the within Defendant, City of Springfield's Objection to Report and Recommendation was served upon all counsel via the Federal Court's ECF Filing System on this October 28, 2016.
              /S/ Edward M. Pikula
              Edward M. Pikula, Esq.

</td><td>

Respectfully Submitted,
**THE DEFENDANT,**
**CITY OF SPRINGFIELD**
**By Its Attorney**

/s/ Edward M. Pikula
_____
Edward M. Pikula, Esq. BBO #399770
City of Springfield Law Department
36 Court Street, Room 210
Springfield, MA 01103
Phone: 413-787-6085
Fax: 413-787-6173
Email: epikula@springfieldcityhall.com

</td></tr>
</table>